**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
|  | X |  |
| UNITED STATES OF AMERICA | : |  |
|  | : |  |
| vs. | : |  |
|  | : | No. 21 Cr. 429 (AT) |
| WILLIAM SCOTT, | : |  |
|  | : |  |
| Defendant. | : |  |
|  | X |  |

**MEMORANDUM OF LAW IN SUPPORT OF**
**DEFENDANT WILLIAM SCOTT'S MOTIONS IN LIMINE**

MILBANK LLP

Antonia M. Apps
Matthew Laroche
Isabel C. Pitaro
55 Hudson Yards
New York, NY  10001
Phone: (212) 530-5000

*Counsel for Defendant William Scott*

## <u>TABLE OF CONTENTS</u>

Pages

OVERVIEW ........................................................................................................1

PRELIMINARY STATEMENT ........................................................................1

ARGUMENT ....................................................................................................4

I.    THE COURT SHOULD PRECLUDE WITNESS-1 AND WITNESS-2 FROM IDENTIFYING MR. SCOTT IN COURT ..................................4

    A.    The Government's Prior Representations Concerning Witness-2 Were Misleading, Inaccurate, and/or Incomplete ........................................6

    B.    The Government's Prior Representations Concerning Witness-1 Were Misleading, Inaccurate, and/or Incomplete .....................................13

II.   THE COURT SHOULD PRECLUDE THE GOVERNMENT FROM INTRODUCING SURVEILLANCE VIDEOS OF THE ALLEGED INCIDENT ..............................................................................17

    A.    Relevant Facts ..........................................................................17

    B.    The Video Footage Should Be Excluded Based on the Government's Discovery Violations .........................................................20

III.  THE COURT SHOULD INSTRUCT THE JURY AS TO ADVERSE INFERENCES DUE TO THE GOVERNMENT'S DISCLOSURE VIOLATIONS ..............................................................................25

IV.  THE COURT SHOULD EXCLUDE TESTIMONY FROM A LAW ENFORCEMENT OFFICER IDENTIFYING MR. SCOTT ON THE SURVEILLANCE VIDEO FOOTAGE ................................................26

    A.    Officer-4's Opinion is Inadmissible Under Rule 701 ...............................26

    B.    Officer-4's Opinion is Unfairly Prejudicial Under Rule 403....................30

V.   THE COURT SHOULD PRECLUDE ANY WITNESS OR THE GOVERNMENT FROM REFERRING TO MR. SCOTT AS "ILL WILL" AND STRIKE THE ALIAS "ILL WILL" FROM THE INDICTMENT.............31

    A.    The Government's Witnesses Do Not Appear to Have First-Hand Knowledge of Whether or Not Mr. Scott is "Ill Will"...............................32

    B.    "Ill Will" Should Be Excluded Because It Is Irrelevant ...........................33

C. "Ill Will" Should Be Excluded Because It Is Unfairly Prejudicial and Risks Misleading the Jury and Confusing the Issues .........................35

D. "Ill Will" Should Be Struck From the Indictment ....................................36

VI. THE COURT SHOULD PRECLUDE THE GOVERNMENT FROM USING THE TERMS "CONVICTED FELON," "FELON," AND "FELONY" ................................................................................................37

VII. THE COURT SHOULD PRECLUDE THE GOVERNMENT FROM ARGUING THAT MR. SCOTT ATTEMPTED TO FLEE AFTER JUNE 23, 2020.............................................................................................................38

VIII. THE COURT SHOULD PROHIBIT THE GOVERNMENT AND ITS WITNESSES FROM REFERRING TO WITNESS-1 AS A "VICTIM" AT TRIAL ...........................................................................................................41

IX. THE COURT SHOULD GIVE A LIMITING INSTRUCTION REGARDING MR. SCOTT'S PRIOR CONVICTION .......................................42

X. RESERVATION OF ADDITIONAL ISSUES. .......................................................43

CONCLUSION.........................................................................................................................44

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Bank of China v. NBM LLC*,
   359 F.3d 171 (2d Cir. 2004)...............................................................29

*Blount v. City of New York*,
   No. 15 Civ. 5599 (PKC), 2019 WL 1050994 (E.D.N.Y. Mar. 5, 2019)................................35

*Boykin v. W. Express, Inc.*,
   No. 12 Civ. 7428 (NSR), 2016 WL 8710481 (S.D.N.Y. Feb. 5, 2016)..................................24

*Burgess v. Conway*,
   No. 09 Civ. 9151 (THK), 2010 WL 6841526 (S.D.N.Y. Oct. 21, 2010) ..............................16

*Cameron v. City of New York*,
   598 F.3d 50 (2d Cir. 2010)............................................................27, 28

*Deans v. Ercole*,
   No. 09 Civ. 56 (BMC), 2010 WL 1010743 (E.D.N.Y. Mar. 15, 2010).................................25

*Dickerson v. Fogg*,
   692 F.2d 238 (2d Cir. 1982)..........................................................11, 12, 13

*Doe v. Lima*,
   No. 14 Civ. 2953 (PAE), 2020 WL 728813 (S.D.N.Y. Feb. 13, 2020)..................................35

*Folio Impressions, Inc. v. Byer California*,
   937 F.2d 759 (2d Cir. 1991)............................................................32

*Golding v. City of New York*,
   No. 15 Civ. 3498 (ALC), 2016 WL 5478435 (S.D.N.Y. Sep. 27, 2016) ..............................26

*Highland Capital Mgmt., L.P. v. Schneider*,
   551 F. Supp. 2d 173 (S.D.N.Y. 2008)...................................................42

*Manson v. Brathwaite*,
   432 U.S. 98 (1977)..........................................................................9

*MF Glob. Holdings Ltd. v. PricewaterhouseCoopers LLP*,
   232 F. Supp. 3d 558 (S.D.N.Y. 2017).................................................41, 42

*Neil v. Biggers*,
   409 U.S. 188 (1972) .................................................................. *passim*

*Quinoy v. Pena*,
    No. 13 Civ. 1945 (NSR), 2014 WL 1998239 (S.D.N.Y. May 14, 2014) ..............................25

*Raheem v. Kelly*,
    257 F.3d 122 (2d Cir. 2001)........................................................................................9, 10, 11

*Rosario v. Smith*,
    No. 07 Civ. 3611 (WHP), 2009 WL 1787715 (S.D.N.Y. June 23, 2009) ............................25

*Shrader v. CSX Transp., Inc.*,
    70 F.3d 255 (2d Cir. 1995).................................................................................................6

*Speedfit LLC v. Woodway USA, Inc.*,
    No. 13 Civ. 1276 (KAM) (AKT), 2020 WL 130423 (E.D.N.Y. Jan. 9, 2020).......................42

*Tennison v. Circus Circus Enter., Inc.*,
    244 F.3d 684 (9th Cir.2001) ..............................................................................................36

Transcript of Proceedings, *United States v. Gil*,
    No. 14 Cr. 721 (JGK) (S.D.N.Y. Aug. 10, 2015) ..................................................................37

*United States v. Hernandez*,
    No. 15 Cr. 379 (PKC) (S.D.N.Y. Sep. 23, 2019)....................................................................34

*United States v. Al Kassar*,
    660 F.3d 108 (2d Cir. 2011)..............................................................................................35

*United States v. Al-Sadawi*,
    432 F.3d 419 (2d Cir. 2005)..............................................................................................38

*United States v. Allen*,
    No. 09 Cr. 329 (RJA), 2014 WL 1745933 (W.D.N.Y. Apr. 30, 2014) ..................................36

*United States v. Aloi*,
    511 F.2d 585 (2d Cir. 1975)..............................................................................................31

*United States v. Alston*,
    No. 15 Cr. 435 (CM), 2016 WL 5806790 (S.D.N.Y. Sep. 27, 2016) ....................................35

*United States v. Amuso*,
    21 F.3d 1251 (2d Cir. 1994)..............................................................................................38

*United States v. Arroyo*,
    600 F. App'x 11 (2d Cir. 2015) .........................................................................................27

*United States v. Beahm*,
    664 F.2d 414 (4th Cir. 1981) ............................................................................................38

*United States v. Belk*,
  346 F.3d 305 (2d Cir. 2003)..................................................................36

*United States v. Brooks*,
  242 F.3d 368 (2d Cir. 2000)..................................................................36

*United States v. Ciak*,
  102 F.3d 38 (2d Cir. 1996)....................................................................9

*United States v. Clark*,
  984 F.2d 31 (2d Cir. 1993)....................................................................5

*United States v. Cuti*,
  720 F.3d 453 (2d Cir. 2013)..................................................................32

*United States v. Farmer*,
  583 F.3d 131 (2d Cir. 2009)..............................................31, 33, 34, 35

*United States v. Freeman*,
  730 F.3d 590 (6th Cir. 2013) ...............................................................27

*United States v. Gadson*,
  763 F.3d 1189 (9th Cir. 2014) .........................................................27, 28

*United States v. Garcia*,
  291 F.3d 127 (2d Cir. 2002)..................................................................32

*United States v. Garcia*,
  413 F.3d 201 (2d Cir. 2005)............................................................26, 29

*United States v. Gasperini*,
  No. 16 Cr. 441 (NGG), 2017 WL 3140366 (E.D.N.Y. July 21, 2017)..................41

*United States v. Gilliam*,
  994 F.2d 97 (2d Cir. 1993)..............................................................42, 43

*United States v. Green*,
  No. 12 Cr. 83 (WMS), 2017 WL 4803957 (W.D.N.Y. Oct. 25, 2017) .................40

*United States v. Greenfield*,
  No. 01 Cr. 401 (AGS), 2001 WL 1230538 (S.D.N.Y. Oct. 16, 2001) .................5

*United States v. Grinage*,
  390 F.3d 746 (2d Cir. 2004)..................................................................26

*United States v. Halloran*,
  821 F.3d 321 (2d Cir. 2016)..................................................................21

*United States v. Hampton,*
    718 F.3d 978 (D.C. Cir. 2013) ............................................................30

*United States v. Helbrans,*
    No. 19 Cr. 497 (NSR), 2021 WL 4778525 (S.D.N.Y. Oct. 12, 2021) ....................................41

*United States v. Knowles,*
    889 F.3d 1251 (11th Cir. 2018) ............................................................30

*United States v. Maldonado-Rivera,*
    922 F.2d 934 (2d Cir. 1990) ............................................................4, 9

*United States v. Mason,*
    No. 06 Cr. 80 (NRB), 2008 WL 281970 (S.D.N.Y. Jan. 25, 2008) .................20, 22, 23, 24

*United States v. Merino-Balderrama,*
    146 F.3d 758 (9th Cir. 1998) ............................................................28

*United States v. Meyers,*
    550 F.2d 1036 (5th Cir. 1977) ............................................................40

*United States v. Miller,*
    116 F.3d 641 (2d Cir. 1997) ............................................................20

*United States v. Miranda,*
    526 F.2d 1319 (2d Cir. 1975) ............................................................20

*United States v. Mitchell,*
    6554 F. App'x 21 (2d Cir. 2016) ............................................................26

*United States v. Mulder,*
    273 F.3d 91 (2d Cir. 2001) ............................................................36

*United States v. Orena,*
    876 F. Supp. 20 (E.D.N.Y. 1995) ............................................................36

*United States v. Persico,*
    621 F. Supp. 842 (S.D.N.Y. 1985) ............................................................33

*United States v. Pierce,*
    136 F.3d 770 (11th Cir. 1998) ............................................................30

*United States v. Rea,*
    958 F.2d 1206 (2d Cir. 1992) ............................................................27, 28

*United States v. Robinson,*
    206 F. App'x 80 (2d Cir. 2006) ............................................................33

vi

*United States v. Rollins,*
    544 F.3d 820 (7th Cir. 2008) .................................................27

*United States v. Ruggiero,*
    824 F. Supp. 379 (S.D.N.Y. 1993)...........................................33

*United States v. Salameh,*
    152 F.3d 88 (2d Cir. 1998)......................................................39

*United States v. Sanchez,*
    790 F.2d 245 (2d Cir. 1986)....................................................40

*United States v. Schulte,*
    436 F.Supp.3d 698 (S.D.N.Y. 2020)........................................34

*United States v. Silverman,*
    861 F.2d 571 (9th Cir. 1988) ..................................................39

*United States v. Wade,*
    388 U.S. 218 (1967)..................................................................9

*United States v. Walker,*
    974 F.3d 193 (2d Cir. 2020).......................................26, 27, 30

*Viereck v. United States,*
    318 U.S. 236 (1943)................................................................41

*Wiggins v. Greiner,*
    132 F. App'x 861 (2d Cir. 2005) ...............................................5

*Young v. Conway,*
    698 F.3d 69 (2d Cir. 2012)............................10, 11, 12, 13

**Other Authorities**

Fed. R. Crim. P. 7 .......................................................................36

Fed. R. Evid. 602 .......................................................................32

Fed. R. Evid. 701 ....................................................26, 27, 28, 29

Fed. R. Evid. 702 ................................................................28, 29

**OVERVIEW**

Defendant William Scott respectfully submits this memorandum in support of motions *in limine* seeking the following rulings in advance of the upcoming trial:

1.  Two eyewitnesses to Mr. Scott's alleged possession of ammunition are precluded from identifying Mr. Scott at trial;

2.  All video footage collected as part of this investigation is excluded;

3.  The jury will be provided two adverse inference instructions concerning the government's disclosure violations;

4.  No law enforcement officer will be permitted to identify anyone on the video footage as Mr. Scott;

5.  The government and its witnesses are prohibited from referring to Mr. Scott by his alleged alias "Ill Will" and the alias will be struck from the Indictment;

6.  The government and its witnesses are prohibited from using the terms felon and felony;

7.  The government is prohibited from arguing that Mr. Scott fled from the Bronx after June 23, 2020;

8.  The government and its witnesses are prohibited from referring to the individual who was shot on June 23, 2020 as a "Victim";

9.  Mr. Scott is entitled to a limiting instruction concerning his prior conviction.

**PRELIMINARY STATEMENT**

Mr. Scott is charged with one count of possessing ammunition on June 23, 2020. The government alleges that on that day, Mr. Scott argued with another person about a dog and, after the dispute escalated, fired several shots, striking one person ("Witness-1"). The government alleges that this conduct was captured on video (the "Video Footage") and that Witness-1 and ███████████████ ("Witness-2") identified a photograph of Mr. Scott as the person who shot Witness-1. The Court has since ruled that Witness-1 and Witness-2 may identify Mr. Scott at trial even though law enforcement's identification procedures were suggestive. The Court concluded

that there were independently reliable bases for those witnesses' identifications based on the government's proffers concerning the identification procedures and the witnesses' statements.

This case appears straightforward, but it is not.  In the past month, the government has made several productions of key materials that should have been produced well over a year ago and have been in the government's possession since shortly after June 23, 2020.  The government's late productions include:

- <u>November 18</u>:  Three surveillance videos that show events allegedly involving Mr. Scott that occurred immediately before the shooting.  The defense was unable to review these videos until the government provided them in a different format on November 22 and 23;

- <u>November 22</u>:  Notes from meetings with law enforcement officers and witnesses undermining prior representations made by the government in briefing concerning Witness-1's and Witness-2's identifications, as well as body camera footage showing a critical portion of Witness-2's identification of Mr. Scott's photograph;

- <u>November 26</u>:  Five additional surveillance videos that show events before, during, and after the shooting.  Mr. Scott is unable to review these videos in the format provided by the government, but will be reviewing them using government computers at the U.S. Attorney's Office on November 30.

These productions plainly include Rule 16 and, potentially, *Brady* material.  For example, the body camera footage disclosed on November 22 reflects that before Witness-2 was shown Mr. Scott's photograph during the identification procedures, the officer referred to the photograph, which Witness-2 could see, as "***the subject in the investigation***."  In essence, law enforcement identified a photograph of Mr. Scott as the shooter and ***then*** asked Witness-2 to confirm it.  The government also disclosed for the first time on November 22 that shortly before the shooting, Witness-1 had taken ecstasy—a hallucinogen that impacts perception—which of course could have impacted his ability to identify Mr. Scott as the alleged shooter.  These and a number of other important facts relating to the reliability of Witness-1's and Witness-2's identifications were omitted by the government in its briefing and not disclosed to the defense until a week ago.

In the past two weeks, the government also has produced *eight* new surveillance videos reflecting events allegedly involving Mr. Scott that occurred immediately, before, during, and after the shooting.  One of these videos apparently captures the shooting itself.  Even more troubling is that the defense has learned that some of these videos were found on a flash drive that one of the lead investigators from the New York City Police Department ("NYPD") had at *his home* for some unspecified period of time.  The government also noted in its November 26 production email that the videos separately depict individuals who, based on the government's description, the defense believes could be potential witnesses or alternative suspects.  Though the government stated that they do not view those videos as *Brady*, the defense may very well have a different view, but will be unable to make a preliminary determination until it can view them on November 30.  And even if those videos are not *Brady* per se, they still might lead to the development of other witnesses who the defense will have virtually no time to identify, investigate, and contact.

To be clear, defense counsel credits the representations of the prosecutors and appreciates their candor in identifying newly produced videos and responding to defense inquiries.  That does not, however, change the fact that Mr. Scott has been severely prejudiced by these belated disclosures.  With respect to the identification briefing, the defense was unable to raise numerous arguments that undermined the government's proffers because the government failed to disclose key evidence that contradicted their claims.  With respect to the videos, the defense must now review and explore new potential leads and identify never before seen witnesses who might assist in Mr. Scott's defense.  Even if the defense identifies those individuals, it is extremely unlikely that their memories of events will be as robust as they would have been had the defense been able to identify them shortly after the shooting.  The defense also has serious concerns that video footage was lost or manipulated based on the fact that a lead investigator failed to appropriately

secure and store a flash drive with some of the key videos and instead brought it home, where it was presumably accessible to any number of individuals.

Against this backdrop, the defense is seeking various relief for the government's disclosure violations, including (i) preclusion of Witness-1 and Witness-2 from identifying Mr. Scott at trial; (ii) exclusion of all the Video Footage; and (iii) in the alternative, adverse inferences against the government for its disclosure violations.

## ARGUMENT

### I.   THE COURT SHOULD PRECLUDE WITNESS-1 AND WITNESS-2 FROM IDENTIFYING MR. SCOTT IN COURT

On September 9, 2021, the Court denied Mr. Scott's motion to suppress identification evidence offered against him by Witness-1 and Witness-2.  (*See* Dkt. 27 (the "September 2021 Order") (referring to Witness-1 as the "Victim" and Witness-2 as the "Witness")).  The Court should reconsider its prior ruling based on the late and material disclosures by the government that undermine its prior representations about those identifications.  (*See* Dkt. Nos. 18 and 19).

As the Court explained in its September 2021 Order, pretrial identifications are evaluated using a two-step inquiry under which "'[t]he first question is whether the pretrial identification procedures were unduly suggestive of the suspect's guilt.'"  (September 2021 Order at 2 (quoting *United States v. Maldonado-Rivera*, 922 F.2d 934, 973 (2d Cir. 1990))).  If the procedures were unduly suggestive, then the court must move to the second step and "weigh the suggestiveness of the pretrial process against factors suggesting that an in-court identification may be independently reliable rather than the product of the earlier suggestive procedures."  (*Id.*).  When considering whether such independent reliability exists, courts consider the following factors:

(1) a witness's opportunity to view a criminal during the crime, (2) the witness's degree of attention, (3) the accuracy of any prior description of the criminal by the witness, (4) the level of certainty demonstrated by the witness at the time of the

confrontation, and (5) the length of time between the crime and the confrontation.

(*Id.* at 4 (citing *Wiggins v. Greiner*, 132 F. App'x 861, 864-65 (2d Cir. 2005); *Neil v. Biggers*, 409 U.S. 188, 199-200 (1972))).

Applying the two-step inquiry, the Court held that the single-photo identification procedure used with respect to Witness-1 and Witness-2 was unduly suggestive. However, relying on the government's proffer concerning the circumstances of those identifications and the witnesses' knowledge and familiarity with Mr. Scott, the Court also held that there was "a basis for an independently reliable in-court identification." (*Id.*). The Court also denied Mr. Scott's motion because he did "not raise any non-speculative suggestion that the Government's proffer is false." (*Id.* at 3).

Mr. Scott can now make such a showing. As detailed above and below, in mid-November 2021, the government produced body camera footage and notes of meetings involving Witness-1, Witness-2, and law enforcement officers, which were available to the government long before the parties briefed the motion to suppress. These delinquent productions reveal that the government's proffers were inaccurate and/or incomplete. They also reinforce that Witness-1 and Witness-2 do not have an independently reliable basis to identify Mr. Scott at trial. As a result, Mr. Scott respectfully requests that the Court reconsider its prior ruling and prohibit Witness-1 and Witness-2 from identifying him at trial.[1]

---

[1]     Though the Federal Rules of Criminal Procedure do not provide for motions for reconsideration, the Second Circuit has noted that such motions "in criminal cases have traditionally been allowed." *United States v. Greenfield*, No. 01 Cr. 401 (AGS), 2001 WL 1230538, at *1 (S.D.N.Y. Oct. 16, 2001) (citing *United States v. Clark*, 984 F.2d 31, 33 (2d Cir. 1993)). Courts have generally analyzed such motions under the applicable rules and standards for motions for reconsideration in civil cases. *Id.* In this District, Local Civil Rule 6.3 governs motions for reconsideration and requires the moving party to set forth "the matters or controlling decisions which counsel believes the court has overlooked." The purpose of a motion for reconsideration, therefore, is to bring to the Court's attention facts or controlling law that the moving party believes the Court has overlooked and "that might reasonably be expected to alter

### A.    The Government's Prior Representations Concerning Witness-2 Were Misleading, Inaccurate, and/or Incomplete

In the motion to suppress briefing, the government proffered the following with respect to

Witness-2, who was referred to as the Witness:

> After the Shooting, the Victim and the Witness went to the hospital.  While there, a detective with the New York City Police Department ("Detective-1") spoke with the Witness. The Witness stated, in sum and substance and among other things, that the shooter's name was "Ill Will," that "Ill Will" was a neighbor who rented a room in the Building, and that the Witness saw "Ill Will" on a daily basis. As Detective-1 did not know the identity of "Ill Will," he showed the Witness two photographs of individuals who had recently committed shootings in the area. . . . The Witness said neither was the shooter. Detective-1 also showed the Witness a photograph of the Victim, and the Witness confirmed that was the victim, not the shooter. Detective-1 then learned from a colleague that "Ill Will" was the street name of the defendant.  At that point, Detective-1 showed the Witness a photograph of the defendant, . . . and the Witness identified the defendant as the shooter. Detective-1 retrieved a printed photograph of the defendant and showed it to the Witness. The Witness confirmed that was the shooter and signed the photograph.

(Dkt. 18 at 2).

The government's proffer was inaccurate and omitted material facts.  Most notably, the

body camera footage reflects that before Witness-2 was asked to identify Mr. Scott's photograph,

one of the officers showed Witness-2 that photograph and stated in Witness-2's presence that the

person in the photograph was the "***subject in the investigation***."  In other words, law enforcement

guaranteed that Witness-2 would identify Mr. Scott as the shooter.

The  body  camera  footage  from  one  officer  ("Officer-1")  captures  Witness-2's

identification of Mr. Scott.  Officer-1's body camera footage begins at 23:23:47Z.  The defense

has requested information from the government concerning the time stamps of the body camera

---

the conclusion reached by the court."  *Shrader v. CSX Transp., Inc.*, 70 F.3d 255, 257 (2d Cir. 1995).  The Court could not have "overlook[ed]" any new facts identified in this memorandum because the government failed to disclose them.  Under these circumstances, Mr. Scott respectfully submits that reconsideration is appropriate.

footage.  However, "Z" typically refers to Zulu time, which is four hours ahead of Eastern Daylight Time.  Assuming that conversion, the body camera footage begins at 7:23 p.m. on June 23, 2020, which is about an hour after the shooting.

The footage begins with Officer-1 and Officer-2 walking through the hospital into what appears to be a parking lot.  Once there, the two officers approached a law enforcement officer who the defense understands to be Detective-1 referenced above.  Detective-1 was speaking with Witness-2.  When Officer-1 was close to Detective-1 and Witness-2, Officer-1 turned on the audio of the body camera footage.

The identification procedures that followed were extraordinarily suggestive and guaranteed that Witness-2 would identify Mr. Scott as the shooter.  While standing immediately next to Witness-2, Detective-1 pulled up a picture of Mr. Scott on his phone in the view of Witness-2 and Witness-2 glanced at the picture on the phone.  Detective-1 then turned the phone with Mr. Scott's picture toward the body camera and stated, "***Here is the subject in the investigation***."  (Ex. A, at 1:18-22).[2]  Detective-1 then showed the picture to Witness-2, who, after just hearing Detective-1 identify Mr. Scott as the subject of the shooting, identified Mr. Scott as the shooter who she knew as "Ill Will."  Seconds later, Detective-1 ***repeated*** the procedure (that is, showed Witness-2 the single-photo of Mr. Scott) because he was concerned that the audio for the body camera footage did not capture the earlier identification.  Witness-2 provided similar responses and also noted that "Ill Will" was her neighbor.  Notably, immediately after this identification, and still within feet of Witness-2, Detective-1 pointed to Mr. Scott's picture on the phone and said, "This is the suspect ugh William Smith . . . Scott."

The body camera footage is materially different from the government's proffer in several

---

[2]      "Ex." refers to the defense's exhibits to this memorandum, which are being filed under seal because they were provided to the defense pursuant to the 3500 Protective Order.

ways.  Though the Court and the defense understood that Witness-2 had identified Mr. Scott's photograph in the hospital (Dkt. 27 at 1), in actuality, the identification occurred outside the hospital.  The body camera footage also does not capture Detective-1 showing Witness-1 any pictures other than one of Mr. Scott or Witness-1 viewing a printed photograph of Mr. Scott. Moreover, the printed photograph of Mr. Scott that Witness-2 allegedly identified is marked "7:39 p.m.," which is over fifteen minutes after Detective-1 appeared to leave Witness-2 and after the body camera footage was shut off.  (*See* Ex. B).  This raises significant questions about why the officers did not record all the interactions with Witness-2 and what occurred during those other interactions.

The body camera footage also does not capture Witness-2 explaining that "Ill Will" was the shooter and her neighbor before being shown Mr. Scott's picture.  (*See* Sept. 2021 Order at 4 (noting that one of the "most significant[]" proffered facts was that "both the Victim and the Witness identified Defendant by name prior to being shown the photographs").  Rather, the footage reflects that before Mr. Scott's photo was shown to Witness-2, Detective-1 stated in Witness-2's presence that Mr. Scott was the "subject in the investigation."  It was not until after Detective-1 made that statement that Witness-2 identified Mr. Scott as the alleged perpetrator.

The reliability of Witness-2's identification is even further undermined by previously undisclosed notes of an interview with Witness-2 that took place on June 29, 2020.  Those notes reflect that Witness-2 did not "recall what Ill Will [was] wearing" on the day of the shooting and that Witness-2 believed he was "wearing [a] dark color shirt when he left the apartment."  (*See* Ex. C at 2).  However, the Video Footage reflects that the shooter appears to be wearing a white shirt. Here, again, the government was aware of these facts at the time of the motion to suppress briefing but failed to disclose them to the Court or the defense.

Against this backdrop, the Court can no longer trust the government's proffered facts or conclude that there is an independently reliable basis for Witness-2's identification of Mr. Scott in Court. "When the prosecution offers testimony from an eyewitness to identify the defendant as a perpetrator of the offense, fundamental fairness requires that that identification testimony be reliable." *See Raheem v. Kelly*, 257 F.3d 122, 133 (2d Cir. 2001) (citing *Manson v. Brathwaite*, 432 U.S. 98, 112-14 (1977) ("reliability is the linchpin in determining the admissibility of identification testimony")). The reliability of an in-court identification is determined by "weighing the degree of suggestiveness of [the pretrial procedures] against 'factors suggesting that [the] in-court identification may be independently reliable rather than the product of the earlier suggestive procedures.'" *United States v. Ciak*, 102 F.3d 38, 42 (2d Cir. 1996) (quoting *United States v. Maldonado-Rivera*, 922 F.2d 934, 973 (2d Cir. 1990)).

Here, there is no question that law enforcement's identification procedures were extraordinarily suggestive and weigh heavily against permitting an in-court identification. Witness-2 was, in essence, told that Mr. Scott was the perpetrator ("***Here is the subject in the investigation***") and then asked if he was the perpetrator—on at least two occasions. Witness-2 also was asked to identify Mr. Scott as the perpetrator on at least one other occasion, though the government chose not to record that identification. In these circumstances, the Court cannot have any confidence that Witness-2's identification was anything other than the product of the earlier suggestive procedures. *See United States v. Wade*, 388 U.S. 218, 228 (1967) ("A major factor contributing to the high incidence of miscarriage of justice from mistaken identification has been the degree of suggestion inherent in the manner in which the prosecution presents the suspect to witnesses for pretrial identification."). In this respect, Mr. Scott's "protection against suggestive identification procedures encompasses not only the right to avoid methods that suggest the initial

identification, but as well the right to avoid having suggestive methods transform a selection that was only tentative into one that is positively certain." *Raheem*, 257 F.3d at 135. At a minimum, law enforcement's identification procedures had the effect of increasing Witness-2's "certainty through a suggestive lineup," which "due process precludes." *Id.* (citing cases).

If the government asserts that Witness-2 had already identified "Ill Will" as the shooter prior to the identification shown on the body camera footage, that would still be extremely problematic. For one, the government has provided no explanation for why it chose to record the identification on the body camera footage, but not the discussions with Witness-2 that may have preceded it. Moreover, even if Witness-2 identified someone named "Ill Will" as the shooter prior to being shown the picture, the foregoing identification procedures made certain that Witness-2 would connect "Ill Will" to Mr. Scott. (Ex. A ("Here is the subject in the investigation.")).[3]

The newly discovered evidence also significantly undercuts the independent reliability of Witness-2's identification considering the *Biggers* factors. The defense recognizes that Witness-2 ███████████████ during the shooting, which could suggest she had an adequate opportunity to view the perpetrator. However, the Second Circuit has explained that "the presence of a weapon during a crime 'will draw central attention, thus decreasing the ability of the eyewitness to adequately encode and later recall peripheral details.'" *Young v. Conway*, 698 F.3d 69, 80-81 (2d Cir. 2012) (quoting Nancy Mehrkens Steblay, *A Meta–Analytic Review of the Weapon Focus Effect*, 16 Law & Hum. Behav. 413, 414 (1992)). Moreover, "high levels of stress have been shown to induce a defensive mental state that can result in a diminished ability

---

[3]     If the government asserts that Witness-2 was shown Mr. Scott's picture **before** the identification captured on the body camera footage, that would also be problematic. Assuming those set of facts, Witness-2 would have been shown Mr. Scott's picture in a highly suggestive manner **on four separate occasions**. That would raise a number of questions including why the government chose not to capture the initial identification on the body camera footage and why the government did not disclose all of the various identifications in its initial proffer.

accurately to process and recall events, leading to inaccurate identifications." *Id.* at 81 (citing Kenneth A. Deffenbacher et al., *A Meta-Analytic Review of the Effects of High Stress on Eyewitness Memory*, 28 Law & Hum. Behav. 687, 699-700 (2004)).

In any event, "[a] good or poor rating with respect to any one of these factors will generally not be dispositive," *Raheem*, 257 F.3d at 135, and the newly discovered evidence substantially undermines several of the other factors. The Court can no longer conclude that Witness-2 had a sufficient level of certainty at the time of the identification. As detailed above, Witness-2's identification was influenced at least in part by the highly suggestive identification procedures. The Second Circuit has explained that "prior identifications may taint subsequent in-court identifications due to a phenomenon known as the 'mugshot exposure effect,' or 'unconscious transference,' whereby a witness selects a person in a later identification procedure based on a sense of familiarity deriving from her exposure to him during a prior one." *Conway*, 698 F.3d at 82. Where, as here, a witness identifies the defendant during an identification procedure prior to the in-court identification, the witness's memory can be tainted by the "'mugshot commitment effect: having identified that person as the perpetrator, she becomes attached to her prior identification. As a result, she is more likely to identify him again in a subsequent identification procedure, even if he is innocent." *Id.*; *see also Dickerson v. Fogg*, 692 F.2d 238, 246 (2d Cir. 1982) ("the extent to which an affirmative identification is the product of prodding [is a] signal[] which undermine[s] the certainty of the witness's identification of the suspect at the pre-trial confrontation.").

Moreover, Witness-2's certainty is undermined by the fact that the government selectively recorded interactions with Witness-2 while omitting other interactions and photo identifications that might have shown uncertainty in her initial or subsequent identifications. *Dickerson*, 692 F.2d

at 246 (noting that "[h]esitancy" and "the inability to be positively sure about a suspect" undermine certainty in the identification).   The defense was and is substantially prejudiced by the government's conduct because (i) the defense could not explore this issue in connection with its initial motion eleven months ago, and (ii) as of today, the government has met with Witness-2 numerous times in advance of trial, which would serve only to reinforce her already tainted identification.  *Conway*, 698 F.3d at 82 ("[W]here a witness has been primed with information supporting an erroneous identification—such as repeated exposure to [the defendant's] face in photographs, the illegal lineup, and the 1993 trial—research suggests she is often more confident in her erroneous selection.").

The accuracy of Witness-2's prior description of the perpetrator also has now been undermined.  Though the government's proffer suggested that Witness-2's identification was unreproachable, the government failed to disclose that Witness-2 told the government less than a week after the shooting that she could not "recall" what Mr. Scott was wearing and that she believed he was wearing clothing that was actually different than what the Video Footage reflects the shooter was wearing.  *Dickerson*, 692 F.2d at 245-46 ("[The witness's] inability to provide a minimally detailed description when he talked with the police plainly devalues his description as a factor demonstrating the reliability of his identification.").

In similar circumstances, the Second Circuit has precluded a subsequent in court identification.  For example, in *Dickerson* law enforcement focused the witness's attention on two specific subjects, pressured the witness to take a second and third look after his first tentative identification, and then arrested the defendant in the witness's presence.  As to the *Biggers* factors, the witness observed the defendant for several minutes but on a dark night; provided a minimally detailed description of the subject; was prodded by law enforcement to identify the defendant; and

identified the defendant about 40 hours after the incident.  The Court concluded that "these patently weak indicia of reliability cannot erase the corrupting influence" of law enforcement's highly suggestive identification procedures.  *Id.* at 247; *see also Conway*, 698 F.3d at 82-83 (similar).

The same reasoning applies here.  The identification procedures in this case were arguably more suggestive than those in *Dickerson*, given that law enforcement identified a picture of Mr. Scott as the alleged perpetrator before asking Witness-2 who was in the picture and then showed Witness-2 the same single-photo of the defendant on at least two other occasions the same day. The Court must weigh these extraordinarily suggestive procedures against the newly discovered evidence that undermines reliability.  Given the totality of the circumstances, including the government's failure to disclose material facts in its possession and failure to record key portions of the identification, the Court simply cannot conclude (and the government cannot satisfy its burden of showing) that Witness-2's identification is independently reliable.  As a result, the Court should preclude Witness-2 from identifying Mr. Scott at trial.

## B.    The Government's Prior Representations Concerning Witness-1 Were Misleading, Inaccurate, and/or Incomplete

The government also omitted material facts with respect to Witness-1's identification. After Mr. Scott had filed his initial motion to suppress, the defense learned that Witness-1 had also identified Mr. Scott.   In response to the defense's supplemental motion challenging that identification, the government proffered the following with respect to Witness-1, who was referred to as the Victim:

> The Victim also identified the defendant as the shooter shortly after the Shooting. While at the hospital, a second NYPD detective ("Detective-2") interviewed the Victim. The Victim stated, in sum and substance and among other things, that "Ill Will," the shooter, was his neighbor, who he sees on a daily basis, and that "Ill Will" was wearing a white shirt and red shorts Detective-2 showed the Victim a printed photograph of the defendant. The Victim confirmed that was the shooter and signed the photograph.

(Dkt. 18 at 2-3).

As with Witness-2's identification, newly produced evidence reveals several facts that undermine the government's proffer.  As an initial matter, Witness-1's alleged identification occurred just minutes after ███████ Witness-2, identified Mr. Scott as the perpetrator.  (*See* Ex. D (photograph of Mr. Scott allegedly identified by Witness-1 at 7:42 p.m., minutes after Witness-2 allegedly identified the same photograph of Mr. Scott)).  For all the reasons discussed above, Witness-2's identification was not reliable and influenced by law enforcement, and the proximity of the two witnesses' identifications raises concerns that Witness-1's identification was also impacted by what law enforcement told him about Mr. Scott or by Witness-2's already tainted identification.  Moreover, unlike Witness-2, Witness-1's identification was not recorded on body camera footage, even though Officer-1's body camera footage begins inside the hospital.  Law enforcement's failure to record Witness-1's identification of Mr. Scott further undermines its reliability.

Furthermore, the government omitted material information from its proffer.  The government's notes of an interview with Witness-1 that occurred on June 29, 2020, reflect that Witness-1 told the government that he had taken ecstasy shortly before the shooting occurred. According to the National Institute of Health, ecstasy "is a synthetic drug that alters mood and perception (awareness of surrounding objects in conditions)" and it can cause "distorted sensory and time perception."  *See* MDMA (Ecstasy/Molly) DrugFacts (Nov. 27, 2021), available at https://www.drugabuse.gov/publications/drugfacts/mdma-ecstasymolly.  Though Witness-1 told the government that he "[d]idn't feel like under [the] influence," he admitted that he might not have felt being shot "because of" the ecstasy.  (*See* Ex. E).  In other words, Witness-1 admitted that he might not have felt a gunshot wound because he was under the influence of a powerful

synthetic drug that distorts sensory and time perception.  This information was plainly material to the defense and simply not disclosed.  Moreover, Witness-1 has recently disclosed to the government that he might have drank several beers prior to the shooting.  (*See* Ex. F).[4]  Although this information does not appear to have been available to the government at the time of the motion to suppress, it could have been discovered had the defense been able to question Witness-1 at a hearing about his state of mind on the day of the shooting.

Other parts of the government's proffer also are undermined based on Witness-1's June 29, 2020 meeting with the government.  For example, while the government proffered that Mr. Scott was Witness-1's neighbor, Witness-1 told the government that prior to the shooting, Witness-1 was living at a different housing project about three and a half miles from the location of the shooting.  (*See* Ex. E).  The government also proffered that Witness-1 identified the alleged perpetrator as "Ill Will" before being shown a photograph of Mr. Scott.  However, newly produced notes from a June 26, 2020 interview of Officer-2 do not reflect that Witness-1 referred to the shooter as "Ill Will."  Rather, those notes show that Witness-1 said he had seen the shooter "around," and that when Witness-1 was shown Mr. Scott's picture, he stated, "that's the clown that shot me."  (*See* Ex. G).  Relatedly, though the government suggested that Witness-1 knew Mr. Scott independently as "Ill Will," during Witness-1's June 29, 2020 meeting with the government, Witness-1 admitted that he only knew Mr. Scott as "Ill Will" because ▮▮▮▮▮▮▮ told him "that's who they call Ill Will."  These statements were all omitted from the government's proffer.

As with Witness-2, the Court can no longer conclude that there is an independently reliable

---

[4]      Ex. F are handwritten notes of a November 17, 2021 meeting involving the government and Witness-2.  Though they are difficult to read, it appears that they state "had used ecstasy day before + had beer or 3 but able to see + remember clearly."  It is unclear if Witness-2 now asserts that he took ecstasy the day before the shooting.  However, such an assertion would make no sense in light of his claim on June 29, 2020 that he took ecstasy the day of the shooting and might not have felt a gunshot wound because of it.

basis for Witness-1's identification of Mr. Scott in Court.  As detailed above, Witness-2's identification procedures were extraordinarily suggestive.  Though the government has not provided footage of Witness-1's identification of Mr. Scott, there is a plausible basis to believe those procedures were similar to the ones employed with Witness-2.  Even if they were not, the Court has already found that the government's proffered procedures with respect to Witness-1 were suggestive.

Each of the *Biggers* factors also are undermined by the government's newly disclosed evidence.  The defense now knows that Witness-1 was under the influence of a powerful drug that impacts perception at the time of the shooting.  The defense recognizes that a witness's intoxication at the time of a pretrial identification does not necessarily preclude a subsequent in court identification.  *See Burgess v. Conway*, No. 09 Civ. 9151 (THK), 2010 WL 6841526, at *13-14 (S.D.N.Y. Oct. 21, 2010), *report and recommendation adopted*, No. 09 Civ. 9151 (BSJ), 2011 WL 2638141 (S.D.N.Y. July 5, 2011).  But the defense was never able to explore to what extent Witness-1's drug use impacted his ability to perceive the shooting because it was never disclosed.  Nevertheless, by Witness-1's own admission, Witness-1's state of mind was impacted to such an extent that he did not feel the effects of a substantial gunshot wound.  The government also failed to disclose that Witness-1 was not, in fact, Mr. Scott's neighbor, that Witness-1 did not apparently refer to Mr. Scott as "Ill Will" during the identification procedures, and that Witness-1 only knew his nickname from ███████████.  (*See* Sept. 2021 Order at 4 (noting that some of the "most significant[]" factors supporting an independently reliable identification were that Witness-1 was Mr. Scott's neighbor and that Witness-1 knew Mr. Scott as "Ill Will")).  Witness-1's generic description of the perpetrator as someone with a white shirt and red shorts also does not support a finding of independent reliability.  Indeed, many individuals fit that description on the Video

Footage and, as discussed below, the government has recently produced *new* videos in which the government identified two other men wearing red shorts in the vicinity of the shooting immediately before and after it occurred.

For all of these reasons, there is not an independently reliable basis for Witness-1 to identify Mr. Scott at trial and the Court should revisit its prior ruling.

* * *

Even if the Court believes that there is still a basis for Witness-1 and Witness-2 to reliably identify Mr. Scott at trial, the Court should still exclude the identifications because of the government's multiple disclosure violations. As detailed above, the government failed to disclose (i) body camera footage that shows a markedly different identification procedure than that proffered by the government; (ii) notes of a meeting with Witness-1 in which Witness-1 disclosed that he took ecstasy shortly before the shooting and otherwise made statements that contradicted other parts of the government's proffer; and (iii) notes of a meeting in which Witness-2 identified Mr. Scott wearing different clothing than the alleged shooter on June 23, 2020. There can be no reasonable dispute that these materials were (and are) material to the defense and that the failure to disclose them has prejudiced Mr. Scott. Accordingly, the Court should preclude Witness-1 and Witness-2 from identifying Mr. Scott at trial.

## II.  THE COURT SHOULD PRECLUDE THE GOVERNMENT FROM INTRODUCING SURVEILLANCE VIDEOS OF THE ALLEGED INCIDENT

For similar reasons, the Court also should exclude the Video Footage. Exclusion is necessary because the government failed to produce many of the videos until days before trial in violation of its Rule 16 and, potentially, *Brady* obligations.

### A.  Relevant Facts

On July 7, 2020, Mr. Scott was arrested. By July 29, 2020, the government had produced

fourteen videos of the area in the Bronx in which the shooting occurred, some of which depicted events before and after the shooting.

Almost a year and a half later, and shortly before trial, the government began producing numerous other videos of the area of the shooting, which had been in the government's possession since immediately after the shooting.  On November 16 and 22, 2021, the government produced body camera footage from several officers.   Some of that footage depicted Witness-2's identification as discussed above.  Other footage showed the immediate aftermath of the crime scene and reflected that law enforcement was concerned that civilians were walking through the scene and had potentially contaminated it.

On November 18, 2021, the government produced three additional videos that showed events immediately before the shooting.   In its production letter, the government candidly disclosed that these materials had been inadvertently omitted from its July 29, 2020 production. The defense was unable to view the new videos in the format they were produced, and the government subsequently provided converted versions that were viewable to the defense on November 22, 2021.

In response to the foregoing productions, the defense emailed the government, explaining that it believed the late productions had prejudiced Mr. Scott's defense.  The defense requested additional information from the government to ensure that the defense had received all the discovery and, in particular, all Video Footage related to the investigation.  Then, on November 24, the government produced notes of a meeting with Officer-2 from the same day, in which Officer-2 stated, among other things, that he had kept a "[h]ard drive with full video" at his home:

- Got video after shooting and put relevant clips of Scott leaving building/shooting into DD5
- Hard drive with full video is at home
- Will look tomorrow morning but best recollection is total video given from building is 30 mins
- Best recollection is videos from other buildings not probative of any value ███████████

(Ex. H).

On November 26, 2021, the government responded to the defense's requests in its November 22 email. Among other things, the government informed the defense that the government had received a "flash drive" from Officer-2 that contained five additional videos that had never before been produced, at least one of which apparently includes footage of the shooting. The government also confirmed that the flash drive was the hard drive referenced in Officer-2's 3500 material. The government's understanding is that Officer-2 was recently promoted and that when that happened, he moved offices and had to bring his old files home. The government also understands that the videos on the flash drive were originally collected by another officer ("Officer-3") from three locations: two of those locations are a block from the shooting, 2254 Crotona Avenue and 2260 Crotona Avenue, and the other location is where the shooting occurred, 760 East 183rd Street. (*See* Ex. I). Officer-3 gave the videos to Officer-2, who saved clips of parts of those videos in the case file but maintained the full videos on the flash drive, which he eventually brought to his home. (*See* Ex. J).

The government also identified specific portions of three of the five newly produced videos, noting that, in the minutes immediately before and after the shooting, two of the videos showed a man in red shorts walking in the direction of the shooting, and another video showed another man in red shorts walking in the opposite direction of the shooting. The defense understands that the government does not believe that either of those men are Mr. Scott and the government noted that it did not view these videos as *Brady* material.

19

As of the filing of this memorandum, the defense has been unable to view the five newly produced videos. Though the government produced them around 11:30 p.m. on November 26, the defense had been unable to download the viewer provided by the government that is necessary for reviewing the videos. The defense requested converted versions from the government and plans to view the original videos at the government's office on November 30.

The government intends to introduce two of the eight newly produced videos—one that was produced on November 18 and another that was produced on November 26.

### B.      The Video Footage Should Be Excluded Based on the Government's Discovery Violations

The Court should exclude all of the Video Footage in this case. There is no question that the government violated its Rule 16 and, potentially, *Brady* obligations. The videos produced on November 16, 18, 22, and 26, 2021, were in the government's possession shortly after June 23, 2020, and they are material to the defense as they record footage of events before, during, and after the shooting. Yet, the government failed to produce them for almost a year and a half. Based on the government's description of portions of three of the videos, which the defense will not be able to review until November 30, it appears that the new videos also include footage of potential alternative perpetrators (or at a minimum witnesses) who the defense has never seen before. The defense has been severely prejudiced by these belated productions. The defense has virtually no time to review and investigate the newly produced videos before trial. More critically, even if the defense was able to identify potential witnesses from the new videos, those witnesses' memories will almost certainly be far worse than shortly after the incident occurred.

The Court has "broad discretion" to fashion an appropriate remedy for the government's failure to timely disclose Rule 16 materials. *United States v. Miller*, 116 F.3d 641, 681 (2d Cir. 1997). "Whether or not sanctions for nondisclosure should be imposed depends in large measure

upon the extent of the government's culpability for failure to make disclosable material available to the defense, on the one hand, weighed against the amount of prejudice to the defense which resulted, on the other." *United States v. Miranda*, 526 F.2d 1319, 1324-25 (2d Cir. 1975). "Such sanctions [may] include the exclusion or suppression of other evidence concerning the subject matter of the undisclosed material." *Id.* at 1324 n.4; *see also United States v. Mason*, No. 06 Cr. 80 (NRB), 2008 WL 281970 at *3-4 (S.D.N.Y. Jan. 25, 2008) (granting suppression of all documents recovered by the government when a portion of the documents were not produced until over a year after they were recovered). Similar sanctions may be imposed for a *Brady* violation up to and including dismissal of the Indictment. (*See* Dkt. 6 (Fed. R. Crim. P. 5(f) Order (describing sanctions for *Brady* violation))); *see also United States v. Halloran*, 821 F.3d 321, 342 n.14 (2d Cir. 2016).

Here, exclusion of all the Video Footage is appropriate. The government is culpable for the failure to disclose all of the Video Footage, which has been in law enforcement's possession since shortly after the shooting. Nevertheless, the government waited until days before trial to produce eight videos, some of which show the shooting and others of which might identify alternative perpetrators or witnesses.

The defense also is concerned that the prosecutors have not received all of the Video Footage collected as part of the investigation. The defense credits the prosecutors' representations that they have produced all the Video Footage that was provided to them by law enforcement and appreciates the prosecutors' candor in responding to questions from defense counsel. However, the circumstances of the video collection and storage raises significant concerns that more videos exist, that videos collected as part of the investigation might have been altered or deleted, and/or that videos were purposefully not recovered as part of the investigation.

Incredibly, five of the eight new videos were on a flash drive that Officer-2 took to his home.  The prosecutors were provided that flash drive just days ago and only after the defense raised concerns about discovery productions.  The defense understands that the flash drive had some of the original footage as it was collected from various locations in the vicinity of the shooting.  Officer-2 did not load the original and complete footage into the case file "due to its format." (*See* Ex. J).  Rather, he unilaterally and without consulting the prosecutors identified clips that he believed were relevant and loaded them into the NYPD's case file.  This procedure was highly problematic.  Some of the videos on the flash drive apparently include potential witnesses and alternative perpetrators who the defense has not yet seen.

Officer-2 also brought the entire flash drive home for some unspecified period of time where it was presumably unsecured and accessible by any number of individuals who reside at or visited his home.  The government, thus, cannot guarantee that the flash drive was not manipulated to alter or delete videos while it was unsecured.  Officer-2's apparent explanation for bringing the flash drive home—because he was promoted—makes no sense.  Officer-2 did not leave the NYPD, he was simply promoted to another position within the organization.  Even if he had to change physical locations, there is no justifiable reason to store investigative files at his home because of that change.  Moreover, Officer-2's 3500 material suggests that he refrained from collecting other video evidence because he determined that it was "not probative" or "of any value." (*See* Ex. H). Given that Officer-2's discovery determinations have proved wrong already, it is a realistic possibility that Officer-2 failed to preserve videos that could have been helpful to the defense.

The belated productions have significantly prejudiced the defense.  Trial is in nine days, and the defense will not be able to view five of the videos until November 30.  The defense must compare the new videos to all of the other videos previously produced to identify any discrepancies

or new potential witnesses or suspects who might be helpful to the defense.  Thus, the defense does not have sufficient time "to make effective use" of the videos for trial.  (*See* Dkt. 6 at 1).

In similar circumstances, where the government produced some but not all materials recovered from the search of a home, a court in this district excluded ***all*** of the materials recovered pursuant to the search, even those that were timely disclosed.  *Mason*, 2008 WL 281970, at *3-4. In *Mason*, the government recovered physical evidence and hundreds of pages of documents from a home search but failed to produce the documents until a year and a half later and just a few weeks before trial.  *Id.* at *2.  Similar to the circumstances in this case, the government in *Mason* was aware of the existence of the undisclosed materials, but simply neglected to produce them.  *Id.* The undisclosed home search materials in *Mason* also did not appear to be necessarily helpful to the defense.

The court concluded that the government should be precluded from introducing ***all*** of the evidence from the home search, explaining that based on "the government's cavalier approach to its discovery obligations . . . it cannot be reasonably concluded that there is no prejudice to the defendants from the fact that they did not have this information *for the better part of a year or more*."  *Id.* at *3.  The court also explained why precluding only the late-produced documents would be an insufficient sanction:  so limiting the preclusion "would reward the government for its non-disclosures and be no sanction at all. . . . To allow the government to introduce this evidence when it selectively failed to produce the remainder of the seized documents would invite mischief in the discovery process."  *Id.* at *4.

The same reasoning applies here.  As an initial matter, the government still intends to introduce two of the eight newly produced videos, including one of the videos produced days ago that the defense has not yet been able to review.  The government's position—that it can withhold

evidence for 17 months until days before trial and still rely on that evidence without giving the defense a fair opportunity to review and make use of it—is stunning and does not further the interests of justice.

In any event, excluding only the newly produced videos would be no sanction at all. The government would be in the same exact position as it was a month ago. But the defense would not be. As in *Mason*, "it cannot be reasonably concluded that there is no prejudice" to Mr. Scott because he did not have the videos for almost a year and a half. Moreover, leads from the withheld videos, five of which Mr. Scott has not yet reviewed, might well support new defense theories. *Id.* at *3. A continuance would not cure this prejudice. As noted, even if Mr. Scott locates individuals on the new videos, which will be more difficult given the passage of time, it is unlikely that those individuals' memories will be as robust as closer in time to the incident.

Regardless, Mr. Scott has been detained since his arrest in July 2020. The Court indicated in July 2021 that a trial would be set in the fourth quarter of this year, and it has secured a trial slot for him in the midst of the COVID-19 pandemic. The government has had over seventeen months to fulfil its obligation to disclose all of the videos collected as part of this investigation. As the court concluded in *Mason*:

> The government's eleventh hour effort to change the evidentiary landscape of this case in a way that prejudicially impacts the defendant[] should not be remedied by a scheduling change which as a concomitant, adverse impact on the defendant[], defense counsel, and the Court. It is not too much to ask the government, with all its resources, to respect a trial date set many months ago.

*Id.* at *4.

For all of these reasons, the Video Footage should be excluded in its entirety.[5]

---

[5]      The defense reserves its right to challenge the authenticity of the Video Footage. To authenticate surveillance video, the proponent must "demonstrate . . . [both] that the video is authentic and that the events are accurately depicted." *Boykin v. W. Express, Inc.*, No. 12 Civ. 7428 (NSR), 2016 WL 8710481, at *5 (S.D.N.Y. Feb. 5, 2016). As described above, the defense

**III.    THE COURT SHOULD INSTRUCT THE JURY AS TO ADVERSE INFERENCES DUE TO THE GOVERNMENT'S DISCLOSURE VIOLATIONS**

If the Court does not grant Mr. Scott's requests to preclude Witness-1 from identifying Mr. Scott at trial and exclude the Video Footage, the defense respectfully requests that the Court give two adverse inference instructions to the jury.  Courts instruct juries to draw adverse inferences against the government where, as here, the government failed to make timely disclosures of Rule 16 and/or *Brady* materials.  *See, e.g.*, *Rosario v. Smith*, No. 07 Civ. 3611 (WHP), 2009 WL 1787715, at *1 (S.D.N.Y. June 23, 2009) ("The trial court also instructed the jury that it could draw an adverse inference against the Government because of the prosecution's failure to disclose the statements."); *United States v. Sadr*, 18 Cr. 224 (AJN) (S.D.N.Y. Mar. 10, 2020) (providing adverse inference instruction and striking testimony based on government's disclosure violations).

Accordingly, if the Court allows Witness-1 to make an in-court identification of Mr. Scott, the defense respectfully requests that the Court give the following adverse inference instruction:

> You have heard that Witness-1 had taken MDMA, also known as ecstasy, shortly before he identified Mr. Scott as the alleged shooter.  Under our Constitution, the government is required to inform the defense of any information known to the government that casts doubt on the credibility of the government's own witnesses. In this case, the government failed to inform the defense of Witness-1's intoxication in a timely manner as required by the law.  I instruct you that this delay was because this information was damaging to the prosecution's case.  In evaluating the evidence, you can decide what weight, if any, to give to the government's conduct on this issue.

Similarly, with respect to the late-produced videos, the defense respectfully requests that

---

has not yet been able to review all the videos, and Officer-2's conduct raises serious questions about whether or not the government can authenticate them.  Even assuming the Video Footage is authentic, it does not appear to accurately and reliably depict the alleged shooting.  Several of the videos are blurry, and they all are recorded from a distance.  Moreover, several of the videos have inconsistent timestamps, including one video that displays six cameras simultaneously.  The defense will promptly address this issue once it has been able to review all the videos and after the government identifies all witnesses through whom they intend to introduce the videos.

the Court give the following adverse inference instruction:

> You have seen video evidence in this case. The government failed to timely
> produce this video evidence to the defense, in violation of its legal obligations under
> the Federal Rules. I instruct you that the government should have produced these
> videos to the defendant sooner. In evaluating the evidence, you can decide what
> weight, if any, to give to the government's conduct on this issue. You may also
> consider how the government's delayed production of relevant evidence may have
> impacted the defense's ability to make its case.

## IV.   THE COURT SHOULD EXCLUDE TESTIMONY FROM A LAW ENFORCEMENT OFFICER IDENTIFYING MR. SCOTT ON THE SURVEILLANCE VIDEO FOOTAGE

If the Court allows the government to admit the Video Footage, the Court should
substantially limit law enforcement testimony concerning it. In particular, the government has
informed defense counsel that it may have a law enforcement officer ("Officer-4") attempt to
identify Mr. Scott as one of the individuals on the Video Footage. As set forth below, the Court
should preclude any such identification pursuant to Federal Rules of Evidence 701 and 403.

### A.   Officer-4's Opinion is Inadmissible Under Rule 701

Rule 701 allows a lay witness to offer opinions that are (a) "rationally based on the
witness's perception," (b) "helpful" to the jury, and (c) "not based on scientific, technical, or other
specialized knowledge within the scope of" expert testimony. Fed. R. Evid. 701. A law
enforcement agent's identification of a defendant on video footage is not rationally based on his
or her perception if it is based "on the entirety of information collected by himself as well as other
investigators," rather than on his personal perceptions as an eyewitness to the events on the video
or direct observations of the defendant. *See United States v. Mitchell*, 6554 F. App'x 21, 25 (2d
Cir. 2016); *see also United States v. Garcia*, 413 F.3d 201, 212 (2d Cir. 2005); *Golding v. City of
New York*, No. 15 Civ. 3498 (ALC), 2016 WL 5478435, at *4 (S.D.N.Y. Sep. 27, 2016) (describing
the argument that an officer had first-hand perceptions of a plaintiff taking a Breathalyzer test

because he watched a video recording of the event as "questionable at best").

Furthermore, jurors are not "helped" by opinion testimony that, in addition to telling them "what was in the evidence," also tells them "what inferences to draw from it." *United States v. Grinage*, 390 F.3d 746, 750 (2d Cir. 2004); *see also United States v. Walker*, 974 F.3d 193, 205 (2d Cir. 2020) ("Where the jury is 'in as good a position as the witness to draw the inference' to which the opinion relates, the opinion is not helpful and should not be admitted." (quoting *United States v. Rea*, 958 F.2d 1206, 1216 (2d Cir. 1992)); *Cameron v. City of New York*, 598 F.3d 50, 62 (2d Cir. 2010) ("When jurors can see with their own eyes both a defendant and a photograph that allegedly depicts that defendant, there is usually no need for a witness to testify to a resemblance between the two."). Put another way, Rule 701 is designed to bar testimony that "'merely tell[s] the jury what result to reach as to the defendants' culpability'" based on "'spoon-fed . . . interpretations of . . . the government's theory of the case.'" *See United States v. Gadson*, 763 F.3d 1189, 1208 (9th Cir. 2014) (quoting *United States v. Rollins*, 544 F.3d 820, 833 (7th Cir. 2008) (first quote) and *United States v. Freeman*, 730 F.3d 590, 597 (6th Cir. 2013) (second quote)); *see also* Fed. R. Evid. 701, advisory committee's note ("If . . . attempts are made to introduce meaningless assertions which amount to little more than choosing up sides, exclusion for lack of helpfulness is called for by the rule.").

Applying those principles, Officer-4 is not qualified to offer a lay opinion that Mr. Scott is on the Video Footage. *First*, in cases permitting a witness to identify a defendant on video footage, the witness's opinion was based on his "familiarity with [the defendant's] manner of dress, gait, and demeanor observed in [the witness's] several prior encounters with [the defendant]." *United States v. Arroyo*, 600 F. App'x 11, 15 (2d Cir. 2015); *see also United States v. Walker*, 974 F.3d 193, 205 (2d Cir. 2020) (holding that the district court did not abuse its discretion in permitting

probation officer to identify the defendant on a video of a robbery where the officer "had spent many hours with Walker leading up to the time of the robbery and had the opportunity to observe physical traits such as his gait, which were on display in the surveillance video but not at trial").

Here, the government has not produced any evidence that Officer-4 has directly observed Mr. Scott other than on the day of his arrest, which was weeks after the incident in question.  Thus, Officer-4's testimony that Mr. Scott appears on the Video Footage would be speculative, instead of grounded in the officer's direct knowledge of Mr. Scott based on prior interactions or as an eyewitness to the events on the Video Footage.  Moreover, even if Officer-4 had a basis to identify Mr. Scott, any such foundation likely would be based on inadmissible evidence that has never been disclosed to the defense.  *See, e.g.*, *Gadson*, 763 F.3d at 1208 ("[T]estimony that relies on or conveys hearsay evidence . . . is also inadmissible, both because it would not be based on the officer's own perceptions, and would not be helpful."); *see also United States v. Merino-Balderrama*, 146 F.3d 758, 763 (9th Cir. 1998) ("Confronting a defendant with evidence that he has never seen, sought, or produced offends basic concepts of fairness.").

*Second*, for similar reasons, Officer-4's identification of Mr. Scott on the Video Footage would not be helpful to the jury.  Because Officer-4 has only observed Mr. Scott on the day of his arrest, Officer-4 is in no better position than the jury to determine whether Mr. Scott is the individual on the Video Footage.  *See Cameron*, 598 F.3d at 62 ("When jurors can see with their own eyes both a defendant and a photograph that allegedly depicts that defendant, there is usually no need for a witness to testify to a resemblance between the two.").  Indeed, any such testimony by Officer-4 would essentially "spoon-feed" the government's case to the jury and "tell the jury what result to reach," which is exactly the type of testimony that must be excluded as unhelpful under Rule 701.  *See Gadson*, 763 F.3d at 1208; *Rea*, 958 F.2d at 1215-16; *see also* Fed. R. Evid.

701, advisory committee's note (explaining that Rule 701 was designed to exclude testimony amounting to "meaningless interpretations" that do "little more than choosing up sides").

*Finally*, Officer-4's identification of Mr. Scott would have to be based on "specialized knowledge" that is properly within the scope of expert testimony.  *See* Fed. R. Evid. 701, 702. Rule 701 is designed to ensure that lay and expert testimony remain separate and requires the Court to "scrutinize[]" whether "the reliability requirements set forth in Rule 702 will be evaded through the simple expedient of proffering an expert in lay witness clothing."  Fed. R. Evid. 701, advisory committee's note; *see also Garcia*, 413 F.3d at 215 ("The purpose of this final foundation requirement is to prevent a party from conflating expert and lay opinion testimony thereby conferring an aura of expertise on a witness without satisfying the reliability standard for expert testimony set forth in Rule 702 and the pre-trial disclosure requirements set forth in Fed. R. Crim. P. 16 and Fed. R. Civ. P. 26.").  Thus, in considering whether a lay opinion is based on specialized knowledge, "a court must focus on 'the reasoning process' by which a witness reached his proffered opinion."  *Garcia*, 413 F.3d at 215; *see also Bank of China v. NBM LLC*, 359 F.3d 171, 182 (2d Cir. 2004) (finding error in admission of evidence under Fed. R. Evid. 701 that was "not a product of [witness's] investigation" but rather "reflected [his] specialized knowledge").

Here, the government has not produced any evidence supporting that Officer-4's opinion would be informed by reasoning processes familiar to the average person in everyday life rather than by scientific, technical, or other specialized knowledge.  Rather, it appears that Officer-4 will be basing his opinion on the totality of the underlying investigation and his training and experience. The Second Circuit has held that "the foundation requirements of Rule 701 do not permit a law enforcement agent to testify to an opinion so based and formed if the agent's reasoning process depended, in whole or in part, on his specialized training and experience."  *Garcia*, 413 F.3d at

216.  As a result, Officer-4's testimony is inadmissible under Rule 701.

### B.      Officer-4's Opinion is Unfairly Prejudicial Under Rule 403

Officer-4's testimony that Mr. Scott appears on the Video Footage also should be excluded

under Rule 403.  For all the reasons outlined above, any such testimony would have little, if any,

probative value because the jury is in as good a position as Officer-4 to determine who is or is not

on the Video Footage.  Officer-4's identification of Mr. Scott on the Video Footage also would be

highly prejudicial.  Officer-4 would be testifying to one of the key and ultimate issues in the case,

and there would be a significant "risk that the jury will defer to the officer's superior knowledge

of the case."  *United States v. Hampton*, 718 F.3d 978, 981 (D.C. Cir. 2013).  Several courts have

found that identification testimony by law enforcement "may increase the possibility of prejudice

to the defendant either by highlighting the defendant's prior contact with the criminal justice

system, . . . or by effectively constraining defense counsel's ability to undermine the basis for the

witness's identification on cross-examination."  *United States v. Pierce*, 136 F.3d 770, 776 (11th

Cir. 1998); *see also United States v. Knowles*, 889 F.3d 1251, 1256-57 (11th Cir. 2018) ("a danger

of unfair prejudice may arise when the source of identification testimony is a law enforcement

official whose familiarity with the defendant was obtained through the defendant's past exposure

to the criminal justice system."); *Walker*, 974 F.3d at 205 (same and citing cases).

While the Second Circuit "place[s] great weight on the District Court" in determining

whether or not to permit such an identification, it has approved of such testimony only where the

defense can meaningfully cross-examine the witness as to the basis of the witness's knowledge.

*See Walker*, 974 F.3d at 206.  Here, however, the government has not produced any evidence—

other than the fact that Officer-4 interacted with Mr. Scott on one day, weeks after the incident in

question—that would permit the defense to meaningfully cross examine Officer-4 on this topic.

To the extent that Officer-4's knowledge is based on other alleged bad acts of Mr. Scott, the government did not identify any such acts in its Rule 404(b) notice, which was due several weeks ago. The government should not be permitted to cure that deficiency now, given that the defense will have virtually no time before trial to investigate Officer-4's alleged bases for identifying Mr. Scott on the Video Footage.

In sum, given the limited probative value of the proposed identification evidence, the substantial risk its admission would present, and the constraints of Rule 701, Officer-4 should be precluded from identifying Mr. Scott on the Video Footage at trial.

## V.   THE COURT SHOULD PRECLUDE ANY WITNESS OR THE GOVERNMENT FROM REFERRING TO MR. SCOTT AS "ILL WILL" AND STRIKE THE ALIAS "ILL WILL" FROM THE INDICTMENT

The government's discovery and 3500 material suggest that the government, Witness-1, and Witness-2 may refer to Mr. Scott by the alleged alias "Ill Will." The government has provided no discovery supporting why Mr. Scott is allegedly known as "Ill," but the plain meaning of that term suggests that Mr. Scott is an "evil" person. *See* Ill, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/ill (last visited Nov. 24, 2021). As the Second Circuit has explained:

> When a defendant charged with a crime of violence is identified before a jury by a nickname that bespeaks guilt, violence, or depravity, the potential for prejudice is obvious. Before receiving such evidence over a defendant's objection, a trial court should consider seriously whether the probative value is substantially outweighed by any danger of unfair prejudice, Fed. R. Evid. 403, and whether introduction of the nickname is truly needed to identify the defendant, connect him with the crime, or prove some other matter of significance.

*United States v. Farmer*, 583 F.3d 131, 135 (2d Cir. 2009) (vacating attempted murder conviction because misuse of a nickname caused the defendant substantial prejudice); *see also United States v. Aloi*, 511 F.2d 585, 602 (2d Cir. 1975) (referring to coconspirators and/or defendants by

inflammatory nicknames is a "prosecution practice . . . to be condemned").

In light of this precedent, the government and its witnesses should be precluded from referring to Mr. Scott as "Ill Will."  The reasons include (i) Witness-1 and Witness-2 do not appear to have personal knowledge of whether or not Mr. Scott's alias is "Ill Will"; (ii) referring to Mr. Scott as "Ill Will" is not relevant to whether he possessed ammunition on June 23, 2020; and (iii) to the extent that any probative value can be discerned, it is substantially outweighed by the danger of unfair prejudice, misleading the jury, and confusion of the issues.

### A.    The Government's Witnesses Do Not Appear to Have First-Hand Knowledge of Whether or Not Mr. Scott is "Ill Will"

Whether Mr. Scott's alias is "Ill Will" is a factual question.  "The Federal Rules of Evidence allow the admission of fact testimony so long as the witness has personal knowledge, *see* Fed. R. Evid. 602."  *See United States v. Cuti*, 720 F.3d 453, 457 (2d Cir. 2013); *see also* Fed. R. Evid. 602 ("A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter.").  "The test is whether a reasonable trier of fact could believe the witness had personal knowledge." *Folio Impressions, Inc. v. Byer California*, 937 F.2d 759, 764 (2d Cir. 1991).  Personal knowledge can be obtained "from general observation" but "not upon conjecture or hearsay." *Id.*; *see also United States v. Garcia*, 291 F.3d 127, 140 (2d Cir. 2002) (referring to the requirement that a lay witness must have "first-hand knowledge or observation" to testify as a "foundational requirement [that] goes to the admissibility of evidence, not merely its weight").

Here, 3500 material strongly suggests that Witness-1 and Witness-2 do not have personal knowledge of whether Mr. Scott's alias is "Ill Will."  Witness-1 knows Mr. Scott as "Ill Will" "because ███████████ said 'that's who they call Ill Will.'" (*See* Ex. E).  As a result, Witness-1's knowledge of Mr. Scott's alleged alias appears to be based on multiple levels of hearsay (that is,

from ███████ who learned the alias from others), which does not amount to personal knowledge under Rule 602. Similarly, though Witness-2 allegedly knows Mr. Scott as "Ill Will," it is not clear what that knowledge is based on. Witness-2 does not know Mr. Scott's "real name" and refers to "Ill Will" as his "street name." (*See* Ex. C). If Witness-2's knowledge is based on what Witness-2 has heard from others in the neighborhood, it also would be based on "inadmissible hearsay." *United States v. Robinson*, 206 F. App'x 80, 83 (2d Cir. 2006) (summary order). Moreover, the government has not produced any other discovery, such as information obtained from the phone alleged to be used by Mr. Scott, supporting that Mr. Scott is referred to as "Ill Will."[6] Thus, Witness-1 and Witness-2 should not be permitted to refer to Mr. Scott as "Ill Will" because they lack personal knowledge sufficient to do so.

### B. "Ill Will" Should Be Excluded Because It Is Irrelevant

Whether "Ill Will" is Mr. Scott's alias is not relevant to the sole count that Mr. Scott possessed three rounds of ammunition on June 23, 2020. We anticipate that the government may argue that the alias is necessary to identify Mr. Scott. Courts that have allowed aliases to establish identity have done so where (i) the defendant used the alias in connection with illegal activity, *see United States v. Ruggiero*, 824 F. Supp. 379, 397 (S.D.N.Y. 1993) (holding aliases were necessary to identify the defendant where he identified himself to police by his alias and had a vanity license plate with it); (ii) the defendant is referred to by his alias on a recording or in a written communication such that the alias would be helpful in identifying who was speaking, *see United States v. Persico*, 621 F. Supp. 842, 861 (S.D.N.Y. 1985) ("The government claims that in testimony and on tape there will be references to, for example, 'Frankie the Beast,' without mention of any surname."); or (iii) a witness knows the defendant only by his or her alias, *see*

---

[6]     In fact, the person the government alleges to be Mr. Scott is referred to as "Don" in text messages on that phone.

*Farmer*, 583 F.3d at 146 ("[I]t was error for the district court to permit the government to elicit testimony of Farmer's nickname (except for references by witnesses who know him by that name).").

None of those circumstances are present here. Mr. Scott is not alleged to have used the alias in connection with possessing ammunition and it has no legitimate relationship to the crime charged. Mr. Scott also will not be referred to by his alleged alias on any recording or written communication. Messages recovered from the phone alleged to be used by Mr. Scott refer to the phone's user as "Don," not "Ill Will." Relatedly, unlike adjectives that describe a person's physical features (*e.g.*, "Big Will" or "Little Will"), "Ill" would not help the jury identify Mr. Scott as the person who is allegedly on the Video Footage.

Finally, though some government witnesses allegedly only know Mr. Scott as "Ill Will," the fact that the alias includes Mr. Scott's real name ("Will") is a critical distinction from cases in which witnesses were permitted to testify as to the defendant's alias. For example, in *Farmer*, the Second Circuit indicated that it was permissible for some witnesses to refer to the defendant as his alias "murder," because the witnesses did not know his real name. 583 F.3d at 146. Here, by contrast, the witnesses do know Mr. Scott's real name, Will. Thus, those witnesses could simply identify him without the pejorative epithet "Ill." The fact that those same witnesses might know Mr. Scott as "Ill" plus "Will" is not probative, especially where, as here, those witnesses' knowledge of the alias appears to be based on inadmissible hearsay. Thus, the alias "Ill Will" is not necessary to identify the defendant as the alleged perpetrator of the acts charged in the Indictment.[7]

---

[7]     There also would be no prejudice to the government from having their witnesses refer to Mr. Scott as "Will" instead of "Ill Will." For example, the government often requests that courts permit its witnesses to testify using pseudonyms for safety reasons, which necessarily requires every other witness to refer to that individual by the pseudonym, rather than how that person is

**C.      "Ill Will" Should Be Excluded Because It Is Unfairly Prejudicial and Risks Misleading the Jury and Confusing the Issues**

Even if referring to Mr. Scott as "Ill Will" had any scintilla of probative value, it would be substantially outweighed by the danger of unfair prejudice, misleading the jury, and confusion of the issues.  The definitions of "Ill" include "causing suffering or distress," "attributing evil or an objectionable quality," and "indicative of an evil or malevolent intention."  *See* Ill, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/ill (last visited Nov. 24, 2021). As the Second Circuit cautioned in *Farmer*, where, as here, "a nickname . . . bespeaks guilt, violence, or depravity, the potential for prejudice is obvious."  *Farmer*, 583 F.3d at 135.  Referring to Mr. Scott as "Ill"—that is, someone who is "evil"—would plainly be highly inflammatory and simply suggest to the jury that they should convict him because he is a "malevolent" person, not based on the evidence.  *See also United States v. Alston*, No. 15 Cr. 435 (CM), 2016 WL 5806790, at *8 (S.D.N.Y. Sep. 27, 2016) (allowing nicknames to be used at trial only where they were "innocuous and not suggestive of a criminal disposition"); *Blount v. City of New York*, No. 15 Civ. 5599 (PKC), 2019 WL 1050994, at *1 (E.D.N.Y. Mar. 5, 2019) ("Plaintiff's stage name, 'Moon Murder,' could easily suggest to the jury that Plaintiff has a propensity for criminal activity, which could unduly influence [it]").

Referring to Mr. Scott as "Ill" also risks misleading and confusing the jury.  Even if there was evidence explaining the meaning of the nickname (and, as noted, the government has produced none), any such evidence would almost certainly amount to impermissible character evidence used to show a propensity for violent or criminal behavior.  *See Farmer*, 583 F.3d at 146 (referencing

_____

known to the witness.  *See, e.g.*, *United States v. Hernandez*, No. 15 Cr. 379 (PKC) (S.D.N.Y. Sep. 23, 2019) (granting government's request that a cooperating witness testify using a pseudonym); *United States v. Schulte*, 436 F. Supp. 3d 698, 706-07 (S.D.N.Y. 2020) (granting government's request that certain intelligence agency witnesses testify using pseudonyms).

the danger of admitting impermissible character evidence as an additional reason to prevent the use of a nickname).  Thus, the jury would be left to speculate why Mr. Scott is allegedly called "Ill."  Moreover, if this alias was presented, the defense would have to present evidence to show its appropriate purposes and potentially contest the government's proof.  This would be the quintessential type of "trial within a trial" that Rule 403 disfavors.  *United States v. Al Kassar*, 660 F.3d 108, 123-24 (2d Cir. 2011); *Doe v. Lima*, No. 14 Civ. 2953 (PAE), 2020 WL 728813, at *6 (S.D.N.Y. Feb. 13, 2020) (precluding evidence where it would amount to "hijacking a targeted inquiry" into the issues at hand and "promote delay, risk confusing the jury as to its finite mission, and create a high risk of unfair prejudice to plaintiffs"); *see also Tennison v. Circus Circus Enter., Inc.*, 244 F.3d 684, 690 (9th Cir.2001) (affirming exclusion of evidence under Rule 403 where the evidence "might have resulted in a 'mini trial'").  Thus, the Court should exclude any references to Mr. Scott as "Ill Will" in advance of trial.

### D.    "Ill Will" Should Be Struck From the Indictment

For similar reasons, the Court also should strike the alias "Ill Will" from the Indictment. *See* Fed. R. Crim. 7(d) ("the court may strike surplusage from the indictment"); *see also United States v. Mulder*, 273 F.3d 91, 99-100 (2d Cir. 2001) (granting motion to strike surplusage that is not relevant to the crime charged and is unfairly prejudicial); *United States v. Allen*, No. 09 Cr. 329 (RJA), 2014 WL 1745933, at *6 (W.D.N.Y. Apr. 30, 2014) ("presenting an indictment containing repeated references to defendant Allen as 'Killer Kev' to the jury . . . is unduly prejudicial."); *United States v. Orena*, 876 F. Supp. 20, 25 (E.D.N.Y. 1995) (striking the alias "Paulie Guns" from the indictment).

## VI.     THE COURT SHOULD PRECLUDE THE GOVERNMENT FROM USING THE TERMS "CONVICTED FELON," "FELON," AND "FELONY"

The Government should be precluded from referring to Mr. Scott as a "convicted felon," or using the terms "felon" or "felony" at trial.  The Second Circuit strongly approves of these protective measures in § 922(g)(1) prosecutions, and has described district courts that have taken them as "conscientiously and carefully . . . protect[ing a] defendant from undue prejudice." *United States v. Belk*, 346 F.3d 305, 311 (2d Cir. 2003); *see also United States v. Brooks*, 242 F.3d 368, 368 (2d Cir. 2000) (summary order) (criticizing the government for referring to the defendant as a convicted felon:  "Although mention of the elements was entirely permissible, the fact that Brooks was a convicted felon was mentioned by the AUSA no fewer than eight times, frequently in statements that the jury might well not have understood to be merely articulations of the elements of the offense."); *see also Transcript of Proceedings* at 19-20, *United States v. Gil*, No. 14 Cr. 721 (JGK) (S.D.N.Y. Aug. 10, 2015) (holding that the term "convicted felon" is "unnecessary, and possibly pejorative" and that "[t]he government should not refer to the defendant as a convicted felon" but instead "use the terms in the statute").

The Second Circuit's precedent makes sense and should be applied here.  Section 922(g)(1) does not use the terms "convicted felon," "felon," or "felony."  Thus, referring to Mr. Scott by those terms has little, if any, probative value.  This is especially true in this case because Mr. Scott has stipulated that he has been convicted of a crime punishable by imprisonment for a term exceeding one year, which relieves the government from establishing that element of the offense.  Referring to Mr. Scott as a convicted felon or using similar terms also would be highly prejudicial.  Those terms would suggest to the jury that Mr. Scott should be convicted because he has a propensity to commit the offense in question.  Indeed, even the government has recognized that "convict" and "felon" are disparaging and highly stigmatizing labels.  *See* Tom Jackman, *Guest*

*Post By Karol Mason: Justice Dep't Agency to Alter Its Terminology for Released Convicts, to Ease Reentry*, Wash. Post. (May 4, 2016).  As a result, the government should be precluded from using those and similar terms at trial.

## VII.   THE COURT SHOULD PRECLUDE THE GOVERNMENT FROM ARGUING THAT MR. SCOTT ATTEMPTED TO FLEE AFTER JUNE 23, 2020

On July 7, 2020, Mr. Scott was arrested at a friend's home in Kingston, New York.  The Court should prohibit the Government from arguing that Mr. Scott allegedly fled to that location following the incident in question.  The government did not identify Mr. Scott's alleged flight in its Rule 404(b) notice, which was due on November 15, 2021.  However, yesterday evening, the government emailed defense counsel and stated that it might seek to introduce flight as Rule 404(b) evidence.  The government's notice is two weeks late and should not be considered as a basis to introduce the evidence.  As a result, if the government seeks to admit evidence of flight, it must establish that it is circumstantial evidence of consciousness of guilt.  For the reasons below, the government cannot do so, and the evidence should otherwise be excluded under Rule 403.

Where, as here, the defendant's flight is allegedly evidence of consciousness of guilt, it must meet the four-step test set forth in *United States v. Al-Sadawi*, 432 F.3d 419, 424 (2d Cir. 2005).  In particular, the probative value of this evidence "depends upon the degree of confidence with which four inferences can be drawn: (1) from the defendant's behavior to flight; (2) from flight to consciousness of guilt; (3) from consciousness of guilt to consciousness of guilt concerning the crime charged; and (4) from consciousness of guilt concerning the crime charged to actual guilt of the crime charged."  *Id.*; *United States v. Beahm*, 664 F.2d 414, 420 (4th Cir. 1981) ("If the government wishes to offer evidence of flight to demonstrate guilt, it must ensure that each link in the chain of inferences leading to that conclusion is sturdily supported.").  These requirements "ensure[] that the evidence is probative in a legal sense and protects the defendant

against the possibility of the jury drawing unsupported inferences from otherwise innocuous behavior." *United States v. Amuso*, 21 F.3d 1251, 1260 (2d Cir. 1994).

      The government cannot make this showing. *First*, the government cannot establish when Mr. Scott traveled to Kingston, which would be a necessary factual predicate for establishing the *Al-Sadawi* factors. The government has only recently produced location data that they collected as part of this investigation. On June 25, 2020, the government obtained authorization to use a pen register and trap and trace device on the number associated with a phone he is alleged to have used ("Phone-1"), and then on July 1, 2020, the government obtained authorization to use a cell site simulator to identify the location of Phone-1. However, the government did not produce returns from those investigative techniques until November 5, 2021. The government has agreed not to use this cell site data, presumably in recognition of the fact the materials should have been produced pursuant to the government's Rule 16 obligations over a year ago.[8]

      In any event, the government's location data does not support an inference that Mr. Scott fled immediately following the incident in question. At best, the government's location data would show that Mr. Scott was not in the Bronx on June 30, the earliest date for which the government received location data. But that does not support an inference that Mr. Scott fled because he possessed ammunition seven days earlier. *See United States v. Silverman*, 861 F.2d 571, 582 n.4 (9th Cir. 1988) ("Evidence that a defendant fled ***immediately*** after a crime was committed supports an inference that the flight was motivated by a consciousness of guilt of that crime. As the time between the commission of the offense and the flight grows longer, the inference grows weaker." (emphasis added)). Indeed, the government has not produced any evidence concerning how Mr.

---

[8]    Moreover, to the extent anyone from the government was going to testify about them, any testimony would amount to expert testimony for which the government has not identified an expert.

Scott traveled or what he traveled with, which might have supported an inference as to consciousness of guilt. *See also United States v. Salameh*, 152 F.3d 88, 157 (holding that the jury could have inferred consciousness of guilt where the defendant in a bombing prosecution left the country the day after the bombing and traveled using a one-way ticket, with no luggage, and leaving his family behind).[9]

*Second*, the government cannot establish that Mr. Scott's alleged flight is evidence of consciousness of guilt of the actual crime charged. As of June 23, 2020, Mr. Scott was also charged in state court for an alleged crime that occurred on July 22, 2016. Prior to June 23, 2020, Mr. Scott also exchanged messages on Phone-1 that he had "been on the move" recently, which suggests that he was moving around before the incident in question. Thus, even assuming Mr. Scott fled, it could have been because he was worried about being apprehended on the other pending state charge, not based on what occurred on June 23, 2020. In fact, following Mr. Scott's arrest, Mr. Scott was informed that he was arrested based on "a federal arrest warrant . . . for a shooting that happened in the Bronx." He responded by asking whether the shooting was "the one I'm on bail for now," that is, the other state charge. When Officer-4 told Mr. Scott that he was arrested for something that "happened a couple weeks ago," Mr. Scott responded, "I'm not aware of that." Mr. Scott's statements following his arrest strongly cuts against any inference that Mr. Scott fled because of what allegedly occurred on June 23, 2020. Given the lack of evidence that Mr. Scott's alleged flight was related to the charges in this case (and in fact evidence strongly suggesting otherwise), the jury would be left to speculate, which is impermissible. *United States v. Sanchez*,

---

[9]     A text message from the phone alleged to be used by Mr. Scott reflects that on June 24, 2020, Mr. Scott allegedly asked another person for an "outta town spot asap" and said "Bet shit went left yesterday." But even assuming that message reflects that Mr. Scott was considering leaving the Bronx, the government cannot establish when he actually did so, which undercuts any inference of consciousness of guilt.

790 F.2d 245 at 252 (2d Cir. 1986) (Flight evidence "must . . . provide the jury with more than an opportunity for mere 'conjecture and speculation.'" (quoting *United States v. Meyers*, 550 F.2d 1036, 1050 (5th Cir. 1977))); *see also United States v. Green*, No. 12 Cr. 83 (WMS), ), 2017 WL 4803957, at *4-5 (W.D.N.Y. Oct. 25, 2017) (excluding flight evidence where the government did not establish that the defendant's flight was based on the charges in the case).

The Court should preclude evidence of flight for an independent reason:  any probative value from that evidence is substantially outweighed by the danger of unfair prejudice.  For all the reasons discussed above, the government's flight evidence is speculative at best.  On the other hand, the potential for unfair prejudice is substantial in that the jury would be left to speculate about the timing and reasons for Mr. Scott being at a friend's house in Kingston a couple weeks after the incident in question.  The evidence should be excluded.

## VIII.    THE   COURT   SHOULD   PROHIBIT   THE   GOVERNMENT   AND   ITS WITNESSES FROM REFERRING TO WITNESS-1 AS A "VICTIM" AT TRIAL

The Court should prohibit the government from referring to Witness-1 as "the victim" at trial because such references are irrelevant and unduly prejudicial.  Courts may prohibit the use of certain "pejorative terms" during argument, questioning, or testimony, when such categorizations are "inflammatory and unnecessary to prove a claim" or "do not bear on the issues being tried." *MF Glob. Holdings Ltd. v. PricewaterhouseCoopers LLP*, 232 F. Supp. 3d 558, 570 (S.D.N.Y. 2017).  In jury arguments, the government also must not "indulge[] in an appeal wholly irrelevant to any facts or issues in the case." *Viereck v. United States*, 318 U.S. 236, 247 (1943).

Courts have, at times, permitted the government to refer to individuals as "victims" over defense objections. *See United States v. Helbrans*, No. 19 Cr. 497 (NSR), 2021 WL 4778525, at *15-17  (S.D.N.Y. Oct. 12, 2021); *United States v. Gasperini*, No. 16 Cr. 441 (NGG), 2017 WL 3140366, at *7 (E.D.N.Y. July 21, 2017).  However, in each of those cases, the defendants were

charged with crimes in which the existence of victims was necessary to proving at least some of the offenses. *Helbrans*, 2021 WL 4778525, at *1 (defendants charged with, among many other things, conspiracy to commit international parental kidnapping of minors); *Gasperini*, 2017 WL 3140366, at *1 (defendant charged with, among other things, computer intrusion of certain advertisers in the United States).

The circumstances here are markedly different. Mr. Scott is charged with possessing ammunition, not shooting Witness-1. As a result, referring to Witness-1 as a victim is unnecessary to prove the sole count of the Indictment. Moreover, any probative value from the term victim would be substantially outweighed by the danger of unfair prejudice and misleading the jury. Referring to Witness-1 as a victim would suggest to the jury that they should convict Mr. Scott because he has allegedly harmed another individual, which is not an element of the offense charged, rather than based on the actual evidence. As a result, the Court should preclude the government or its witnesses from referring to Witness-1 as a victim. *See MF Glob. Holdings Ltd.*, 232 F. Supp. 3d at 570 (disallowing use of the term "vulture funds" as inflammatory and unnecessary); *Speedfit LLC v. Woodway USA, Inc.*, No. 13 Civ. 1276 (KAM) (AKT), 2020 WL 130423, at *7 (E.D.N.Y. Jan. 9, 2020) (excluding references to "fraud" in an action which did not allege fraud as both irrelevant and unfairly prejudicial under Rule 403). *Highland Capital Mgmt., L.P. v. Schneider*, 551 F. Supp. 2d 173, 193 (S.D.N.Y. 2008) (disallowing use of the phrase "insider trading" as inflammatory and unnecessary under Rule 403).

## IX.  THE COURT SHOULD GIVE A LIMITING INSTRUCTION REGARDING MR. SCOTT'S PRIOR CONVICTION

Mr. Scott has agreed to enter into the following stipulation with the government concerning his prior conviction:

On September 5, 2017, WILLIAM SCOTT, the defendant, was convicted in a state court of a crime punishable by imprisonment for a term exceeding one year, and thereafter Mr. Scott knew he had been convicted in a state court of a crime punishable by imprisonment for a term exceeding one year.

Where a stipulation as to the defendant's prior conviction is entered in a § 922(g) prosecution, a limiting instruction to the jury is proper at the defendant's request to ensure that the jury considers the prior conviction for a proper purpose. *See United States v. Gilliam*, 994 F.2d 97, 100 (2d Cir. 1993). Accordingly, after the stipulation is entered in evidence during the trial, Mr. Scott requests that the Court instruct the jury as follows:

> The fact of Mr. Scott's prior conviction is admissible because, as I will explain to you at the conclusion of the case, one element that the government must prove beyond reasonable doubt is that prior to June 23, 2020, Mr. Scott was convicted of an offense punishable for a term exceeding one year. I want to firmly instruct you that the prior conviction that is an element of the charge here is only to be considered by you for the fact that it exists and for nothing else. You are not to consider it for any other purpose, and you are not to speculate as to what it was for or anything else. It is not to be in any way considered by you on whether the government has proved beyond a reasonable doubt that the defendant was in knowing possession of ammunition on June 23, 2020 or that the defendant's alleged possession of the ammunition was in or affecting interstate or foreign commerce.

*See, e.g.*, *Gilliam*, 994 F.3d at 100 (describing a similar instruction as "a strongly worded and quite proper curative instruction to prevent the jury from speculating on the nature of [the defendant's] prior conviction").

## X. RESERVATION OF ADDITIONAL ISSUES.

As Mr. Scott continues to prepare for trial, we may continue to receive information that raises additional unforeseen pretrial issues. In the event the government provides more material to the defense, including additional Rule 16, 3500, and/or *Brady*/*Giglio* disclosures, Mr. Scott reserves the right to supplement his motions *in limine*.

## <u>CONCLUSION</u>

For the foregoing reasons, Mr. Scott's motions *in limine* should be granted.

Dated: November 29, 2021
      New York, New York

                      Respectfully submitted,

                      /s/ Antonia M. Apps
                      Antonia M. Apps
                      Matthew Laroche
                      Isabel C. Pitaro
                      MILBANK LLP
                      55 Hudson Yards
                      New York, NY 10001
                      Telephone: 212-530-5000

                      *Counsel for Defendant William Scott*