**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|                              |   |                    |
|------------------------------|---|--------------------|
|                              | X |                    |
| UNITED STATES OF AMERICA     | : |                    |
|                              | : |                    |
|           vs.                | : |                    |
|                              | : | No. 21 Cr. 429 (AT) |
| WILLIAM SCOTT,               | : |                    |
|                              | : |                    |
|                              | : |                    |
|           Defendant.         | : |                    |
|                              | X |                    |

**DEFENDANT WILLIAM SCOTT'S MEMORANDUM OF LAW IN SUPPORT OF ITS**
**SUPPLEMENTAL MOTION *IN LIMINE* AND IN OPPOSITION TO**
**THE GOVERNMENT'S MOTIONS *IN LIMINE***

LAW OFFICES OF SUSAN G. KELLMAN
Susan G. Kellman
25 Eighth Avenue
Brooklyn, NY  11217
Phone: (718) 783-8200

Eylan Schulman, Esq.
Associate Counsel

*Counsel for Defendant William Scott*

# TABLE OF CONTENTS

**Pages**

PRELIMINARY STATEMENT ................................................................................................1

SUMMARY OF THE ARGUMENT ......................................................................................2

ARGUMENT ...........................................................................................................................3

  I.   THE COURT SHOULD PRECLUDE THE GOVERNMENT FROM USING ANY
SURVEILLANCE VIDEOS AT TRIAL..........................................................................3

  II.   THE COURT SHOULD NOT ADMIT WITNESS-2'S PRIOR IDENTIFICATION
OF SCOTT .......................................................................................................................5

      A.   The Government Should Not be Allowed to Relitigate a Matter on which this
Court has Already Ruled.................................................................................................5

      B.   Witness-2's Prior Identification of Scott was Unduly Suggestive and Should Not
be Admitted .....................................................................................................................7

  III.   THE COURT SHOULD NOT ALLOW GOVERNMENT WITNESSES TO
CONDUCT SURVEILLANCE VIDEO IDENTIFICATIONS ............................................9

      A.   Officer-4's Opinion is Inadmissible Under Rule 701 and Unfairly Prejudicial
Under Rule 403 ...............................................................................................................9

      B.   Witness-2's Opinion is Inadmissible Due to the Government's Prior Misleading,
Inaccurate, and Incomplete Prior Representations .........................................................11

  IV.   THE COURT SHOULD PRECLUDE THE GOVERNMENT FROM ARGUING
OR INTRODUCING EVIDENCE SHOWING SCOTT ATTEMPTED TO FLEE THE
BRONX AFTER JUNE 23, 2020.......................................................................................12

      A.   Testimony About Location Data Obtained by the Government is Inadmissible
Due to the Government's Belated Production ..................................................................13

      B.   The Government's Proposed Text Message Evidence from Phone-1 is
Misleading and Inadmissible..........................................................................................14

      C.   The Government Should Not be Allowed to Offer Evidence of Flight as Direct
Proof of Consciousness of Guilt .....................................................................................17

D.   The Government Should Not be Allowed to Admit Evidence of Flight under Rule 404(b) ........................................................................................................ 18

V.   THE COURT SHOULD ALLOW THE DEFENSE TO CROSS-EXAMINE WITNESS-1 ABOUT HIS 2011 FELONY CONVICTION AND RESERVE RULING ON THE ADMISSIBILITY OF WITNESS-1 AND WITNESS-2'S OTHER ARRESTS AND CONVICTIONS ................................................................................ 20

A.   The Court Should Allow the Defense to Cross-Examine Witness-1 About His Conviction for a Felony Within the Last Ten Years ...................................................... 21

B.   The Court Should Reserve Ruling on the Admissibility of the Other Prior Arrests, Convictions, and Bad Acts .................................................................................... 23

CONCLUSION ........................................................................................................25

# TABLE OF AUTHORITIES

**Pages**

**Cases**

*Annunziato v. Manson*, 566 F.2d 410 (2d Cir. 1977).........................................................................4

*Boykin v. W. Express, Inc.*, No. 12 Civ. 7428 (NSR), 2016 WL 8710481

   (S.D.N.Y. Feb. 5, 2016) .............................................................................4

*Davis v. Alaska*, 415 U.S. 308 (1974)..........................................................................23

*Dickerson v. Fogg,* 692 F.2d 238 (2d Cir. 1982)..........................................................12

*Henry v. Speckard*, 22 F.3d 1209 (2d Cir. 1994)..........................................................23

*Johnson v. Mammoth Recreations, Inc.*, 975 F.2d 604 (9th Cir. 1992).........................19

*Josendis v. Wall to Wall Residence Repairs, Inc.*, 662 F.3d 1292 (11th Cir. 2011).....................19

*Leo v. Long Island R. Co.*, 307 F.R.D. 314 (S.D.N.Y. 2015) ........................................4

*Mikus v. U.S.*, 433 F.2d 719 (2d Cir. 1970) .................................................................4

*Nappi v. Yelich*, 793 F.3d 246 (2d Cir. 2015) ..............................................................23

*Parker v. Columbia Pictures Industries*, 204 F.3d 326 (2d Cir. 2000).........................19

*Reid v. Cty. of Erie*, No. 15 Civ. 01078 (JJM), 2019 WL 4600168 (W.D.N.Y. Mar. 14, 2019).. 19

*Shrader v. CSX Transp., Inc.,* 70 F.3d 255 (2d Cir. 1995) ............................................6

*U. S. ex rel. Annunziato v. Manson*, 425 F. Supp. 1272 (D. Conn. 1977) ....................24

*United States v. Alawi*, 20 Cr. 192 (JLS), 2021 WL 2252808 (W.D.N.Y. June 2, 2021) ...........20

*United States v. Al-Sadawi*, 432 F.3d 419 (2d Cir. 2005).............................................17

*United States v. Arroyo*, 600 F. App'x 11 (2d Cir. 2015)..............................................10

*United States v. Casanova*, No. 11 Cr. 562 (RJS), 2012 WL 760308 (S.D.N.Y. March 8, 2012) 19

*United States v. Crumble*, No. 18 Cr. 32 (ARR), 2018 WL 1737642 (E.D.N.Y. Apr. 11, 2018) .. 8

*United States v. Estrada*, 430 F.3d 606 (2d Cir. 2005).........................................21, 22

iii

*United States v. Feola*, 651 F. Supp. 1068 (S.D.N.Y. 1987) ........................................... 22

*United States v. Freeman*, 730 F.3d 590 (6th Cir. 2013) ................................................. 9

*United States v. Fuentes*, 563 F.2d 527 (2d Cir. 1977) .................................................... 4

*United States v. Gadson*, 763 F.3d 1189 (9th Cir. 2014) ................................................ 9

*United States v. Garcia*, 413 F.3d 201 (2d Cir. 2005) .................................................... 11

*United States v. Grinage*, 390 F.3d 746 (2d Cir. 2004) .................................................. 9

*United States v. Hampton*, 718 F.3d 978 (D.C. Cir. 2013) ............................................. 11

*United States v. Hayes*, 553 F.2d 824 (2d Cir. 1977) ..................................................... 22

*United States v. Hernandez*, No. 12 Civ. 322 (AT), 2015 WL 10710164

    (N.D. Ga. Feb. 2, 2015) ................................................................................ 20

*United States v. Jackson*, No. 19 Cr. 356 (ARR), 2020 WL 7063566 (E.D.N.Y. Dec. 2, 2020) . 22

*United States v. Jenkins*, No. 02 Cr. 1384 (RCC), 2003 WL 21047761 (S.D.N.Y. May 8, 2003) 22

*United States v. Johnson*, No. 16 Cr. 457 (NGG), 2017 WL 11490480

    (E.D.N.Y. May 24, 2017) ............................................................................. 19

*United States v. Kornegay*, 410 F.3d 89 (1st Cir. 2005) ................................................. 10

*United States v. Lumpkin*, 192 F.3d 280 (2d Cir. 1999) ................................................. 8

*United States v. Meyers*, 550 F.2d 1036 (5th Cir. 1977) ................................................ 16

*United States v. Mitchell*, 654 F. App'x 21 (2d Cir. 2016) ............................................. 9

*United States v. Perez*, No. 01 Cr. 848 (SWK), 2003 WL 721568 (S.D.N.Y. Feb. 28, 2003) ....... 8

*United States v. Reed*, No. 11 Cr. 487 (RJS), 2012 WL 2053758 (S.D.N.Y. June 6, 2012) .......... 8

*United States v. Rollins*, 544 F.3d 820 (7th Cir. 2008) .................................................. 9

*United States v. Sanchez*, 790 F.2d 245 (2d Cir. 1986) ................................................. 16

*United States v. Silverman*, 861 F.2d 571 (9th Cir. 1988) ............................................. 18

*United States v. Vasquez*, 840 F. Supp. 2d 564 (E.D.N.Y. 2011) ................................................ 22

*United States v. White*, 312 F.Supp.3d 355 (E.D.N.Y. 2018) ....................................................... 23

*United States v. Williams*, 88 F.Supp.3d 117 (N.D.N.Y. 2015) .................................................. 19

*Wiggins v. Greiner,* 132 F. App'x 861 (2d Cir. 2006) .................................................................... 8

*Young v. Conway*, 698 F.3d 69 (2d Cir. 2012) ............................................................................ 11

## Rules

Fed. R. Evid. 401 ........................................................................................................................ 15

Fed. R. Evid. 403 .................................................................................................................. 11, 23

Fed. R. Evid. 404(b) ............................................................................................................. 18, 20

Fed. R. Evid. 609 .................................................................................................................. 20, 21

Fed. R. Evid. 701. ................................................................................................................... 9, 11

Fed. R. Evid. 901 .......................................................................................................................... 3

## Articles, Authorities, Publications

Patrick M. Seffrin & Bianca I. Domahidi, *The Drugs–Violence Nexus: A Systematic Comparison of Adolescent Drug Dealers and Drug Users*, 44 J. OF DRUG ISSUES 394 (2014) ................... 25

## <u>PRELIMINARY STATEMENT</u>

Defendant William Scott ("Scott") submits this memorandum of law in support of his supplemental motion *in limine* to preclude video surveillance footage collected as part of the investigation because: (1) the government cannot establish chain of custody or authenticate the videos; and, (2) of the government's discovery violations, as outlined in Scott's motion filed on November 29, 2021 at Dkt. 41. Additionally, this memorandum is submitted in opposition to the government's motions *in limine* to have the Court: (1) revisit its prior suppression ruling from September 2021 regarding the admissibility of Witness-2's prior identification of Scott; (2) permit Witness-2 and Officer-4 to conduct surveillance video identifications of Scott; (3) introduce evidence of Scott's intention to leave the Bronx after June 23, 2020; and, (4) requesting the Court preclude cross-examination of Witness-1 and Witness-2 about prior arrests and convictions.[1]

Scott is charged in a one-count indictment with possessing ammunition on June 23, 2020. The government indicated its intention to produce two witnesses to identify Scott. The first, "Witness-1," will claim Scott shot him on June 23, 2020 and the second, "Witness-2," will claim to have witnessed the incident and identify Scott in the courtroom. Scott respectfully asks the Court to deny the government's motions *in limine*. Specifically, we ask that your Honor: (1) exclude Witness-2's prior identification of Scott; (2) preclude Witness-2 and Officer-4 from identifying Scott on surveillance video footage; (3) prohibit the government from arguing or introducing evidence that Scott discussed leaving the Bronx after June 23, 2020; and, (4) allow Scott to cross-examine Witness-1 and Witness-2 about prior arrests and convictions.

---

[1] Scott addresses the government's motions in the order that they were addressed in Scott's motions in limine (Dkt. 41 ("Defendant's Motions *in limine*")

## SUMMARY OF THE ARGUMENT

On the eve of trial, in November 2021, the government produced *eight* previously undisclosed surveillance videos reflecting critical events related to the incident that forms the gravamen of the charge in the indictment, including a video capturing the shooting itself and another video showing Witness-2's prior identification of Scott. The videos should have been produced more than a year earlier, since they have been in the government's possession since shortly after June 23, 2020.[2]

In addition to the prejudice caused by forcing the Court to analyze the motion to suppress identification evidence in September 2021 without the benefit of the actual identification that was indisputably in the government's possession -- there seems to be a larger problem waiting in the wings. From our review of the discovery, it appears unlikely that the government will be able to establish a proper chain of custody or to properly authenticate the videos because the lead detective stored the original videos at his home and left them on a flash drive for an unspecified period of time prior to producing, securing, or vouchering them as evidence as required by law. The government offers no explanation for this mishandling of the evidence; and thus, it raises serious concerns that parts of the videos may have been lost or manipulated since the videos were never properly secured as evidence must be and were presumably accessible to any number of individuals. Additionally, the government has indicated that it does not intend to call the "custodial officer" as a witness, raising additional concerns that others may have had access to the videos.

---

[2] The government's discovery violations are particularly egregious when the Court considers the history of the case, including the Court's dismissal of the indictment in 20 Cr. 332, based on the government's violation of Scott's Fifth Amendment right to a race-neutral jury selection process. (Dkt. 40.)

It is unusual that AUSA Rothman was investigating the incident and interviewing relevant parties within three days of the shooting, on June 26, 2020, yet AUSA Rothman did not ensure that the relevant videos were properly secured and disclosed. *See e.g.,* 3504-11, attached as Ex. A (Interview of "Officer-2" (as referred to in Scott's motion filed on November 29, 2021 at Dkt. 41) by AUSA Rothman and another detective). Officer-2 was ultimately responsible for destroying chain-of-custody by bringing surveillance videos home, rather than securing the videos as evidence.

The Court previously ruled that Witness-1 and Witness-2 may identify Scott at trial, notwithstanding suggestive law enforcement identification procedures.  The Court indicated it would allow in-court identifications but precluded admission of suggestive out-of-court identifications, concluding there was an independently reliable basis for the identification.  (Order, Dkt. 27 at 3-4).  However, the evidentiary landscape has changed significantly since the Court evaluated the appropriateness of the identification back in September 2021.  Further, the in-court identifications have been irreparably tainted by the previous out-of-court identifications.

The newly produced evidence from the government demonstrates the government's proffer in connection with the identification suppression motion was at best inaccurate and at worst misleading.  (Gov't Opposition to Scott's Motion to Suppress, Dkt. 18).  Specifically, newly disclosed body camera footage confirms that Witness-2's identification was staged, suggestive, and inconsistent with the government's prior proffer to the Court.  Additionally, Witness-2 gave an inaccurate description of the clothing worn by the alleged shooter.

## ARGUMENT

I.   **THE COURT SHOULD PRECLUDE THE GOVERNMENT FROM USING ANY SURVEILLANCE VIDEOS AT TRIAL**

The Court should preclude the government from introducing surveillance videos of the incident based on the government's multitude of discovery violations throughout the case, for the reasons argued in Scott's *in limine* motion.  Defendant's *in limine* motion at 17-24.  Additionally, it appears the government will be unable to establish chain of custody or authenticate the surveillance videos because the investigating NYPD detective brought the original videos home with him, rather than vouchering them with the applicable case file.

Fed. R. Evid. 901 mandates that "[t]o satisfy the requirement of authenticating or

identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." The Second Circuit requires authentication of video evidence "on the same principles as still photographs." *Mikus v. U.S.*, 433 F.2d 719, 725 (2d Cir. 1970); *see also Leo v. Long Island R. Co.*, 307 F.R.D. 314, 323-26 (S.D.N.Y. 2015) (holding that videos are not self-authenticating and require authentication testimony). Thus, to authenticate the videos, "Defendant[s] must demonstrate not only that Plaintiff is the individual depicted in the video but also that the video is authentic and that the events are accurately depicted." *Boykin v. W. Express, Inc.*, No. 12 Civ. 7428 (NSR), 2016 WL 8710481, at *5 (S.D.N.Y. Feb. 5, 2016) (finding insufficient authentication of a video though one party "has admitted that she is the individual in the videos, this alone does not confirm the genuineness or authenticity of what, according to [d]efendant, 'was truly and accurately before the camera'").

The Second Circuit "does not have a rigid formula for evaluating the authenticity of video tapes, the requisite indicia of authenticity can be created by presenting witnesses who recall the events depicted, testimony as to the chain of custody, testimony of the person recording the events, or any other evidence tending to show the accuracy of the depictions." *Boykin*, 2016 WL 8710481, at *5 (*citing United States v. Fuentes*, 563 F.2d 527, 532 (2d Cir. 1977) (noting that "since recorded evidence is likely to have a strong impression upon a jury and is susceptible to alteration, [it] ha[s] adopted a general standard, namely, that the government 'produce clear and convincing evidence of authenticity and accuracy' as a foundation for the admission of such recording").

The government recently produced videos which had inexplicably been on a hard drive in one of the investigating detective's homes for approximately seventeen months. It appears the officer saved parts of the videos onto the NYPD's Electronic Case Management System ("ECMS"), but took the original flash drive with the full video home, and did not include the

videos in a secure case file.  Specifically, it appears the investigating detective took only small excerpts of the videos and submitted them to the ECMS, and the "full video was to be preserved in the case folder."  (Ex. B, DD5#13).  Rather than preserve the "full video" in the case folder, Officer-2 brought the video home and never secured perhaps the most important evidence in the case.

As a result of Officer-2's mishandling of the evidence, the government will be unable to establish a proper evidentiary foundation for the videos because: (1) the accuracy of the recordings is in doubt; there are questions about whether the videos are authentic; (2) there is doubt about whether the events are accurately depicted; and (3) secure chain of custody was broken when Officer-2 brought the videos home.

For these reasons, in addition to the government's failure to timely produce many of the surveillance videos, the Court should preclude the government from introducing any surveillance videos during trial.

## II.   THE COURT SHOULD NOT ADMIT WITNESS-2'S PRIOR IDENTIFICATION OF SCOTT

### A.   The Government Should Not be Allowed to Relitigate a Matter on which this Court has Already Ruled

The government seeks to relitigate the admissibility of Witness-2's prior identification of Scott.  On September 9, 2021, the Court held the police's "identification process" for Witnesses 1 and 2 was "unduly suggestive," but found an "independently reliable basis for an in-court identification."  (Dkt. 27 at 3-4).  The government now suggests the Court only deemed the photograph Witness-2 signed when she identified Scott to be unduly suggestive and requests that Witness-2 be allowed to state at trial that she previously identified the shooter as "Ill Will."

The government's application flies directly in the face of the Court's prior determination,

which found the NYPD's entire "identification *process*" (emphasis added) misleading – not just the signed photo.  (Dkt. 27 at 3).  Additionally, it is impossible to view this video without drawing the inescapable conclusion that the identification has been rehearsed prior to switching on the body camera recorder.

The government now asks the Court to reconsider its prior ruling related to the out of court identification process.  In the Southern District, Local Civil Rule 6.3 governs motions for reconsideration and requires the moving party to set forth "the matters or controlling decisions which counsel believes the court has overlooked," that "might reasonably be expected to alter the conclusion reached by the court." *Shrader v. CSX Transp., Inc.,* 70 F.3d 255, 257 (2d Cir. 1995).  Here, the government does not allege any facts, matters, or controlling decisions that would alter the court's conclusion.  Rather, the new facts revealed by the government's late video disclosures underscore the government's proffer confirming that the identifications were, to be charitable, misleading.

Besides the *eight* previously undisclosed surveillance videos, the government made late disclosures of NYPD body camera footage and notes of meetings involving Witness-1, Witness-2, and law enforcement officers.  The disclosures were particularly concerning because the evidence was in the government's possession at the time the parties briefed the motion to suppress in August 2021, but was not produced until November 2021.  The delinquent productions revealed the government's proffers in its motion to suppress briefing were inaccurate, confirming that Witness-1 and Witness-2 did not have independently reliable bases to identify Scott at trial.  As a result, the Court should reconsider its prior ruling and prohibit Witness-1 or Witness-2 from identifying Scott at trial, in addition to not modifying its ruling precluding use of the out-of-court suggestive identifications from the day of the incident.

**B.**     **Witness-2's Prior Identification of Scott was Unduly Suggestive and Should Not be Admitted**

In its *in limine* argument to admit Witness-2's prior identification of Scott as "Ill Will," the government states "the officers showed the witness several photographs, and the witness selected the defendant's photograph and later signed a printed copy."  (*See* Dkt. 40 at 9 ("Government's motions *in limine*")).  That statement is simply false and the identification procedure utilized by the officer is the textbook definition of "suggestibility."  NYPD body camera footage makes clear there was no "select[ion]" of the defendant's photograph from a set of several different photographs.  Rather, in a staged manner, the officer showed Witness-2 a photograph of Scott, mentioned Scott was "the subject in the investigation," and asked her to indicate who the individual was.  Thinking the bodycam on his fellow officer did not record the first staged identification, the same officer repeated the same, staged process, limiting the identification to showing Witness-2 one image of Scott – not "several different photographs" as the government claims.  (*See* Ex. A to Defendant's motions *in limine*).  Based on the new, untimely disclosures, it appears Witness-2 only identified Scott *after* Detective-1 told Witness-2 that Scott was the suspect, suggesting indisputably that Scott was the right person to identify – as he was the only person depicted in a photograph.

The government now argues Witness-2 identified "Ill Will" as the shooter prior to making the identification.  Clearly, however, the officers made a conscious choice to manipulate their body camera recorders at the time.  The government has provided no explanation for why the investigating police officers manipulated their recordings of the identification process to 2 minutes and 24 seconds, limiting the recording to what is clearly a staged identification of Witness-2.  Further, the officers, who claim that Witness-1 was able to identify the shooter, failed to produce any recorded evidence in support of this assertion.  It is also worth noting that after the officer

turned on her bodycam for the rehearsed identification footage, the audio recording did not commence for a minute.  Accordingly, the government only produced 1 minute and 24 seconds of actual audio content of the officer's seriously flawed identification process.  It begs the question – why wasn't the entire identification process recorded?  To further compound the questions raised by these events, one is left to ask – why wasn't the identification of Witness-1 recorded?  It is fair to conclude the identification by Witness-1 was just as staged and suggestive as the identification by Witness-2 – or simply never occurred.

To add insult to injury, in November 2021, the government also produced previously undisclosed interview notes revealing Witness-2 did not "recall what Ill Will [was] wearing" on the day of the shooting.  Witness-2 actually indicated that the shooter was "wearing [a] dark color shirt when he left the apartment."  (*See* Ex. C to Defendant's motions *in limine* at 2).  This description is inconsistent with surveillance footage of the alleged event showing the shooter wearing a white shirt, not a "dark colored shirt," reinforcing the unreliability of Witness-2's identification.  As the Court has already concluded, the identification procedures used by the investigating officer were extraordinarily suggestive and nothing the government proffers has eroded that holding.  *See, e.g., United States v. Lumpkin*, 192 F.3d 280, 285, 288 (2d Cir. 1999) (holding that a single-photo identification procedure was impermissibly suggestive); *United States v. Perez*, No. 01 Cr. 848 (SWK), 2003 WL 721568, at *4 (S.D.N.Y. Feb. 28, 2003) (same); *Wiggins v. Greiner,* 132 F. App'x 861, 865 (2d Cir. 2006) (same); *United States v. Reed*, No. 11 Cr. 487 (RJS), 2012 WL 2053758, at *5 (S.D.N.Y. June 6, 2012), *aff'd*, 756 F.3d 184 (2d Cir. 2014) (same); *United States v. Crumble*, No. 18 Cr. 32 (ARR), 2018 WL 1737642, at *1 (E.D.N.Y. Apr. 11, 2018) (same).  Accordingly, the Court should deny the government's motion to admit Witness-2's prior identification of Scott and preclude any in-court identifications by either Witness-1 or

Witness-2, as any such identifications would be far too unreliable in light of the previous suggestive identifications.

## III.   THE COURT SHOULD NOT ALLOW GOVERNMENT WITNESSES TO CONDUCT SURVEILLANCE VIDEO IDENTIFICATIONS

The government's request to offer testimony from a law enforcement officer and Witness-2 identifying Scott in surveillance video footage from the alleged incident should be denied.

### A.   Officer-4's Opinion is Inadmissible Under Rule 701 and Unfairly Prejudicial Under Rule 403

Rule 701 allows lay witnesses to offer opinions that are (a) "rationally based on the witness's perception," (b) "helpful" to the jury, and (c) "not based on scientific, technical, or other specialized knowledge within the scope of" expert testimony.  Fed. R. Evid. 701.  A law enforcement agent's identification of a defendant on video footage is not rationally based on his or her perception if it is based "on the entirety of information collected by himself as well as other investigators," rather than on personal perceptions as an eyewitness to the events on the video or direct observations of the defendant.  See *United States v. Mitchell*, 654 F. App'x 21, 25 (2d Cir. 2016).  An opinion is <u>not</u> helpful where it tells the jury "what inferences to draw from" the evidence, which is exactly what the government seeks to do here.  *See United States v. Grinage*, 390 F.3d 746, 750 (2d Cir. 2004); *see also* (Defendant's Motions *in limine* at 27).

One of the purposes of Rule 701 is to prevent testimony that is "'merely telling the jury what result to reach as to the defendants' culpability'" based on "'spoon-fed . . . interpretations of . . . the government's theory of the case.'"  *See United States v. Gadson*, 763 F.3d 1189, 1208 (9th Cir. 2014) (quoting *United States v. Rollins*, 544 F.3d 820, 833 (7th Cir. 2008) (first quote) and *United States v. Freeman*, 730 F.3d 590, 597 (6th Cir. 2013) (second quote)).  Therefore, an identification by a witness is helpful only when "it is based on 'factors that the jury did not

possess,' such as familiarity with a defendant's 'manner of dress, gait, and demeanor' from 'several prior encounters.'"  (See Government's motions in limine at 12 (quoting United States v. Arroyo, 600 F. App'x 11, 15 (2d Cir. 2015)))

The government does not cite any case law supporting its self-serving request to allow Officer-4 to invade the province of the jury and identify Scott on a surveillance video, based on a single, short interaction.  The common thread in the cases cited where the courts permitted surveillance video identifications occurs when the witness had repeated contact with the person she sought to identify, unlike this case.  See e.g., Arroyo, 600 F. App'x at 15 (holding a witness's identification of defendant in a surveillance video was helpful where he had "several prior encounters" with the defendant and observed the defendant discharging his firearm); United States v. Kornegay, 410 F.3d 89, 95 (1st Cir. 2005) (holding a witness had sufficient familiarity to identify defendant where he had met defendant on six occasions in a few months "for the sole purpose of distinguishing him from his twin brother").

Here, the government offers Officer-4 to usurp the role of the jury.  Indeed, the government can point to no case where a court permitted a law enforcement officer to make a self-serving identification of a criminal defendant from video footage, based on a single, brief interaction. Again, it is undisputed that Officer-4 only met Scott once, on the day of his arrest, weeks after the alleged incident, in a short-lived interaction.

Assuming arguendo that Officer-4's opinion was based on personal knowledge – which it is not – and would be helpful to the jury, it would be impermissible expert testimony based on "specialized knowledge."  Specifically, Officer-4 would base his opinion on training and experience with the underlying investigation, rather than a reasoning process utilized by an average person in everyday life.  (See Defendant's motion in limine at 29).  Such an opinion is not a lay

10

opinion and is impermissible without the proper foundation for expert testimony.  *See United States v. Garcia*, 413 F.3d 201, 216 (2d Cir. 2005) ("the foundation requirements of Rule 701 do not permit a law enforcement agent to testify to an opinion so based and formed if the agent's reasoning process depending, in whole or in part, on his specialized training and experience.").

Finally, even if Officer-4 were qualified to give his opinion that Scott is the person depicted in the surveillance videos, allowing such testimony would be highly prejudicial and the Court should exclude it under Rule 403.  The testimony would be highly prejudicial due to the "risk that the jury will defer to the officer's superior knowledge of the case" and substitute the officer's judgment for its own.  *See United States v. Hampton*, 718 F.3d 978, 981 (D.C. Cir. 2013).  Additionally, if any probative value could be gained from Officer-4's testimony, Officer-4's limited interactions with Scott would severely limit that value.  (*See* Defendant's motions *in limine* at 30).

**B.    Witness-2's Opinion is Inadmissible Due to the Government's Prior Misleading, Inaccurate, and Incomplete Prior Representations**

Permitting Witness-2 to identify Scott at trial would be unreliable due to the government's prior misleading, inaccurate, and incomplete representations to the Court.  *See* Defendant's motion *in limine* at 4-13.  Allowing Witness-2 to identify Scott on video at trial would be equally unreliable and unfair.  As described above, Witness-2's identification was influenced by the highly suggestive procedures the investigating NYPD officers employed.  The Second Circuit has explained that "prior identifications may taint subsequent in-court identifications due to a phenomenon known as the 'mugshot exposure effect,' or 'unconscious transference,' whereby a witness selects a person in a later identification procedure based on a sense of familiarity deriving from her exposure to him during a prior one."  *Young v. Conway*, 698 F.3d 69, 82 (2d Cir. 2012).  Because Witness-2 identified Scott during a highly suggestive identification procedure, before being asked to identify

Scott on video footage in court, it cannot be seriously argued that Witness-2's memory is untainted by the "mugshot commitment effect: having identified that person as the perpetrator, she becomes attached to her prior identification.  As a result, she is more likely to identify him again in a subsequent identification procedure, even if he is innocent."  *Id.*; *see also Dickerson v. Fogg,* 692 F.2d 238, 246 (2d Cir. 1982) ("the extent to which an affirmative identification is the product of prodding [is a] signal[] which undermine[s] the certainty of the witness's identification of the suspect at the pre-trial confrontation.").

The Court should also preclude any surveillance video identifications since the accuracy of Witness-2's prior description has been undermined by the government's delinquent productions. (*See* Defendant's motions *in limine* at 12).  Less than a week after the shooting, Witness-2 could not "recall" what "Ill Will" was wearing at the time of the shooting and believed he was wearing a dark shirt (when the video footage depicts the shooter wearing a white shirt).  *Dickerson*, 692 F.2d at 245-46 ("[The witness's] inability to provide a minimally detailed description when he talked with the police plainly devalues his description as a factor demonstrating the reliability of his identification.").  These facts, in the context of the government's failure to disclose material facts in its possession and failing to video record key portions of the identification, make it clear that Witness-2's identification of Scott is manifestly unreliable.

## IV.   THE COURT SHOULD PRECLUDE THE GOVERNMENT FROM ARGUING OR INTRODUCING EVIDENCE SHOWING SCOTT ATTEMPTED TO FLEE THE BRONX AFTER JUNE 23, 2020

The government argues it should be allowed to introduce evidence of Scott's alleged flight from the Bronx after June 23, 2020, to prove consciousness of guilt.  The government intends to introduce this evidence through testimony from Detective-1 and text messages from a cellphone

the government seized at the time of Scott's arrest ("Phone-1") and suggests such evidence is admissible both as direct proof of Scott's consciousness of guilt and as Rule 404(b) evidence. Scott respectfully requests that Court deny the government's motion on both grounds. The evidence the government proffers in support of its motion is misleading, highly prejudicial and of limited probative value. Moreover, the government's failure to produce discovery in a timely manner has prejudiced the defense's ability to rebut the evidence the government requests to offer on this point.

### A.   Testimony About Location Data Obtained by the Government is Inadmissible Due to the Government's Belated Production

The Government states that it intends to elicit testimony from Officer-4 explaining that Officer-4 arrested Scott in Kingston, New York, as opposed to the Bronx. (Government's motions *in limine* at 13.) The government did not disclose in its motion how Officer-4 located Scott in order to make the arrest. Along with its late video disclosures in November 2021, the government produced, for the first time, cell site simulator returns indicating that the government employed a highly technical technique to obtain Scott's location.[3] The data produced by the government makes it clear that Officer-4 was involved in monitoring the cellular location data for Scott and suggests that he determined where to arrest Scott based on this data. The defense cannot appropriately analyze the cell site data produced by the government without the assistance of an expert. Due to this late production of key evidence, a recurring theme for the government that taints this entire case, the Court should preclude Officer-4 from testifying about the location of Scott's arrest and should also prevent the government from presenting arguments about the

---

[3] The government agreed with prior counsel from Milbank not to use this cell site data at trial, presumably in recognition of the fact that the government had such data at the time Scott was arrested and, therefore, it should have been produced pursuant to the government's Rule 16 obligations over a year and a half ago.

location of Scott's arrest.

**B.    The Government's Proposed Text Message Evidence from Phone-1 is Misleading and Inadmissible**

The government proposes to admit several text messages to and from Phone-1 which the government claims is probative of Scott's consciousness of guilt.   While unclear from the government's motion, the messages are the subject of several different conversations between Phone-1 and different individuals, spanning days.   Though the government tries to paint the messages on Phone-1 in the most harmful light possible, a more careful review of the full threads reveals the messages are not probative of flight and should not be admitted as evidence.   A comprehensive account of the text messages is as follows:

- Messages between Phone-1 and contact "Gee God":
  - Phone-1 (7:21 PM[4] on June 23, 2020): I need u to bring me the money in the drawer the one we're the TV is at
  - Gee God (9:43 AM on June 24, 2020): Hey Don are you doing.  Well please let me know ok
  - Phone-1 (9:44 AM on June 24, 2020): I'm ok
  - Phone-1 (9:45 AM on June 24, 2020): Is everything good
  - Phone-1 (10:20 AM on June 24, 2020): With u
  - Gee God (12:03 PM on June 24, 2020): Hey Don u know how I do we got a. Friend name Jesus
  - Phone-1 (12:30 PM on June 24, 2020): Yes sir
  - Phone-1 (12:32 PM on June 24, 2020): Everything good no knocks on the door for anything right
  - Gee God (1:37 PM on June 24, 2020): No what up
  - Phone-1 (2:01 PM on June 24, 2020): Tlk to u in person
  - Phone-1 (2:01 PM on June 24, 2020): Everything good

- Messages between Phone-1 and contact "Light Sis":
  - Phone-1 (12:32 PM on June 24, 2020): Sis need a outta town spot asap
  - Light Sis (12:50 PM on June 24, 2020): Oh wow I don't have no oT spots

---

[4] All times are in EDT.

- o Phone-1 (12:51 PM on June 24, 2020): What about the I'd.  I need one for my name 87 4_7 William Scott

- o Light Sis (12:53 PM on June 24, 2020): Ok let me hit this nigga up I have not heard from him in a minute when he hit me back I'll hit u

- o Phone-1 (12:56 PM on June 24, 2020): Bet shit went left yesterday

- o Light Sis (3:36 PM on June 24, 2020): With who and how?

- Messages between Phone-1 and 347-647-8613:
  - o 347-647-8613 (4:54 PM on June 24, 2020): 870 Southern Boulevard between Tiffany and Barretto

  - o Phone-1 (4:58 PM on June 24, 2020): Ok bet

  - o Phone-1 (4:59 PM on June 24, 2020): Omw

  - o 347-647-8613 (4:59 PM on June 24, 2020): Copy

  - o 347-647-8613 (5:21 PM on June 24, 2020): ?

  - o Phone-1 (5:27 PM on June 24, 2020): Trust me bro omw had to get the bread and give my daughter her bike this god plan

- Messages between Phone-1 and contact "Twinny":
  - o Phone-1 (2:12 PM on July 7, 2020): Nah the feds got me

  - o Twinny (2:14 PM on July 7, 2020): Where you at

  - o Phone-1 (2:19 PM on July 7, 2020): In the car going to the booking to to to 500 pearl street on the morning

  - o Twinny (2:24 PM on July 7, 2020): What's it for

Additionally, on June 25, 2020, contact "Bm" sends Phone-1 a screenshot of an alert from the Citizen application[5] that describes a shooting that occurred at 765 East 183rd Street.  The alert is not dated.

The government's attempt to use these texts to prove Scott fled the Bronx has very limited probative value, are irrelevant and are unfairly prejudicial.  Evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence."  Fed. R. Evid. 401.  None of the text messages the government proffers make it more likely than not that

---

[5] Citizen is a mobile app that sends users location-based safety alerts in real time.  To generate these alerts, the Citizen app receives input from users, who can report incidents near them and monitors 911 communications.

Scott fled the Bronx after June 23, 2020.  The introduction of these texts from Phone-1 would do nothing except impermissibly "provide the jury with . . . an opportunity for mere 'conjecture and speculation.'"  *United States v. Sanchez*, 790 F.2d 245, 252 (2d Cir. 1986) (quoting *United States v. Meyers*, 550 F.2d 1036, 1050 (5th Cir. 1977)).

The texts with "Gee God" do no more than show two friends checking in on each other. Additionally, a more detailed review of the communications contained on Phone-1 reveals its user regularly asks other individuals in his contact list for money and did so prior to June 23, 2020.

Although the texts with Light Sis may appear to suggest Phone-1 is looking for an out-of-town spot, they are not probative in the larger context of Phone-1's prior conversations with "Light Sis."  For example, on June 17, 2020, Person-1 texted "Light Sis" saying he had "been on the move" and asked if "Light Sis" "got that paper work I sent u."  And on June 19, 2020, "Light Sis" texted Person-1 saying, "sorry for the late respond been running just like u."  Critically, and we submit dispositively, these conversations, which occurred *before* Scott allegedly possessed ammunition on June 23, 2020, or fled thereafter, suggest the conversation between Person-1 and "Light Sis" is just another conversation about "paper work" and being "on the move," and are unrelated to what may have occurred on June 23, 2020.

It is unclear why the government considers Phone-1's messages with 347-647-8613 to be probative of flight when, in fact, they reveal that the user of Phone-1 was meeting up with others at "870 Southern Boulevard between Tiffany and Barretto" -- an address ***in the Bronx***, on June 24, 2020.  If anything, the texts are proof the user of Phone-1 did not flee the Bronx in response to events that occurred on June 23, 2020.

The government does not explain how a text that says "the feds got me" is proof of flight any more than it is a simple statement of fact.  The message, sent the day Scott was arrested, proves

no more than the user of Phone-1 was arrested on July 7, 2020 and wanted to inform his contacts of that fact.  Of course, the fact that Scott was arrested is not in dispute.

Finally, the fact that Phone-1 was sent an undated photograph from the Citizen App on June 25, 2020 describing a shooting that took place near where he lived is hardly probative of guilt and does no more than prove that "Bm" wanted to inform the user of Phone-1 about what had, reportedly, occurred.  Because the picture sent by "Bm" is undated and sent on June 25, 2020 the government cannot establish that the event described in the photo even occurred on June 23, 2020, or that the picture describes the shooting in which Scott allegedly participated.

For the reasons stated, the Court is respectfully requested to preclude the government from arguing or introducing evidence showing Scott attempted to flee from the Bronx after June 23, 2020.

### C.     The Government Should Not be Allowed to Offer Evidence of Flight as Direct Proof of Consciousness of Guilt

Evidence of flight is only admissible as direct evidence of consciousness of guilt if it meets the four-part test set out in *United States v. Al-Sadawi*, 432 F.3d 419, 424 (2d Cir. 2005).  Under this test, the evidence must support four inferences: "(1) from the defendant's behavior to flight; (2) from flight to consciousness of guilt; (3) from consciousness of guilt to consciousness of guilt concerning the crime charged; and (4) from consciousness of guilt concerning the crime charged to actual guilt of the crime charged."  *Id.*  As discussed in Defendant's motions *in limine*, the government cannot make this showing.  (See Defendant's motions *in limine* at Section VII).

The messages on Phone-1 demonstrate its user remained in the Bronx the day after the shooting.  Moreover, the government has offered no evidence about when or how Scott might have fled the Bronx.  The earliest date the government traces Scott to Kingston, New York is June 30, 2020, a week after the incident occurred, which is too far from the date of the offense to support

17

an inference that the flight was motivated by the events of June 23rd and thus, consciousness of guilt. *See United States v. Silverman*, 861 F.2d 571, 582 n.4 (9th Cir. 1988) ("Evidence that a defendant fled **immediately** after a crime was committed supports an inference that the flight was motivated by a consciousness of guilt of that crime.  As the time between the commission of the offense and the flight grows longer, the inference grows weaker.") (emphasis added).

Additionally, and critically, the government cannot establish that Scott's decision to travel to Kingston was evidence of consciousness of guilt concerning the crime charged because Scott is also facing charges in state court for an alleged crime that occurred on July 22, 2016.  The government can make no showing to establish that, if Scott were fleeing the Bronx, he did so to escape the federal charges against him for possession of ammunition, rather than the state charges. In fact, following Scott's arrest, Scott asked whether he had been arrested for the shooting that he was "on bail for now," suggesting Scott believed he was under arrest based on the state charge – having nothing to do with the events of June 23rd.

Accordingly, the Court should preclude the government from offering evidence of Scott's alleged flight as direct proof of consciousness of guilt because the government has not come forward with sufficient evidence to support the four *Al-Sadawi* inferences.

**D.     The Government Should Not be Allowed to Admit Evidence of Flight under Rule 404(b)**

The government also seeks to offer evidence of Scott's alleged flight under Fed. R. Evid. 404(b).  Consistent with the government's modus operandi in this case, it had no choice but to acknowledge that its Rule 404(b) notice regarding evidence of alleged flight came **fifteen days** *after* the court-ordered deadline for production of 404(b) evidence.  Nevertheless, the government asks the Court to ignore the deadline set by its Order and seeks to admit evidence of the defendant's alleged flight under Rule 404(b), arguing that courts in the Second Circuit have not established a

minimum time for Rule 404(b) notices. (Government's motions *in limine* at 17). The government asserts that Courts in the Second Circuit "have generally required that [Rule 404(b)] notice [] be provided ten days to two weeks before trial," but fail to address the fact that courts have only imposed this timeframe ***in the absence of a scheduling order***. *See United States v. Johnson*, No. 16 Cr. 457 (NGG), 2017 WL 11490480, at *4 (E.D.N.Y. May 24, 2017). The government cites to no cases where a court ignored its own scheduling order and allowed the government to disclose 404(b) notice more than two weeks after the Court's imposed scheduling deadline. When a court has imposed a scheduling order, it generally finds the government should produce 404(b) material consistent with the timeline imposed by that order. *See United States v. Casanova*, No. 11 Cr. 562 (RJS), 2012 WL 760308, at *5 (S.D.N.Y. March 8, 2012). Here, the Court issued a scheduling order requiring disclosure of all Rule 404(b) material by November 15, 2021. The government blew past this deadline, providing notice fifteen days late in direct contravention of this Court's Scheduling Order. (*See* Dkt. 32 (the "Scheduling Order")).

The government's blantant disregard for the rules form a pattern in this case that cannot be ignored. It argues this late disclosure will not prejudice the defendant, but "[d[isregard of the [scheduling] order would undermine the court's ability to control its docket, disrupt the agreed-upon course of the litigation, and reward the indolent and the cavalier." *Parker v. Columbia Pictures Industries*, 204 F.3d 326, 240 (2d Cir. 2000) (citing *Johnson v. Mammoth Recreations, Inc.*, 975 F.2d 604, 610 (9th Cir. 1992)). Moreover, "a district court's decision to hold litigants to the clear terms of its scheduling orders is not an abuse of discretion." *Reid v. Cty. of Erie*, No. 15 Civ. 01078 (JJM), 2019 WL 4600168, at *2 (W.D.N.Y. Mar. 14, 2019) (quoting *Josendis v. Wall to Wall Residence Repairs, Inc.*, 662 F.3d 1292, 1307 (11th Cir. 2011)); *see also United States v. Williams*, 88 F.Supp.3d 117, 119 (N.D.N.Y. 2015) (denying a party's motions because they were

filed in disregard of the court's pretrial scheduling order); *United States v. Alawi*, 20 Cr. 192 (JLS), 2021 WL 2252808, at *4 (W.D.N.Y. June 2, 2021) ("counsel who disregard scheduling order deadlines do so at their … risk").  And courts have excluded Rule 404(b) material when it was produced in violation of a scheduling order.  *See United States v. Hernandez*, No. 12 Civ. 322 (AT), 2015 WL 10710164, at *9 (N.D. Ga. Feb. 2, 2015), *aff'd*, 626 F. App'x 900 (11th Cir. 2015) (disallowing admission of Rule 404(b) evidence produced belatedly in violation of a scheduling order).

Significantly, the government does not argue its late disclosure was due to newly discovered information or new witnesses.  Indeed, it offers no explanation for ignoring the Court's Scheduling Order.  The government had the information it now seeks to use as 404(b) evidence since 2020 (*See* Government's motions *in limine* at 17),yet flouted this Court's clear orders by choosing to disclose its intent to use this information weeks *after* the court-ordered deadline.  The government also makes no arguments to justify its conclusion that evidence of Scott's alleged flight is admissible under Fed. R. Evid 404(b), which only allows for admission evidence of other crimes, wrongs, or acts to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident."  Accordingly, the government, should not be rewarded for ignoring this Court's Scheduling Order.  Rather, the government should be precluded from offering evidence of flight under Rule 404(b).

## V.   THE COURT SHOULD ALLOW THE DEFENSE TO CROSS-EXAMINE WITNESS-1 ABOUT HIS 2011 FELONY CONVICTION AND RESERVE RULING ON THE ADMISSIBILITY OF WITNESS-1 AND WITNESS-2'S OTHER ARRESTS AND CONVICTIONS

The government intends to have Witness-1 testify at trial and allege that Scott shot him.  The government asks the Court to preclude cross-examination of Witness-1 regarding past arrests and prior convictions.  However, Rule 609 expressly permits Scott to cross-examine Witness-1

about his 2011 felony conviction, stating that felonies "***must be admitted***, subject to Rule 403, in a civil case or in a criminal case in which the witness is not a defendant." (emphasis added). When ten or more years pass from conviction or release from confinement, irrelevant to this analysis, convictions are only admissible if the probative value substantially outweighs its prejudicial effect and written notice of the intent to use the information is provided. Scott further requests the Court reserve ruling on the admissibility of Witness-1's other prior arrests, convictions, and bad acts.

### A.   The Court Should Allow the Defense to Cross-Examine Witness-1 About His Conviction for a Felony Within the Last Ten Years

On October 5, 2011, Witness-1 was convicted of criminal sale of a controlled substance in the third degree (the "2011 Felony"), a felony, and was sentenced to two years' imprisonment and three years' supervised release. Witness-1 was released from prison less than ten years ago, making his conviction presumptively admissible under Rule 609. Fed. R. Evid. 609(a)(1)(A). The government argues the 2011 Felony should not be admitted for impeachment purposes of Witness-1 because it does not bear on Witness-1's character for truthfulness, but this is <u>not</u> the standard for the admission of felonies under Rule 609(a)(1). (Government's motions *in limine* at 12). Rule 609(a)(1) presumes all felonies are at least somewhat probative of a witness's propensity to testify truthfully and specifically indicates felony convictions within the last ten years are admissible and need not implicate dishonesty. *See United States v. Estrada*, 430 F.3d 606, 617 (2d Cir. 2005) ("when performing the Rule 403 analysis under Rule 609(a)(1), district courts are admonished to consider that Rule 609(a)(1) crimes, which do not bear directly on honesty such as to be automatically admissible under Rule 609(a)(2), may nonetheless be highly probative of credibility.").

The only limitation on the admissibility of felony convictions within the last ten years is

Rule 403.  *See United States v. Feola*, 651 F. Supp. 1068, 1126 (S.D.N.Y. 1987), *aff'd*, 875 F.2d

857 (2d Cir. 1989).  When, a witness is not also the defendant, like Witness-1, "the prior conviction

is subject to Rule 403 balancing and will be found inadmissible for impeachment purposes only if

the conviction's 'probative value is *substantially outweighed* by the danger of unfair prejudice,

confusion of the issues, or misleading the jury.'"  *United States v. Vasquez*, 840 F. Supp. 2d 564,

567 (E.D.N.Y. 2011) (emphasis in original) (internal citations omitted).  Moreover, "[t]he

probability that prior convictions of an ordinary government witness will be unduly prejudicial is

low in most criminal cases.  Since the behavior of the witness is not the issue in dispute, there is

little chance that the trier of fact will misuse the convictions offered as impeachment evidence as

propensity evidence."  *Estrada*, 430 F.3d at 619 (quoting Fed. R. Evid. 609 Advisory Committee's

Note (1990)).

In conducting the Rule 403 balancing test, courts in the Second Circuit have found that a

past conviction for selling drugs is probative of a witness's propensity to testify truthfully and that

the probative value of such a conviction is not substantially outweighed by the danger of unfair

prejudice, confusion of the issues, or misleading the jury.  *See United States v. Jackson*, No. 19

Cr. 356 (ARR), 2020 WL 7063566, at *2 (E.D.N.Y. Dec. 2, 2020) (finding that drug-sale

convictions are probative enough to warrant admission and that drug-sale convictions are more

probative of veracity than drug possession convictions) (citing *United States v. Hayes*, 553 F.2d

824, 828 n.8 (2d Cir. 1977)).  Courts have also found that a conviction for criminal sale of a

controlled substance in the third degree, the very crime for which Witness-1 was convicted, is

admissible for impeachment purposes.  *See United States v. Jenkins*, No. 02 Cr. 1384 (RCC), 2003

WL 21047761, at *2 (S.D.N.Y. May 8, 2003) (finding third-degree criminal sale of a controlled

substance felony is admissible for impeachment against the defendant); *United States v. White*,

312 F.Supp.3d 355, 361 (E.D.N.Y. 2018) (finding third-degree attempted possession of a controlled substance with intent to sell felony is admissible for impeachment against the defendant). Notably, in both *Jenkins* and *White*, the courts admitted evidence of a prior felony conviction against a criminal defendant, a substantially stricter standard.[6]

The government's analysis in support of its motion to preclude does not apply the Rule 403 balancing test, but rather just states that Witness-1's conviction is "inadmissible because it is not probative of [Witness-1's] truthfulness," which is not the relevant analysis. (Government's motions *in limine* at 8). Additionally, the government does not argue the conviction is unfairly prejudicial, that it runs the risk of confusing the issues, or is misleading to the jury. Therefore, the Court should allow cross-examination of Witness-1 on his 2011 felony conviction.

**B.     The Court Should Reserve Ruling on the Admissibility of the Other Prior Arrests, Convictions, and Bad Acts**

The government has indicated to Scott's prior counsel that it plans to offer immunity to one of its witnesses. However, the government has not provided any details about the scope of this immunity or identified which witness is being offered immunity.

"The exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination." *Davis v. Alaska*, 415 U.S. 308, 316-17 (1974). Any inquiry into a witness's motive to testify necessarily includes that witness's possible self-interest. *See Henry v. Speckard*, 22 F.3d 1209, 1214 (2d Cir. 1994). While the trial court has discretion in deciding the extent to which a defendant can cross examine on this subject, this discretion is cabined by a defendant's Constitutional right to meaningfully cross-examine a witness to show the witness's motive for testifying. *See Nappi v. Yelich*, 793 F.3d 246, 251 (2d Cir. 2015).

---

[6] To be admissible against a criminal defendant, a prior conviction "shall be admitted if the court determines that the probative value of admitting this evidence *outweighs* its prejudicial effect." *Vasquez*, 840 F. Supp. 2d at 567.

Because the defense does not know which witness the government plans to immunize or the scope of the immunity, the defense cannot anticipate the circumstances under which it might seek to cross-examine Witness-1 or Witness-2 on other prior bad acts.  Therefore, it is respectfully submitted that it is premature for the court to rule on the admissibility of the other prior arrests, convictions, or bad acts.  If the government offers immunity to a witness, the defense should be entitled to cross-examine that witness on the details of the government's power over the witness's freedom.  *U. S. ex rel. Annunziato v. Manson*, 425 F. Supp. 1272, 1277 (D. Conn. 1977) (holding that it is error to preclude cross-examination which will provide the only direct evidence of what power the government has over a witness's freedom), *aff'd sub nom*., *Annunziato v. Manson*, 566 F.2d 410 (2d Cir. 1977).  A cross-examination in this context would be particularly important to determine the veracity of the witness' testimony.  If the government has induced a witness to testify in exchange for an agreement not to prosecute the witness for a crime, the jury should know of this potential motive to lie.

Accordingly, Scott respectfully asks that the Court reserve ruling on the admissibility of other prior arrests, convictions, or bad acts of Witness-1 and Witness-2 until the scope and subject of the Government's immunity are known in order to preserve the defendant's Constitutional right to cross-examine the witness's motive in testifying.[7]  Similarly, the Court should reserve judgment on the admissibility of Witness-1's other drug crimes for which the Defendant does not seek admission under Rule 609.

Witness-1 was under the influence of ecstasy at the time of the incident, and seems to have also taken ecstasy the day before the shooting, contrary to his statements to the police on June 29,

---

[7] The defense gave the government written notice that it might seek to cross-examine Witness-1 on his past arrests, convictions, and bad acts from more than ten years ago on November 30, 2021.  Accordingly, the defense believes it has satisfied the notice requirements of Rule 609.

2020. (Defendant's motions *in limine* at 15 n.4). To the extent Witness-1 testifies he did not take ecstasy on the date of the shooting, this opens the door to impeachment. Accordingly, Witness-1's prior drug crime convictions would be probative of his drug use for the purposes of impeachment. *See* Patrick M. Seffrin & Bianca I. Domahidi, *The Drugs–Violence Nexus: A Systematic Comparison of Adolescent Drug Dealers and Drug Users*, 44 J. OF DRUG ISSUES 394 (2014) (noting that approximately 86% of drug dealers use drugs).

## <u>CONCLUSION</u>

For the foregoing reasons, and the reasons outlined in the defense's opening brief, the government's motions *in limine* should be denied, and the defense's motions *in limine* should be granted in their entirety.

Dated: February 16, 2022
      Brooklyn, New York

                                       Respectfully submitted,

                                       /s/ Susan Kellman           

                                       Eylan Schulman, Esq.
                                       Associate Counsel

                                       *Counsel for Defendant William Scott*