UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
UNITED STATES OF AMERICA

                                :

        -v.-                        21 Cr. 429 (AT)

                                :

WILLIAM SCOTT,
      a/k/a "Ill Will,"                :

                    Defendant.     :
-------------------------------------------------------------x

## GOVERNMENT'S MEMORANDUM OF LAW
## IN OPPOSITION TO DEFENDANT'S MOTIONS *IN LIMINE*

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York
One St. Andrew's Plaza
New York, New York 10007

Courtney Heavey
Andrew K. Chan
Alexandra N. Rothman
Assistant United States Attorneys
     *-Of Counsel-*

## <u>TABLE OF CONTENTS</u>

ARGUMENT ............................................................................................................ 2

I.   The Witness and Victim Should Be Permitted To Identify the Defendant In the Courtroom. ....................................................................................................... 2

II.  The Court Should Deny the Defendant's Motion to Preclude the Government From Introducing Surveillance Video. ..................................................................... 12

III. No Adverse Inference Instruction Is Warranted In This Case. ......................... 21

IV.  The Court Should Allow Detective Reynoso to Identify the Defendant on the Surveillance Video ........................................................................................... 23

V.   The Court Should Admit Evidence Regarding the Defendant's Flight From Prosecution 25

VI.  The Defendant's Alias "Ill Will" Is Admissible at Trial ................................. 29

VII. The Government Should Be Permitted To Use the Term "Victim" To Refer to the Shooting Victim ................................................................................................ 33

VIII. The Government Should Be Permitted to Use The Phrase "Convicted Felon," "Felon," And "Felony" ...................................................................................... 35

IX.  The Court Should Give the Limiting Instruction Submitted in the Parties' Joint Request to Charge ............................................................................................. 36

CONCLUSION ..................................................................................................... 37

The Government respectfully submits this memorandum in opposition to the defendant's motions *in limine* filed on November 29, 2021. The defendant asks the Court: (1) to preclude the Witness and Victim from identifying the defendant in court; (2) to preclude the Government from introducing all surveillance video; (3) to deliver two adverse inference jury instructions; (4) to prevent the case detective from identifying the defendant on surveillance video; (5) to exclude evidence that the defendant attempted to flee after the shooting; (6) to preclude the Government or any of its witnesses from referring to the defendant as "Ill Will," the name they know him by, and to strike "Ill Will" from the indictment; (7) to preclude the Government from using the terms "convicted felon," "felon," and "felony"; (8) to preclude the Government from referring to the Victim as a "victim;" and (9) to give a limiting instruction regarding the defendant's prior conviction.

After filing motions *in limine*, the defendant asked to schedule a change of plea proceeding, and the trial, which was scheduled to begin on December 8, 2021, was adjourned. Days before the defendant was scheduled to plead guilty, the defendant changed his mind and instead requested the appointment of his fourth counsel, which the Court granted. The Court has now requested a trial date of April 7, 2022.

The motions rely principally on claims of prejudice and alleged Rule 16 and *Brady* violations, which were exaggerated and unsupported when made in November 2021, and have been further undermined by the trial adjournment. Specifically, the motions focus on claims that the defendant has had no time to review and investigate materials that the Government produced in November 2021. With trial now scheduled for April 2022 at the earliest, there is no such possible claim of prejudice. As described below, defendant's other arguments are not supported by fact or law, and the motions should be denied.

## ARGUMENT

I. **The Witness and Victim Should Be Permitted To Identify the Defendant In the Courtroom**

The defendant again asks the Court to preclude the Witness and Victim from identifying the defendant in the courtroom. In response to the defendant's earlier motion to suppress the Witness's and Victim's identification, the Court held that while the identification process was unduly suggestive, there was an independently reliable basis for the Witness's and Victim's in-court identification given that each had the opportunity to observe the defendant during the incident, each was familiar with the defendant and identified the defendant by his nickname "Ill Will," and the identifications occurred shortly after the shooting. (Dkt. 27). The defendant now claims that additional information regarding the identification process and prior statements of the Witness and Victim require this Court to suppress the in-court identification. This is not so. The defendant's arguments do not undermine the reasons the Court found an independently reliable basis for both the Witness's and the Victim's in-court identification. Accordingly, there is no basis to suppress either the Witness's or the Victim's in-court identification of the defendant. Nonetheless, if the Court finds that there are material factual disputes relevant to the admissibility of an in-court identification, the proper remedy is to hold a *Wade* hearing, which the Government would ask take place on the morning that the Witness and Victim are to testify.

A. Applicable Law

Federal courts follow a two-step analysis in ruling on the admissibility of identification evidence. *Perry v. New Hampshire*, 565 U.S. 228, 238-40 (2012); *Brisco v. Ercole*, 565 F.3d 80, 88 (2d Cir. 2009). First, to exclude a prior identification, the defendant must show that the identification was "so unnecessarily suggestive and conducive to irreparable mistaken

identification that [the defendant] was denied due process of law." *United States v. DiTommaso*, 817 F.2d 201, 213 (2d Cir. 1987); *see Raheem v. Kelly*, 257 F.3d 122, 134 (2d Cir. 2001).

Second, an unduly suggestive identification procedure does not alone require suppression of the prior identification evidence. *See Manson v. Brathwaite*, 432 U.S. 98, 110-14 (1977). Instead, the court must then determine whether the identification evidence is nevertheless "independently reliable" based on the totality of the circumstances. *Brisco*, 565 F.3d at 89; *United States v. Simmons*, 923 F.2d 934, 950 (2d Cir. 1991) ("[E]ven a suggestive out-of-court identification will be admissible if, when viewed in the totality of the circumstances, it possesses sufficient indicia of reliability."); *see Brathwaite*, 432 U.S. at 114 ("[R]eliability is the linchpin in determining the admissibility of identification testimony."). Among the factors to be considered are: "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation." *Neil v. Biggers*, 409 U.S. 188, 199-200 (1972). No single factor is dispositive. *United States v. Concepcion*, 983 F.2d 369, 378 (2d Cir. 1992).

Similarly, even when a pretrial identification is found to be unduly suggestive, "the law is clear that an eyewitness may nonetheless be allowed to make an in-court identification if the eyewitness has an independently reliable basis upon which to make the identification." *United States v. Reed*, No. 11 Cr. 487 (RJS), 2012 WL 2053758, at *6 (S.D.N.Y. June 6, 2012) (citing *United States v. Lumpkin*, 192 F.3d 280, 288 (2d Cir. 1999)); *see also United States v. Salameh*, 152 F.3d 88, 126 (2d Cir. 1998) ("A witness who identified a defendant prior to trial may make an in-court identification of the defendant if . . . the in-court identification is independently reliable,

3

even though the pretrial identification was unduly suggestive.").  The *Neil v. Biggers* factors also guide the inquiry into the independent reliability of an in-court identification.

Where there are factual disputes with respect to the identification process or the witness's familiarity with the defendant, the Court can hold a *Wade* hearing.  *See United States v. Noble*, 2008 WL 140966, at *1 (S.D.N.Y. Jan. 11, 2008) ("A defendant is entitled to an evidentiary hearing on a motion to suppress only if the defendant establishes a contested issue of material fact.").  This requires a defendant's moving papers to be "sufficiently definite, specific, detailed, and nonconjectural to enable the court to conclude that contested issues of fact going to the validity of the [procedure] are in question."  *United States v. Martinez*, 992 F. Supp. 2d 322, 325-26 (S.D.N.Y. 2014) (quoting *United States v. Pena*, 961 F.2d 333, 339 (2d Cir. 1992)).

B.  <u>There is No Basis to Preclude the Witness from Identifying the Defendant at Trial</u>

The defendant relies on body camera footage, which was used to confirm the Witness's prior identification of the defendant, to again argue that the Witness's pre-trial identification was unduly suggestive, and that the Government's prior proffer, which did not mention the body camera footage, was misleading.  While the defendant raises questions regarding the timeline of events involved in the pre-trial identification procedure, witness interviews – notes of which have been given to the defendant – reflect the following:

- First, the Witness was interviewed by Detective O'Donnell outside the hospital.  Before being shown any photographs, the Witness identified a person known to the Witness as "Ill Will" as the shooter, and said, among other things, that Ill Will was the Witness's neighbor, whom the Witness saw daily.
- Second, Detective O'Donnell showed three photographs to the Witness, none of which were photographs of the defendant.  The Witness did not make an identification.
- Third, after the Witness provided more information about Ill Will, including that he had a recent domestic violence case, Detective O'Donnell pulled up a photograph of

the defendant on his camera (the "Photograph").   The Witness confirmed the Photograph was the shooter and Ill Will.

- Fourth, Detective O'Donnell had an NYPD officer who was wearing body-worn camera activate his camera.   In the video, O'Donnell shows the Photograph to the camera and states to the camera, this is the "subject of the investigation," and then shows the Photograph to the Witness,[1] who states, in sum and substance, that the person depicted in the Photograph shot the Victim.[2]  The video then shows the NYPD officers, who were unsure if the camera had recorded the interaction, show the Photograph to the Witness again, who again confirmed that it was the person who shot the Victim.

- Fifth, Detective O'Donnell presented a printed copy of the Photograph for the Witness's signature.

The defendant's argument that the body camera video presents a "markedly different identification procedure than that proffered by the Government," and which the Court found suggestive in any event, does not hold water.  (Mot. at 17).  As reflected in the notes of an interview with the Witness that the defendant submitted as an exhibit to his motion (Mot., Ex. C at 2),[3] the Witness would testify that the body camera footage took place *after* the Witness told law enforcement that the shooter was his/her neighbor, that the Witness knew him as "Ill Will" and after the Witness identified a Photograph of the defendant as the shooter for the first time.  (Dkt. 27, at 3).  Indeed, law enforcement did not have a "subject of the investigation" at the time and was only able to identify and show the Photograph of the defendant because of information that

---

[1] While it may have been better for the Detective to not say "subject of the investigation" in the Witness's presence, it is clear from the video that the Detective said that for the benefit of the camera audience, not the Witness.

[2] Shortly after this case was charged, the Government produced in discovery a DD5 reflecting that the identification was recorded on body camera.  (USAO_000072).  Thus, there can be no argument that the Government purposefully concealed the existence of the recording from the defense.

[3] The Witness recalled signing the Photograph before being recorded on the body-worn camera, which appears to be inconsistent with the time stamp on the body-worn camera and the time written on the signed Photograph, but the Government submits that the order of these two events is not a material fact to whether there is a sufficiently reliable basis for the Witness's in-court identification.

the Witness provided to police based on the Witness's own observations of the shooter.  While the Government does not seek to re-open the Court's prior ruling that the out-of-court identification procedure cannot be introduced at trial, given these facts, it is unlikely that the Detective's showing the Photograph to the Witness either before or after saying that he was the "subject of the investigation" suggested to the Witness who the shooter was.  (Of course, unsurprisingly, the Victim identified the same person).  The Witness knew exactly who the shooter was and had already described the shooter in detail before she was shown any photograph.

In any event, with respect to the Witness's in-court identification, the defendant does not meaningfully dispute all the reasons why this Court previously held that there was an independently reliable basis for the Witness to make such an identification.  There is no dispute that the Witness had a clear opportunity to view the defendant at the time of the incident, as reflected in the video that this Court relied on in making such a finding.  There is no dispute that the Witness identified the defendant as Ill Will, and there is no dispute that the defendant was in fact the Witness's neighbor, whose first name is in fact William, and who was someone that the Witness saw regularly.[4]  The defendant notes that the Witness one week later told law enforcement that he/she was unsure what the defendant was wearing at the time of the shooting, but thought he

---

[4] According to Detective O'Donnell, the Witness told him that he/she saw the defendant every day.  In speaking with the Government, the Witness stated, in sum and substance, that he/she saw the defendant every other day.  Regardless, the undisputed evidence is that the defendant was the Witness's neighbor and someone he/she saw regularly and on numerous occasions, providing clear support for the independent reliability of the Witness's identification.

may have been wearking a dark colored shirt.  (Mot. at 8).  This is plainly the basis for cross-examination and not a basis to preclude the Witness's identification.[5]

The cases cited by the defendant demonstrate how different this case is from cases where courts have suppressed a witness's in-court identification.  In *Young v. Conway*, 698 F.3d 69 (2d Cir. 2012), the Second Circuit held that an in-court identification had been tainted by a prior identification, where the only time a witness to a robbery saw the intruder was for "five to seven minutes" during the robbery, and when the intruder's face "below his eyes—including his lips, nose, ears, and cheeks—was covered by a scarf;" the witness could only describe the intruder as a "black man in his twenties, five-ten, medium build;" and the witness said she could not assist in preparing a composite sketch of the intruder on the night of the incident.  *Id.* at 72-73.  The witness was also unable to identify the intruder in a six-pack photo array that she was shown – twice – one month after the shooting.  *Id.*  It was only the following day, when the defendant was placed in a lineup – and the defendant was the only person in the lineup whose photograph had been in the photo array – that the witness identified the intruder.  *Id.*  The facts in this case could not be more different.  The Witness was familiar with the defendant because he was a neighbor, the defendant's face was visible on the day of the incident, and the Witness had a direct interaction with the defendant that is captured on surveillance footage.  Just after the incident, the Witness identified the defendant by his eponymous nickname, information about his arrest history, and then identified his photograph after being shown the photographs of three other people, whom the Witness did

---

[5] It is only common sense that a witness may remember with clarity who did a certain memorable event, but not remember one week later exactly what the person was wearing at the time.

not identify as the shooter.  Given these glaring disparities, defense's reliance on *Conway* is perplexing.

The same is true for *Dickerson v. Fogg*, 692 F.2d 238 (2d Cir. 1982).  In *Dickerson*, the witness was the victim of a carjacking by four individuals, whom the witness had only seen during the incident and could hardly see at that time.  *Id.* at 241.  The following day, the witness came to court and told the police that the perpetrators were "four young black males," but nothing more. The officer than pointed to the right side of the courtroom where four people were seated and asked if the witness could identify anyone.  *Id.*  The witness said he was "pretty sure" that one of the men was a man from the carjacking, and the officer then asked the witness to "take a better look."  *Id.* at 241-42.  At that point, the witness identified the defendant as the perpetrator.  *Id.*  This case bears no resemblance to the facts in *Dickerson*, and the defendant's suggestion that the "identification procedures in this case were arguably more suggestive than those in *Dickerson*" should be rejected out of hand.[6]

Rather than suppression, the proper avenue if defense wishes to challenge the reliability of the Witness's identification of the defendant as the shooter is cross-examination.  *See United States v. Hamideh*, No. 00 CR. 950 2(NRB), 2001 WL 11071, at *1 (S.D.N.Y. Jan. 3, 2001) ("Of course, any in-court identification at trial is subject to the scrutiny of cross-examination to establish its reliability in light of the factors articulated in *Neil v. Biggers*.").  The defendant can probe the Witness to assess the Witness's ability to see the defendant, the extent to which the Witness was

---

[6] *See also Raheem v. Kelly*, 257 F.3d 122, 140 (2d Cir. 2001) (precluding in-court identification where witness's "best" description of the robber emphasized his leather coat and defendant was only person in line-up wearing leather coat, and witnesses had mis-identified another individual involved in the incident).

affected by the gun or stress of the incident, (*see* Mot. at 10), and the Witness's familiarity with the defendant prior to the incident, and then make whatever arguments he wants to the jury.  But it would be a "Draconian sanction" that would only "frustrate rather than promote justice" for the Court to preclude the Witness from identifying the defendant in the first place.  *See Perry*, 565 U.S. at 239 (describing automatic exclusion of otherwise-reliable identifications as a "Draconian sanction" that could "frustrate rather than promote justice").

C.  There Is No Basis to Preclude the Victim from Identifying the Defendant at Trial

Nor is there any basis to preclude the Victim from identifying the defendant at trial.  As an initial matter, the defense latches onto the time of day that the Victim signed the photograph of the defendant, and argues that because this photograph was signed minutes after the Witness signed a photograph of the defendant, the Victim's identification was polluted by the Witness's identification.  (Mot. at 14).  But the defense's wholly unsupported speculation about the significance of the timing of the identifications does not suffice for argument or law.[7] Accordingly, the defendant fails to set forth any additional arguments regarding the extent to which the Victim's prior identification process was unduly suggestive.

The defendant devotes the remainder of his argument to cataloguing the Government's "multiple disclosure violations," and claiming from them that the Victim's identification is no

---

[7] Defense asks the Court to draw a nefarious inference from the fact that the officers did not record the Victim's identification on body camera, however, the officers were unable to record inside the hospital. While the body-camera footage that recorded the Victim's identification showed the officers walking through the hospital for a few seconds, until exiting into the parking lot, that is only because the body-camera footage generally begins recording about a minute before an officer turns his/her body-camera on. Thus the officer activated his body-camera when he was outside, but it captured the minute beforehand, which included some seconds of him walking through the hospital.

longer independently reliable.  (Mot. at 16-17).  But there were no disclosure violations.  The Government produced notes of the Victim's interviews with the Government and *Giglio* material on the schedule ordered by the Court – three weeks before the previously scheduled trial and now at least a full five months before trial.

Moreover, a review of the *Biggers* factors confirms that the Court's earlier decision to allow the Victim to make an in-court identification remains correct.  There is no dispute that the Victim had an extended ability to view the defendant; the Victim expressed no doubt that the defendant was the shooter; the Victim identified the defendant shortly after the shooting; and the Victim's description of the shooter was accurate.  *Biggers*, 409 U.S. at 199-200.  With respect to the Victim's Ecstasy use and alcohol consumption around the time of the incident, the Victim told the Government and is expected to testify that it did not affect his ability to perceive and recall the events and, as the defendant concedes, alcohol or drug use does not preclude an in court identification.  (*See* Mot. at 16).  *See United States v. White*, 17 Cr. 611 (RWS), Tr. 489-93 (denying motion to preclude in-court identification by shooting victim who was intoxicated at time of shooting and on morphine at the time of out-of-court identification, noting that victim's ability to perceive "was a question of credibility" for the jury).  Rather, the defense can cross-examine the Victim on this when he testifies at trial.  *See Dobson v. Walker,* 150 F. App'x 49, 52 (2d Cir. 2005) ("It is within the scope of proper cross-examination to inquire as to whether a witness's capacity to observe and remember is impaired by drug use.").

The defendant further argues that the Court should preclude the Victim's in-court identification because the Government's earlier proffer that the Victim was the defendant's neighbor was inaccurate.  The Government expects the Victim to testify at trial that the mother of

the Victim's children lived next door to the defendant and the Victim would regularly visit with that woman's children and saw the defendant on numerous occasions and had said hello.[8]  While the Government acknowledges that this is different than the Government's prior proffer that the Victim was the defendant's neighbor and someone the Victim saw every day, the Government submits that given the balance of factors, the evidence still decidedly supports that the Victim knew the defendant well, and there is an independently reliable basis for the Victim's in-court identification.  The defendant will have the opportunity to cross-examine the Victim about his ability to perceive the incident and his prior interactions with the defendant, and there is no reason to prevent the Victim from identifying the defendant in court.[9]

As set forth above, the Government respectfully submits that in weighing the suggestiveness of the pre-trial identification process with the *Biggers* factors, there continues to be an independently reliable basis for the Witness and the Victim to separately identify the defendant as the shooter in Court.  The Government does not believe that there are material factual disputes between the parties that undermine the Court's prior findings.  Nonetheless, if the Court were to determine that there are material factual disputes relevant to whether the Witness and Victim can identify the defendant in court, the Government would request a *Wade* hearing, to be held on the day that the Witness and Victim are called to testify.

---

[8] The Victim initially told law enforcement that he saw the defendant every day, but thereafter stated, in substance and in part, that he saw his children multiple times a week and on numerous such occasions saw the defendant.

[9] Contrary to the argument in the defendant's brief, the fact that the Victim may have known the defendant as "Ill Will," because his daughter previously told him that the man was called "Ill Will," does not undermine the fact that the Victim knew him as "Ill Will."

II.     **The Court Should Deny the Defendant's Motion to Preclude the Government From Introducing Surveillance Video**

The defendant asks this Court to exclude all surveillance video from trial, including videos that were produced to the defendant shortly after this case was charged.  The defendant claims that "[e]xclusion is necessary because the government failed to produce many of the videos until days before trial in violation of its Rule 16 and, potentially, *Brady* obligations." (Mot. at 17).  Trial, of course, was adjourned after the defendant filed the instant motion, making any claim that the defendant has had insufficient time to review and make effective use of these videos now moot.  By the time trial commences, the defendant will have had months to review the small number of videos produced in November 2021.  Moreover, as the defendant concedes, the Government only seeks to offer *two* videos that were first produced in November 2021, the remainder having been produced in July 2020.  As the defendant further concedes, the Government's delay in producing these two videos was wholly inadvertent.  To the extent there was any prejudice to the defendant – and there was not – that prejudice has been fully remedied by the trial adjournment in this case. The defendant's motion should be denied.

A.  Relevant Facts

While the lack of prejudice alone requires denying the defendant's motion, the Government recounts in detail the process by which law enforcement collected and the Government produced video to ensure the record is clear.  To assist the Court, the Government has included a chart, attached hereto as Exhibit A, which catalogues each video collected and produced by number.

The shooting in this case took place on June 23, 2020.  The defendant first shot the Victim in front of a deli at 765 East 183rd Street ("Deli") and then shot the Victim in front of a building at 760 East 183rd Street ("Building"), before fleeing the scene with his daughter.

12

On June 24, 2020, Officer Brian Travis collected video from six cameras at the Building, (*See* Ex. A, Nos. 9 - 13, 18, 19), and three cameras on nearby Crotona Avenue.  (*See id.* No. 20 (2260 Crotona Avenue); No. 21 (2254 Crotona Avenue); No. 22 (2260 Crotona Avenue)).  Travis provided the videos to Detective Joseph Bermudez, who reviewed them and saved clips from Videos 9 through 11, and 13 into the NYPD electronic case management system ("ECMS").  The full set of videos that Travis collected were saved to a flash drive (the "Drive").  That same day, Officer Chad Poidomani collected videos from the Deli.  (*See id.* Nos. 1 - 8).

On July 7, 2020, the defendant was charged in this case.  On July 15, 2020, the Government made its first discovery production, which consisted of, among other things, the four video clips that Bermudez had saved to ECMS and the videos collected by Poidomani from the Deli.  The Bermudez clips showed (a) the defendant and his daughter leaving their apartment (No. 11); (b) the defendant and his daughter waiting for and entering the elevator (No. 10); (c) the defendant and his daughter leaving the elevator and exiting the lobby (No. 13); and (d) the defendant and his daughter exiting a gate, walking towards the Deli, and then the defendant chasing the Victim back to the Building, shooting multiple times and then running away (No. 9).  The Poidomani videos showed, among other things, (a) the defendant shooting the Victim in front of the Deli, and (b) the defendant and his daughter fleeing in a waiting car.  (Nos. 1 – 8).

On July 15, 2020, the case detective, Angel Reynoso, shared with the Government additional videos he had collected from the Building's security company, consisting of (a) one-and-a-half hours of video from six camera angles around the time of the shooting, (*see id.* Nos. 9 – 14), and (b) thirty minutes of video from earlier in the day depicting an altercation between a young female and the defendant, which precipitated the shooting, (*see id.* Nos. 15 – 17).  Because

of what appeared to be technical issues in viewing the original videos, the Government converted the videos into a .wmv file, and on July 29, 2020, produced to the defendant a single .wmv file that depicted Videos 9 through 14.  The Government inadvertently did not convert Videos 15 through 17, did not produce those videos to the defendant, and did not review them until November 2021.  Upon realizing those videos had not been produced, the Government immediately produced them to the defendant.  From this set of videos, the Government only seeks to introduce Video 15, which is a thirty-minute clip of the altercation described above.

In reviewing the case file in preparation for trial in November 2021, the Government determined that it did not have the Bermudez Drive containing the full-length video Bermudez saved clips from in its possession.  The Government retrieved the Drive from Bermudez,[10] and immediately produced its full contents to the defendant.  The Drive contained five videos that had not previously been produced to the defendant.  (*See id.* Nos. 18 – 22).[11]  From this set of videos, the Government only seeks to introduce Video 18, which is a ten-minute video clip that provides a closer view of the shooting and shooter (i.e., the defendant) than the camera angle in Video 9, which had been produced in July 2020.

Finally, in advance of trial, the Government obtained body camera footage from certain officers who were on scene after the shooting.  (*See* Nos. 23 - 25, 27, 28).  The Government produced those videos to the defendant but does not seek to offer any of those videos at trial.

_____

[10] Although the Government only obtained the Drive in November 2021, the existence of the Drive was disclosed to the defense in police reports produced back in July 2020.  *See* USAO_000076.

[11] The new videos on the Drive totaled 84 minutes of video.  The Drive also contained 16 minutes of video from five cameras, which were duplicative of the videos Reynoso collected and the Government produced on July 29, 2020.

B.  <u>Relevant Law</u>

Federal Rule of Criminal Procedure 16(a)(1)(E) states: "Upon a defendant's request, the government must permit the defendant to inspect and to copy or photograph books, papers, documents, data . . . if the item is within the government's possession, custody, or control and: (i) the item is material to preparing the defense; (ii) the government intends to use the item in its case-in-chief at trial; or (iii) the item was obtained from or belongs to the defendant."  Fed. R. Crim. P. 16(a)(1)(E).  Rule 16 does not "bar[] the introduction of evidence that is discovered only shortly before or even during trial, but is promptly disclosed."  *United States v. Rom*, 528 F. App'x 24, 26 (2d Cir. 2013).  To the contrary, Rule 16(c) places on both parties a continuing duty to "promptly" disclose newly discovered evidence or materials that are subject to Rule 16(a)(1)(E), which may occur even during trial.  *See* Fed. R. Crim. P. 16(c) ("A party who discovers additional evidence or material before *or during trial* must promptly disclose its existence to the other party or the court if: (1) the evidence or material is subject to discovery or inspection under this rule; and (2) the other party previously requested, or the court ordered, its production." (emphasis added)).

If a party fails to comply with Rule 16, the Court has "broad discretion in fashioning a remedy," which may include granting a continuance or the exclusion of evidence.  *United States v. Lee*, 834 F.3d 145, 158 (2d Cir. 2016); *see also* Fed. R. Crim. P. 16(d)(2)(A)-(D) (a district court may "enter any other order that is just under the circumstances").  "A district court's decision not to exclude evidence that was the subject of a Rule 16(a) violation is not grounds for reversal unless the violation caused the defendant 'substantial prejudice.'"  *United States v. Salameh*, 152 F.3d 88, 130 (2d Cir. 1998).  "Substantial prejudice" means "the prejudice resulting from the

15

government's untimely disclosure of evidence, rather than the prejudice attributable to the evidence itself." *Id.* (quoting *United States v. Sanchez*, 912 F.2d 18, 23 (2d Cir. 1990)). The Court of Appeals reviews a trial court's choice of remedy for abuse of discretion and will "look to the reasons why disclosure was not made, the extent of the prejudice, if any, to the opposing party, the feasibility of rectifying that prejudice by a continuance, and any other relevant circumstances." *United States v. Ulbricht*, 858 F.3d 71, 115 (2d Cir. 2017) (quoting *Lee*, 834 F.3d at 159).

      C.  <u>Discussion</u>

The Government opposes the defendant's request to exclude all surveillance videos from trial. This unprecedented request is wholly inappropriate, would impede rather than promote justice, and should be denied.

*First*, there is no basis whatsoever to exclude the fourteen videos that the Government produced to the defendant in July 2020. (*See* Ex. A, Nos. 1 – 14). The defendant has not meaningfully argued otherwise. These videos depict the key parts of the shooting and have been in the defendant's possession for at least nineteen months. The defendant has had time to review these videos, they have been the subject of suppression briefing, and the defendant is unable to allege how Rule 16 was violated with respect to these videos. Moreover, these videos were collected by Officer Poidomani and Detective Reynoso, and the defendant has not raised any concerns with the process by which Poidomani or Reynoso collected videos in this case. Thus, the defendant's request to exclude Videos 1 through 14 should be denied.

*Second*, with respect to the videos that the Government first produced in November 2021, the Government only seeks to introduce *two* videos – Video 15 and Video 18 – at trial. As to these videos, the factors set forth in *United States v. Ulbricht* weigh against preclusion. First, the reason

for the delayed production was inadvertent.  As to Video 15, the Government thought the video had been produced with all of the other videos collected by Reynoso in July 2020.  Upon learning it had not been, the Government promptly produced it.  As to Video 18, in preparing for trial, the Government obtained the Bermudez Drive, and upon realizing that the videos on the Drive had not been produced (as the defense could have by reviewing a police report that was disclosed to the defense in July 2020), the Government promptly produced them.  Second, there is no prejudice to the defendant for the delayed production of these two videos, especially where Video 18 is largely duplicative of a video that was produced to the defendant back in July 2020.  Third, and relatedly, any prejudice to the defendant has been rectified by the trial adjournment, which was made at the defendant's request for an independent reason.  By the time trial begins in April 2022, the defendant will have had months to review these videos.  *See United States v. Monsanto Lopez*, 798 F. App'x 688 (2d Cir. 2020) (summary order) (finding no Rule 16 violation where the government "gathered additional evidence shortly before trial" and "promptly produced to defense counsel," where "counsel had over one month to review the materials produced" following a three-week trial continuance, and noting that even if there had been a Rule 16 violation, the court was within in discretion to grant a continuance rather than exclude the evidence from trial).

*Third*, with respect to the remaining videos that the Government first produced in November 2021 and does *not* seek to introduce at trial, the defendant is not entitled to the preclusion of *other* videos that the Government does seek to admit based on any belated production of those videos.  Many of these videos are not even Rule 16 material, as they are not helpful to the defendant, the Government does not seek to offer them, and they were not obtained from the

17

defendant.  *See* Fed. R. Crim. P. 16(a)(1)(E).  Thus, there is no basis to preclude other videos from trial on the grounds that the Government did not produce these videos until November 2021.

With respect to Videos 20 through 22, without having reviewed the videos at the time of filing the instant motions, the defendant argued that these videos may contain *Brady* because they show one or more individuals with white shirts and red shorts in the vicinity of the shooting, representing a potential alternate perpetrator.   The videos do not contain *Brady*.   The video evidence that the Government produced in this case tracks the defendant from his apartment to the shooting and then fleeing the scene in a getaway car.   The fact that other people may have been wearing similar clothing in the vicinity of the shooting does nothing to alter this finding. Moreover, the defendant was already aware of an individual wearing red shorts and a white T-shirt in the vicinity of the shooting because the defendant used that fact during a bail argument before Judge Caproni, suggesting that the defendant was not the shooter.  (Dkt. 25 at 6-8).  Judge Caproni wisely rejected this argument, noting that "the fact that a six or seven year old girl, who clearly left the apartment with [the defendant] is standing by herself across the street, is certainly very strong circumstantial evidence that it was this man in the red shorts and a white T-shirt who was shooting the gun, and not the other guy who walked off in the same direction."  (*Id.* at 8-9).  In any event, the defendant now has the videos, will have had them for months before trial, and can offer them at trial if he thinks helpful to his case.[12]

Nor do any of the other videos contain *Brady* as the videos are not helpful to the defendnat. But, even if the videos were helpful to the defendant, the defendant has had *all* of the videos far in

---

[12] The defendant also argues that the videos, if produced earlier, could have helped the defendant identify potential witnesses.  They would not have.  First, the video does not even depict the shooting, and thus,

advance of trial, and thus, the Government has produced these videos "in time for [their] effective

use at trial." *United States v. Coppa*, 267 F. 3d 132, 143 (2d Cir. 2001) (collecting cases).

*United States v. Halloran*, 821 F.3d 321, 342 (2d Cir. 2016), a case cited by the defendant,

does not suggest otherwise.  In *Halloran*, the Government failed to produce a series of phone calls

until eight days before trial.  The defendant argued that the Government's failure was prejudicial

and violated the defendant's *Brady* rights.  The Second Circuit rejected the argument, holding that

the undisclosed evidence was not material.  The Court also held that the defendant had agreed to

a "weeklong continuance" after the calls were disclosed, which gave the defendant time to make

"effective use" of the calls before trial.  *Id.* at 342.  If anything, the *Halloram* decision confirms,

as the Government has argued, that the trial adjournment warrants a full denial of the motion.

The defendant also tries to equate this case with *United States v. Mason*, No. 06 Cr. 80

(NRB), 2008 WL 281970, at *3-4 (S.D.N.Y. Jan. 25, 2008), but that argument is unpersuasive.  In

*Mason*, the Government failed to produce evidence seized from a search in Florida, including

fingerprint analysis linking the defendant to weapons that the Government sought to offer at trial,

*even after* the defense requested those items.  *Id.*  The Government offered *no* excuse or

explanation for its shortcoming and still sought to introduce the evidence at trial.  The court found

the conduct "striking," and ordered that the Government was precluded from introducing all of the

evidence seized from the Florida search.  *Id.*  The court explained that "the government's eleventh-

---

there would be no eyewitnesses in the video.  Second, while the other videos of the shooting are quite clear,
it is difficult to make out any identities of individuals in these three videos.  And third, the defendant has
failed to explain why any of the individuals depicted in the videos would be helpful to him.  Such baseless
speculation falls far below what is required to establish a *Brady* violation or any other reason to exclude
*other* videos from trial.

hour effort to change the evidentiary landscape of this case in a way that prejudicially impacts the defendants should not be remedied by a scheduling change which has a concomitant, adverse impact on the defendants, defense counsel, and the Court." *Id.* at *4.

But here, the Government produced all but two of the videos that it intends to use at trial back in July 2020. The two videos that the Government first produced in November 2021 and the Government now seeks to use at trial hardly "change the evidentiary landscape." Rather, one video (Video 18) is largely duplicative of a video that was already in the defendant's possession, and the other video (Video 15) provides corroboration for the Witness's testimony about events earlier in the day, but is a far cry from the fingerprint analysis withheld in *Mason*. Moreover, unlike the prosecutors in *Mason*, the Government has been quick to respond to any issue when identified by defense and candid with defense counsel with respect to the reasons for delay in the production of the videos. Thus, the *Mason* decision is wholly inapposite.

The defendant also claims to have concerns about missing or altered videos and destroyed evidence. But these speculative accusations should also be rejected. There is nothing in the record to suggest evidence was lost, destroyed or altered. Rather, the police reports – produced back in July 2020 – document each video collected, even the ones that were belatedly produced. The defendant also raises specific concerns about the videos on Bermudez's Drive because Bermudez had it in his home rather than his office. However, the defendant's arguments are baseless speculation. As described above, five of the videos from Bermudez's Drive were also collected by the case detective, who collected them directly from the Building's security company. A

20

comparison of these videos belies any suggestion that the videos on Bermudez's Drive were altered in a law enforcement officer's home—a truly extraordinary suggestion based on no evidence.

To the extent the defendant wants to contest the authenticity of a particular exhibit offered by the Government, after the Government seeks to lay a proper foundation at trial, he can do so under the relevant law and at the appropriate time. But speculation in a pre-trial motion brief is not a basis to exclude the videos. *See United States v. Prevezon Holdings Inc.*, 319 F.R.D. 459, 462 (S.D.N.Y. 2017) (holding that authentication is not "a particularly high hurdle and is satisfied if sufficient proof has been introduced so that a reasonable juror could find in favor of authenticity or identification"); *United States v. Vayner*, 769 F.3d 125, 131 (2d Cir. 2014) (holding that, once authenticated, a party "remains free to challenge the reliability of the evidence, to minimize its importance, or to argue alternative interpretations of its meaning, but these and similar other challenges go to the weight of the evidence—not to its admissibility.").

## III.    No Adverse Inference Instruction Is Warranted In This Case

For similar reasons, the defendant's requests for adverse inference instructions relating to the surveillance videos and the Victim's identification are also unwarranted. Courts have generally reserved the penalty of adverse inference instructions for extraordinary cases where there is evidence of prosecutorial bad faith or irreparable prejudice to the defendant. *See*, *e.g.*, *Rosario v. Smith*, 2009 WL 1787715, at *6 (S.D.N.Y. June 23, 2009) (defendant prejudiced by untimely *Brady* disclosure because witness's memory had completely degenerated); *United States v. Burciaga*, 2013 WL 1233013, at *2-5 (D.N.M. June 4, 2013) (refusing to provide adverse inference instruction where there was no evidence of prosecutorial bad faith and prejudice to defendant was minimal); *see also United States v. Ramirez*, 2011 WL 6945199, at *2 (S.D.N.Y.

Dec. 23, 2011) (explaining that sanctions for loss or destruction of evidence requires: (1) proof that the evidence had apparent exculpatory value; (2) defendant cannot obtain comparable evidence through alternative means; and (3) bad faith on the part of law enforcement). There is no evidence of any bad faith or prejudice to the defendant here, especially given that the defendant has now had months to review all of the relevant discovery materials.

First, with respect to the Victim, the Court ordered the Government to produce *Giglio* material on November 22, 2021, and the Government complied with that schedule, including by providing the Victim's statements regarding his intoxication on the date of the shooting. The defendant will have had the information for over four months by the start of trial and has used that information—for whatever it is worth—to supplement his challenge to the Victim's in-court identification of the defendant. The defendant will also be able to cross-examine the Victim regarding his intoxication on the date of the shooting at trial, making any instruction to the jury by the Court that the disclosure was not "timely" inappropriate and simply inaccurate.

Similarly, the defense's request for an adverse inference instruction regarding the videos in this case should also be rejected. The Government produced the vast majority of the surveillance videos in this case shortly after the case was charged, and it produced additional video in the Government's possession once it had realized that the videos had inadvertently not been previously produced. The defendant has not identified any bad faith by the Government, any *Brady* in the videos, or any prejudice from their production. At most, the defendant has speculated that the videos could have been helpful in identifying additional witnesses, but the defendant has provided no reason to think that these witnesses would have been helpful to the defendant. (Nor has the defendant claimed he has identified additional witnesses in the months he has had the videos). If

anything, additional eyewitnesses may have corroborated the defendant's involvement in the June 2020 shooting.  Finally, the defendant has now had all of the surveillance videos for at least four months and will be able to present those videos to the jury at trial, if he wishes.  Based on this record, there is no basis here for the unusual remedy of an adverse inference instruction.

## IV.    The Court Should Allow Detective Reynoso to Identify the Defendant on the Surveillance Video

The defendant moves to prevent Detective Reynoso—who transported the defendant from Kingston to New York City on the date of his arrest—from identifying the defendant on surveillance footage.   The admissibility of this evidence is set forth in greater detail in the Government's motions in *limine*.  *See* Gov't. Br. at 10-13.

The defendant claims that Reynoso's identification is inadmissible because: (1) Reynoso only directly observed the defendant on the date of his arrest and therefore the testimony is unhelpful to the jury; and (2) Reynoso's identification either relies on inadmissible evidence that has never been disclosed to the defense or on specialized knowledge akin to expert testimony. (Mot. at 26-29).  But all of these arguments miss the mark.  To begin with, Reynoso is expected to identify the defendant on the surveillance footage based on his direct and personal interactions with the defendant and personal involvement in the investigation.  Reynoso's interactions with the defendant were extensive—he interviewed the defendant, provided food to the defendant on multiple occasions, and remained in the defendant's presence for over eight hours across the span of two days.  Through these face-to-face interactions just a few weeks after the shooting, Reynoso

became familiar with the defendant's appearance, and his testimony will be helpful to the jury for that reason.

Reynoso's identification of the defendant on surveillance video is also not based on any inadmissible evidence that has never been disclosed to the defense. The Government produced the police reports and the post-arrest interview recording documenting portions of Reynoso's interactions with the defendant. Reynoso will be available to be cross-examined regarding the extent of his interactions with the defendant, and any arguments regarding Reynoso's familiarity with the defendant's appearance goes to the weight of the evidence, not to its admissibility. Similarly, Reynoso's testimony will not be based on any specialized training or knowledge that transforms his testimony into expert opinion. Reynoso will simply testify about spending a significant amount of time with the defendant over the course of two days and becoming familiar with the defendant's appearance through those interactions.

The defendant also cites to a number of cases where courts precluded evidence that included interpretations of the Government's theory of the case. (Mot. at 27). Nothing of the sort is being offered here. In *United States v. Freeman*, the Court held that the agent's interpretation of recorded phone calls "spoon-fed" the government's theory of the case, "interpreting even ordinary English language," and was not based on the agent's personal knowledge in the investigation. 730 F.3d 590, 596-97 (6th Cir. 2013). The other caselaw defendant relies on is inapposite because those cases do not involve a law enforcement agent making identifications from surveillance video. Rather, they involve interpretation of wiretap calls or summaries of a law enforcement investigation. *See, e.g., United States v. Mitchell*, 654 F. App'x 21, 25 (2d Cir. 2016) (precluding law enforcement from rendering an opinion on whether there was a conspiracy, based on the

officer's review of wiretapped conversations); *United States v. Garcia*, 413 F.3d 201, 212 (2d Cir. 2005) (holding law enforcement should not have been able to testify that defendant was a "partner" in receiving cocaine, based on the entirety of law enforcement's investigation, rather than his own personal involvement and perceptions).

Finally, the defendant asserts that Reynoso's testimony is inadmissible under Rule 403 because it would have little probative value to the jury and would be unfairly prejudicial to the defendant. (Mot. at 30). As described in the Government's motion *in limine*, courts have recognized that identification testimony can be very helpful to jurors who will not have the same opportunity to interact with the defendant. *See United States v. Woodford*, 2019 WL 5457854, at *14 (E.D.N.Y. Oct. 23, 2019) ("It is true the jury will observe [the defendant] throughout the trial, though defendant acknowledges the jury will not likely observe defendant walking or moving in the manner which the shooter does on the video footage"). There is also no danger here of unfair prejudice from Reynoso's testimony about the basis for his familiarity of the defendant. Reynoso will not be testifying about any other crimes committed by the defendant, or any other interactions between the defendant and the criminal justice system. Based on this record, Reynoso's testimony is also admissible under Rule 403.

## V. The Court Should Admit Evidence Regarding the Defendant's Flight From Prosecution

The defendant asks the Court to exclude unspecified evidence and preclude the Government from arguing to the jury that the defendant fled after the June 23, 2020 shooting to Kingston, New York, where he was arrested on July 7, 2020. (Mot. at 38-41). Notably, the defendant has not sought to preclude the Government from offering the defendant's text messages after the shooting. Nor would there be any grounds for doing so. The defendant's own statements

from immediately after the shooting are admissible as party admissions under Fed. R. Evid. 801(d)(2)(A), and plainly are evidence of consciousness of guilt, regardless of whether the defendant fled.  Thus, there is no basis whatsoever to preclude these text message from trial.

With respect to additional evidence and arguments by the Government about flight, the Second Circuit has held, "[i]t is well-settled that flight can, in some circumstances, evidence consciousness of guilt." *United States v. Al-Sadawi*, 432 F.3d 419, 424 (2d Cir. 2005).  Of course, "a satisfactory factual predicate must exist from which the jury can infer consciousness of guilty from flight." *Id*.  The probative value of circumstantial evidence of guilt depends on the degree of confidence from which four inferences can be drawn:  "(1) from the defendant's behavior to flight; (2) from flight to consciousness of guilt; (3) from consciousness of guilt to consciousness of guilt concerning the crime charged; and (4) from consciousness of guilt concerning the crime charged to actual guilt of the crime charged."  *Id.*

The defendant argues that because the Government cannot prove the defendant left town immediately after the shooting or prove how and whom he traveled with, the Government cannot support the inference that he fled.  (Mot. at 38-39).  But such evidence is unnecessary here, given the defendant's own text messages, beginning the night of the shooting, showing his planning to flee, wherein he stated, "I need u to bring me the money in the drawer[;] the one we're [*sic*] the TV is at."  The following day, the defendant asked the same person if there were any "knocks on the door," evincing his concern about being arrested and suggesting he was not at his residence.  That same day, the defendant texted another individual, making crystal clear that he "need[ed] a outta town spot asap," asking for an ID for his name, "William Scott," and explaining that "bet shit went left yesterday." The defendant's expressed intent to flee immediately after the shooting is critical

evidence of his consciousness of guilt; whether he was able to successfully flee immediately or whether it took several days to find an out of town spot is of no moment.[13]  The defendant's texts are more than ample support for the inference that when the defendant was arrested two weeks later out of town, he had followed his plan and fled.  *See United States v. Steele*, 390 F. App'x 6, 12 (2d Cir. 2010) ("The evidence was not improperly ambiguous in spite of the fact that twenty days had passed since the last robbery and the fact that the arresting officers and agents did not have a chance to inform [the defendant] of the charges before he fled.").

The defendant's competing inference—which he is free to make to the jury if he wishes—that he may have fled to avoid pending state court charges for a separate crime (Mot. at 40), is belied by the defendant's own messages, which explain that his need to get out of town was that "bet shit went left yesterday" – the day after the shooting.  The mere fact that there could be alternative explanations for the defendant being in Kingston, New York is also not a basis to preclude the Government from offering this evidence of flight.  Moreover, the fact that the defendant told arresting officers that he was "not aware," of a shooting in the Bronx that occurred a couple of weeks ago is hardly surprising and of little relevance.  (Mot. at 40).  As the Second Circuit has held, "[w]here the evidence passes the threshold inquiry of relevance, the accepted technique is for the judge to receive the evidence and permit the defendant to bring in evidence in denial or explanation."  *Steele*, 390 F. App'x at 12.  Certainly, where the evidence is admissible, the Court should not preclude the Government from arguing fair inferences from that evidence to the jury.  The defendant is free to call other witnesses, present other evidence to explain why he

---

[13]  As defense counsel concedes, cellphone location data shows that the defendant had left the Bronx by June 30, 2020, a week after the shooting.  (Mot. at 39).

was in Kingston, New York, and make other arguments to the jury about the facts in evidence, but the Government has more than sufficient proof to support the argument that he planned to flee, in fact fled, and that his flight shows his consciousness of guilt.

Finally, the evidence is also admissible under Rule 404(b).  The defendant argues that to the extent the Government seeks to use this evidence as Rule 404(b) evidence rather than direct proof, the Government's Rule 404(b) notice was late. The defendant has suffered no prejudice as a result of the late notice, as evidenced by the fact that the defendant moved in *limine* on the issue. Moreover, the defendant had the underlying evidence as part of the Government's original Rule 16 discovery productions.  Notably, the Second Circuit has adopted an "inclusionary rule" for Rule 404(b) evidence, which permits the admission of other crimes or acts for "any purpose other than to show a defendant's criminal propensity, as long as the evidence is relevant and satisfies the probative-prejudice balancing test of Rule 403 of the Federal Rules of Evidence."  *United States v. Inserra*, 34 F.3d 83, 89 (2d Cir. 1994).  While any evidence, including evidence offered pursuant to Rule 404(b), is subject to the balancing test set forth in Rule 403, the Circuit has long made clear that "other act" evidence that is neither "more sensational or disturbing" than the charged crimes will not be deemed unfairly prejudicial.  *United States v. Roldan-Zapata*, 916 F.2d, 795, 804 (2d Cir. 1990); *see also United States v. Williams*, 205 F.3d 23, 33-34 (2d Cir. 2000); *United States v. Paulino*, 445 F.3d 211, 223 (2d Cir. 2006); *cf. Costantino v. Herzog*, 203 F.3d 164, 174 (2d Cir. 2000) ("Because virtually all evidence is prejudicial to one party or another, to justify exclusion under Rule 403 the prejudice must be unfair.").  Moreover, any arguments about prejudice from the late Rule 404(b) notice are mooted by the trial adjournment in this case. Accordingly, this evidence of flight should be admitted at trial.

## VI.    The Defendant's Alias "Ill Will" Is Admissible at Trial

The defendant moves to preclude any reference to his eponymous alias, "Ill Will," and asks the Court to strike "Ill Will" from the Indictment.  The defendant argues that the witnesses do not have first-hand knowledge of whether the defendant is in fact "Ill Will," and the alias is irrelevant and unfairly prejudicial.  (Mot. at 31-36).  As described below, the use of "Ill Will" is relevant and admissible because it is how the Witness and Victim know the defendant, whom they are expected to identify in court, and how they would naturally and truthfully testify about him.  In addition, the name itself is not unduly inflammatory or prejudicial and the Government plans to make limited use of it.

### A.    Applicable Law

It is well-established that a defendant's alias is relevant and admissible where it is how the witness knows the defendant.  *See, e.g.*, *United States v. Mason*, 06 Cr. 80 (NRB), 2007 WL 541653, at *5 (S.D.N.Y. Feb. 16, 2007) (denying motion to strike defendant's alias where Government would "introduce at trial witness testimony that the individuals charged here were known by co-conspirators and others by the aliases found in the Indictment"); *United States v. Jefferys*, 2019 WL 5103822, at *3 (E.D.N.Y. Oct. 11, 2019) (denying motion to strike alias "moneybags," in trial involving Hobbs Act robbery, where at least one witness would testify they knew the defendant by that nickname); *United States v. Peterson*, 168 F. Supp. 2d 51, 56 (E.D.N.Y. 2001) (denying motion to strike alias where witness would identify the defendant by the alias); *United States v. Rucker*, 32 F. Supp. 2d 545, 560-61 (E.D.N.Y. 1999) ("Reference to a defendant by his name and alias permissible if the government intends to offer evidence of that alias as being necessary to identify the defendant in connection with the crime charged.").

29

Where a witness knows the defendant by an alias, such testimony is admissible even if the alias is prejudicial. *See United States v. Persico*, 621 F. Supp. 842, 860-61 (S.D.N.Y. 1985) (denying motion to strike defendants' aliases, which included "Frank the Beast," and "The Snake" where testimony and recordings would refer to the defendants by those names "without mention of any surname"); *United States v. Delpit*, 94 F.3d 1134, 1146 (8th Cir. 1996) (allowing evidence of alias where defendant was referred to in the wiretaps by the alias "Monster" almost exclusively). As the Second Circuit has explained, "the suggestiveness of the nickname has not required exclusion, especially when it helped to identify the defendant, connect him to the crime . . . or when coherent presentation of the evidence entailed passing reference to it." *United States v. Farmer*, 583 F.3d 131, 146 (2d Cir. 2009). Where an alias is particularly suggestive of criminal conduct – which is hardly the case here – the Court can limit the extent and manner in which the Government repeatedly uses the alias in suggestive ways.

Finally, under Federal Rule of Criminal Procedure 7(d), the Court may strike surplusage from an indictment upon defendant's motion. Fed. R. Crim. P. 7(d). The Second Circuit has held, however, that district courts should not grant motions to strike surplusage unless "the challenged allegations are not relevant to the crime charged and are inflammatory and prejudicial." *United States v. Mulder*, 273 F.3d 91, 99 (2d Cir. 2001) (quoting *United States v. Scarpa*, 913 F.2d 993, 1013 (2d Cir. 1990)). Moreover, "even language deemed prejudicial should not be stricken if evidence of the allegation is admissible and relevant to the charge." *United States v. Rivera*, 2010 WL 1438787, at *5 (E.D.N.Y. Apr. 7, 2010) (citing *Scarpa*, 913 F.2d at 1013). "Given this exacting standard, such motions to strike are rarely granted." *Id.* (quoting *United States v. Coffey*, 361 F. Supp. 2d 102, 123 (E.D.N.Y. 2005) (internal alterations omitted)).

B.  Discussion

As described above, shortly after the shooting, the Witness and the Victim told law enforcement that "Ill Will" was the shooter.  Neither knows the defendant's full government name, but if called to testify, both would be expected to identify the defendant as the individual they know as "Ill Will."  Accordingly, the name "Ill Will" is relevant and admissible.  While the defendant argues that the evidence should be excluded as hearsay because the Witness and Victim do not to have personal knowledge of whether the defendant was in fact known by others as "Ill Will," the Witness is expected to testify that he/she has does have direct knowledge that the defendant was known in the neighborhood as "Ill Will."  Moreover, the Victim is expected to testify that he has direct knowledge that his daughter knew the defendant by that name.  Whether the defendant himself used the "Ill Will" name is irrelevant.

In any event, the Witness's and Victim's testimony is admissible as non-assertive oral conduct and is not being offered for the truth of the matter, but as how the Witness and Victim know and identify the defendant.  *See, e.g.*, *United States v. Weeks*, 919 F.2d 251 (5th Cir. 1990) (allowing warden to testify that defendant's nickname in prison was "Gato" because "the warden's testimony reported non-assertive oral conduct"); *United States v. Whiteside*, 747 F. App'x 387, 398 (6th Cir. 2018) ("Special Agent Wilson testified that he had personal knowledge that [defendant] had been called Mel before on the street." (quotation marks omitted)).

The defendant acknowledges that a defendant's alias is admissible where a witness only knows the defendant by his alias.  (Mot. at 33-34)  However, the defendant asserts that the Witness and Victim *do* know the defendant's real name (in apparent contradiction to the defendant's arguments that the Witness and Victim did not know the defendant well enough to make a reliable

in-court identification).  (Mot. at 34).  Specifically, the defendant claims that because the Witness and Victim know the defendant as "Ill Will" and "Will" is an abbreviation of "William," they therefore know William Scott's name.  *Id.*

Requiring the Victim and Witness to identify the defendant as "Will," however, rather than how they know him, "Ill Will," will require them to substantively change their testimony and likely render their testimony less natural and fluid, on a critical issue for the trial – whether they know and can identify the defendant.  Indeed, defense counsel will undoubtedly attack the Witness and Victim's credibility with respect to their identification.  Forcing the Witness and Victim to change their testimony regarding how they know the defendant could unfairly and artificially weaken their credibility in the eyes of the jury.  These circumstances are fundamentally different from the analogy the defendant tries to draw, where a cooperating witness may testify using a pseudonym himself, as the identity of the cooperating witness is wholly unimportant to the witness's testimony.  Here however, the defendant's identity is a critical issue. Moreover, the witnesses' knowing the defendant as "Will," is very different from knowing him as "Ill Will," as the latter connotes a much more specific name and person.  The two names thus have different implications regarding the Witness's and Victim's familiarity with and knowledge of the defendant, which will be an important part of their testimony.

The alias "Ill Will" is also not unduly prejudicial.  There are multiple definitions of "Ill," none of which are synonymous with an individual who possesses ammunition, and neither the Witness nor the Victim would testify about why or how the defendant got the nickname "Ill Will." Moreover, the Government plans to make limited use of the alias in its questioning and closing statement, none of which would come close to what the Circuit has found problematic.  *See*

*Farmer*, 583 F.3d at 144 (finding that it was error for the Government to use the alias "Murder" thirty times in its rebuttal alone, and argue that the defendant "really tried to prove himself a real gangster, to come up in the gang. You know, maybe live up to his name of Murder").

Finally, because the alias "Ill Will" is relevant, the Court should not strike the alias from the Indictment. *See, e.g.*, *United States v. Miller,* 381 F.2d 529, 536 (2d Cir.1967) (aliases are properly listed in an indictment where they are relevant to the case); *United States v. Elson*, 968 F. Supp. 900, 909 (S.D.N.Y. 1997) ("[A]liases and nicknames should not be stricken from an Indictment when evidence regarding those aliases or nicknames will be presented to the jury at trial."); *see also United States v. Thomas*, 2014 WL 2168468, at *2 (D. Conn. May 23, 2014) (same); *United States v. Scott*, 2015 WL 1525580, at *5 (D. Conn. Apr. 2, 2015) (aliases admissible where probative in identifying defendant); *United States v. Cook*, 2018 WL 2303016, at *8 (D. Conn. May 21, 2018) ("In particular, when witnesses only know the defendants by their alleged aliases, 'inclusion of the alias[es] in the indictment is proper.'") (quoting *United States v. Peterson*, 168 F. Supp. 2d 51, 56 (E.D.N.Y. 2001). Rather than cause jury confusion as the defendant claims, the inclusion of an alias in an indictment may well serve to obviate jury confusion where witnesses refer to a defendant by his alias. *See United States v. Rodriguez*, 734 F. Supp. 116, 128-29 (S.D.N.Y. 1990).

## VII.    The Government Should Be Permitted To Use the Term "Victim" To Refer to the Shooting Victim

The defendant moves to preclude the Government from using the term "victim" to refer to the shooting victim. (Mot. at 41-42). But courts routinely allow the Government to use the term "victim" in trials involving violations of 18 U.S.C. § 922(g). *See, e.g.*, *United States v. Saunders*, 19 Cr. 679 (LGS), (Dkt. 64 at 20) (S.D.N.Y. May 4, 2021) (referring to individual shot by the

defendant as "victim" in 922(g) case involving felon in possession of ammunition); *United States v. Jarrett*, 19 Cr. 670 (LGS), (Dkt. 113 at 68) (S.D.N.Y. Apr. 20, 2021) (same). The defendant has failed to explain why this case should be any different.

Moreover, the term "victim" accurately reflects the individual's status under the Crime Victims' Rights Act. *See* 18 U.S.C. § 3771(e)(2)(A) (defining the term "crime victim" as "a person directly and proximately harmed as a result of the commission of a Federal offense or an offense in the District of Columbia"). The defendant shot at the Victim multiple times and one of the defendant's bullets hit the Victim in the leg. The Victim was rushed to the hospital, where doctors determined that his femur was broken and performed surgery to remove a bullet from his leg.

The defendant's argument – which essentially boils down to the contention that merely referring to the individual's statutory status would result in undue prejudice – strains credulity. Notably, several courts addressing this very issue have denied requests to preclude use of the term, concluding that the Government is within its right to use the term to advocate for its view of the evidence and that such use is not unduly prejudicial. *See, e.g.*, *United States v. Helbrans*, No. 19 Cr. 497 (NSR), 2021 WL 4778525, at *16-17 (S.D.N.Y. Oct. 12, 2021) ("The Court agrees with the Government and declines to preclude the use of the term 'victim.'"); *United States v. Gasperini*, No. 16 Cr. 441 (NGG), 2017 WL 3140366, at *7 (E.D.N.Y. July 21, 2017) (rejecting the defendant's argument to preclude the terms "victim" and "victimized" at trial).

Finally, merely referring to the individual shot as a "victim" will not "suggest to the jury that they should convict Mr. Scott because he has allegedly harmed another individual." (Mot. at 42). The jury will properly be instructed on the law and elements of the crime. The defendant

has failed to cite a single criminal case in support of his argument that using the term "victim" is unduly prejudicial.  For this reason, the motion should be denied.

## VIII.   The Government Should Be Permitted to Use The Phrase "Convicted Felon," "Felon," And "Felony"

Similarly, the defendant asks the Court to impose a categorical prohibition on the use of the terms "convicted felon," "felon," and "felony."  (Mot. at 37-38).  However, those terms are in common parlance and ones that efficiently capture an essential element of the charged offense. Although the defendant is stipulating to being a felon, it is still an element of the case that the Government must prove and make reference to, including in its opening and closing statements. That said, the Government intends to use the term sparingly.

The defendant's suggestion that the Government only use the language of the statute, *i.e.*, "previously was convicted of an offense punishable by more than a year," is unnecessarily verbose as compared to "convicted felon."  Moreover, requiring the Government to only use the language of the statute could create its own danger of unfair prejudice, inviting the jury to speculate on the reasons the Government is avoiding a conventional term.  Permitting the Government to use "convicted felon," where appropriate will reduce potential juror confusion and promote efficiency.

Judge Rakoff considered and rejected an identical motion in *United States v. Hassan Romeo*, 19 Cr. 13 (JSR), Dkt. 28 at 27-29 (S.D.N.Y. May 15, 2019).  There, Judge Rakoff explained:

> I don't see in a case like this what prejudice whatsoever comes from the use of the everyday, ordinary English word that I think goes back probably about a thousand years, that he was convicted of a felony.  It's an everyday word and that's all the government said.  It's of course, an essential element of this case and I think it would be not only pointless, but in some ways kind of ridiculous to have the government just stand up and say, and the parties

> agree that he was convicted of a crime carrying a potential sentence of more
> than one year.  If anything, I think that would lead the jury to speculate
> about what the crime might have been in a way that the much simpler
> formulation given by the government in their opening statement does not
> invite.  The motion is denied.

*Id.*; *see also United States v. White*, 2009 WL 4730234, at *2-3 (E.D.N.Y. Dec. 4, 2009) (refusing

to impose blanket prohibition on the phrase "convicted felon" because it is a "convenient

shorthand" and "commonly used when referring to that element of the crime"); *United States v.*

*White*, 312 F. Supp. 3d 350, 354 (E.D.N.Y. 2018) (same).

The defendant relies on *United States v. Belk*, 346 F.3d 305, 311 (2d Cir. 2003), but that

case did not hold that courts should prohibit the phrase "convicted felon," much less require that

result.  Rather, in rejecting the defendant's claim that the district court erred in refusing to bifurcate

his trial, the Circuit merely remarked that the district court had taken "commendable" measures to

guard against prejudice that might arise from the fact that the jury would learn of the defendant's

prior conviction.  And in *United States v. Brooks*, 242 F.3d 368 (2d Cir. 2000), the Circuit found

no prejudice where the prosecutor referred to the defendant as a "convicted felon" no fewer than

eight times.  *Id.* at *1.  Again, the Government does not intend to rely heavily on the term

"convicted felon," "felon," or "felony," and any concern about prejudice can be addressed through

a limiting instruction.  Thus, the defendant's motion should be denied.

## IX.   The Court Should Give the Limiting Instruction Submitted in the Parties' Joint Request to Charge

The defendant finally requests a limiting instruction with respect to the defendant's prior

felony conviction.  (Mot. at 42-43).  The Government submits that the parties' joint request to

charge, specifically Request No. 4, provides a legally sufficient instruction on the purposes for

which the jury can and cannot consider the defendant's prior conviction.  The Government does

not believe a further limiting instruction is necessary.

**CONCLUSION**

For the foregoing reasons, the Court should deny the defendant's motions *in limine* in their

entirety.

Dated:          New York, New York
                February 16, 2022

                                         Respectfully submitted,

                                         DAMIAN WILLIAMS
                                         United States Attorney
                                         Southern District of New York

                              By:        __/s/_____
                                         Courtney Heavey
                                         Andrew K. Chan
                                         Alexandra N. Rothman
                                         Assistant United States Attorneys
                                         (212) 637-2580 / 1072 / 2413