UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X
THE UNITED STATES OF AMERICA,

           -against-

                                           21 Cr. 429 (AT)

WILLIAM SCOTT,

                 *Defendant.*
-----------------------------------------------------------------------X

---

## SENTENCING MEMORANDUM ON BEHALF OF
## WILLIAM SCOTT

---

Susan G. Kellman, Esq.
Attorney at Law
25 Eighth Avenue
Brooklyn, NY 11217
718-783-8200
sgk@kellmanesq.com
*Attorney for William Scott*


Eylan Schulman, Esq.
Schulman Trial, PLLC.
20 Vesey St., Suite 1400
New York, NY 10007
212-874-2500
eylan@schulmantrial.com
*Attorney for William Scott*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
THE UNITED STATES OF AMERICA,

          -against-

                                                  21 Cr. 429 (AT)

WILLIAM SCOTT,

*Defendant.*
------------------------------------------------------------------------X

        Growing up in the Bronx in the 1980's and 1990's was like few places

on Earth.  African American and Hispanic boys didn't have to fall into the trap that

was either gangs, drugs, or violence, or, all of the above – the Bronx had them

all!  So many, though not all, ended up in jail or worse – dead.  Few had the

tenacity, means, support, skills or education to get out of the Bronx and create a life

that comes so easily to those fortunate enough to not be raised there.  The Bronx

meant – no job opportunities, police outposts on school grounds, shop keepers

fleeing.  In those days, the Bronx was often described as a "war zone" – murder

rates soared to all-time highs.[1]  William came to understand that the police and fire

department did not exist to protect people like him.  The NYPD considered the

Bronx hostile territory and viewed themselves as "soldiers" at war with the

---

[1] Department of Justice, Bureau of Justice Statistics analysis, *U.S. Homicide Rate Falls to Lowest Rate in Four Decades* (November 18, 2011) https://www.justice.gov/archives/opa/blog/new-report-us-homicide-rate-falls-lowest-rate-four-decades.

population they were ostensibly there to protect.  In 1980, NYPD Commissioner Robert J. McGuire told the *Times* that the city, having reduced its police force by 9,000 officers, to 22,000, had conducted a "vast social experiment…[H]ow far can you cut back your police force before crime runs rampant?"[2]

Like so many of his contemporaries, William experienced the official neglect that contributed to the destruction of his community and, consciously or unconsciously, used it as a reason to turn against authority.  This partially explains William's introduction into the criminal justice system at age 16.

Born at an extremely dangerous birthweight of – one pound and one ounce – a "micro-preemie" – was the beginning of William Scott's life's struggles, though it creates context to understand the confluence of events that brings William before this Court.  Being born a micro-preemie led to extended stays in neonatal intensive care units, frequent illness, and doubts about whether William would even reach his first birthday.  Many friends and family describe William's survival as a "miracle."

During early childhood, William had a front-row seat to daily physical abuse at the hands of his father – mostly directed at William's mother, Sharon Renee Boone.  (PSR ¶ 52.)  Ms. Boone eventually left the abusive relationship "to protect Mr. Scott and his twin sister Tameka Scott and remove them from a horrible environment [since they] didn't deserve to be subjected to that kind of living."  (Ltr. of Sharon Renee Boone, annexed as Ex. A.)  Though Ms. Boone left William's

---

[2] Gelinas, Nicole, *The Bronx is Up* (Winter 2016) https://www.city-journal.org/html/bronx-14182.html.

abusive father "for the betterment of the kids," it proved to be the "most difficult time for [her] children," including William. (*Id.*)

William was left without a father. (PSR ¶ 51.) Sadly, however, he certainly had no model of a loving, functional marriage, or decent parenting as a springboard to a better life. William's mother worked two jobs, sixteen hours a day, to support William and his twin sister. By the time Ms. Boone returned home at night, she was too exhausted to parent effectively. Owing to her work schedule, William ended up unsupervised far too often – with the allure of the street-life just outside his front door.

It is difficult to understand the extent the multiple traumas had on William's cognitive and psychological development. Trauma during the early years of one's life is far different from trauma experienced as an adult. Research shows that trauma during the years of brain development can lead to aberrant development, maladaptive behaviors, struggles with social interactions and self-destructive tendencies.[3] Trauma can impact an individual academically, personally, professionally, physically, socially, and romantically.[4] Trauma oftentimes diminishes or extinguishes self-esteem.[5] William's early extreme physical

---

[3] Anda, R.F., Felitti, V.J., Bremner, J.D. *et al.* The enduring effects of abuse and related adverse experiences in childhood. *Eur Arch Psychiatry Clin Neurosci* 256, 174–186 (2006). https://doi.org/10.1007/s00406-005-0624-4.

[4] Perfect, M. M., Turley, M. R., Carlson, J. S., Yohanna, J., & Saint Gilles, M. P. (2016). *School-related outcomes of traumatic event exposure and traumatic stress symptoms in students: A systematic review of research from 1990 to 2015.* School Mental Health, 8(1), 7-43. doi: 10.1007/s12310-016-9175-2.

[5] Lee, Adabel, and Benjamin L Hankin. "Insecure attachment, dysfunctional attitudes, and low self-esteem predicting prospective symptoms of depression and anxiety during adolescence." *Journal of*

challenges, his emotional neglect, and his social history – individually and collectively – illustrate the intense impact that trauma played in his life and its lasting effects.

While it is hard to believe that any good could come from being incarcerated at the MCC and the MDC over the last 26 months, William has learned a valuable, albeit painful lesson, and will dedicate himself to never traveling down the road that brought him to this place again.  We respectfully submit that a robust application of 18 U.S.C. Section 3553(a) will lead your Honor to conclude that a below-Guideline sentence is "sufficient but not greater than necessary" to satisfy the goals of sentencing.  Now in his mid-forties, the imposition of a long prison sentence is unlikely to provide any marginal deterrent effect on William than would a sentence far below the statutory maximum —especially since William is now middle-aged – when the likelihood of recidivism decreases significantly.[6]

---

*clinical child and adolescent psychology : the official journal for the Society of Clinical Child and Adolescent Psychology, American Psychological Association, Division 53* vol. 38,2 (2009): 219-31. doi:10.1080/15374410802698396.

[6] U.S. Sentencing Commission, *The Effects of Aging on Recidivism Among Federal Offenders*, (December 2017) (demonstrating the strong influence age exerts on recidivism – older offenders are substantially less likely to recidivate after release than younger offenders who had served similar sentences, regardless of the length of sentence imposed.)

Objection to the Guideline Calculation

   Mr. Scott was convicted of being a felon in possession of ammunition, in violation of Title 18, United States Code, Section 922(g)(1), after a four-day trial before Your Honor from April 11 to April 14, 2022. Mr. Scott is scheduled to be sentenced by this Honorable Court on September 6, 2022. Section 922(g)(1) carries a maximum term of imprisonment of ten years; a maximum term of supervised release of three years; a maximum fine of $250,000; and a mandatory $100 special assessment.

   Relying on the *attempted murder* Guideline (U.S.S.G. Section 2A2.1(a)(1)(A)), Probation determined that the proper Base Offense Level ("BOL") should be 33, yielding a Sentencing Guidelines range of 235 – 293 months, capped, of course, by a statutory maximum of ten years. Probation finds that the object of the offense would have constituted *first degree murder* and Mr. Scott's actions, therefore, constituted an "attempt." This application is incorrect since a person is guilty of murder when, "[w]ith intent to cause the death of another person, he causes the death of such person or of a third person." (Penal Law § 125.25 [1]). Mr. Scott was not charged with attempted murder, there is no indicia Mr. Scott intended to cause the victim's death, and Mr. Scott's actions were not premeditated. At worst, the video offered by the government during the trial illustrated that William was responding to being chased and confronted by three armed men while he was alone with his young daughter. No reasonable view of the evidence could establish *attempted murder*.

6

The PSR suggests a four-level Guideline increase because "the victim sustained permanent bodily injury."  This too is unsupported by the record since the victim has refused to provide any statements regarding the incident or injury – he did not testify at William's trial and there is no evidence of a "permanent bodily injury," as required for the four-level increase.  (PSR ¶ 16.)  The probation officer's claim that the victim's mobility has been "permanently impaired" relies on medical information recorded immediately after the shooting – more than two years ago – with no proof of "permanency," as required for the increase. (PSR ¶ 11.)

Rather than use the Guideline calculation set forth in the PSR, we respectfully ask that your Honor adopt the applicable offense level that comports with the estimates acceptable to the government, as evidenced in its *Pimentel* letter on November 29, 2021.  (*Pimentel* letter, annexed as Ex. B.)  The *Pimentel* letter explains the U.S. Attorney's Office's position regarding the application of the Sentencing Guidelines to the instant case.  (*Id.*, at 1.)  Of course, the letter does not bind the Court in its independent determination of the correct application of the Guidelines, but it does serve as clear evidence of the government's view of the proper Guidelines application.  No new evidence or witnesses were presented after the government issued the *Pimentel* letter in November 2021 – no circumstances have changed – so the government's "view," even after trial, should not change. Indeed, the notion of punishing a defendant for exercising his right to trial could not be more blatantly on display.  As a result of going to trial, Mr. Scott will not be eligible for the three points for acceptance of responsibility, fair enough; however,

the sentence articulated in the PSR is beyond what is necessary or appropriate and greater than necessary to satisfy the stated objectives of the Sentencing Guidelines.

As outlined in the *Pimentel* letter, the Guideline applicable to the offense charged in the indictment is U.S.S.G. § 2K2.1.  (*Id.*)  Pursuant to U.S.S.G. § 2K2.1(c)(1)(A), because the defendant used or possessed the ammunition in connection with the commission of another offense, to wit, *aggravated assault*, U.S.S.G. § 2A2.2 is applied with respect to that other offense, if the resulting offense level is greater than that determined under U.S.S.G. § 2K2.1(a)-(b).  (*Id.*)  The total offense level determined under both §§ 2A2.2 and 2K2.1(a)-(b) is **24** – making **24** the applicable offense level.  (*Id.*, at 2.)  Mr. Scott's Criminal History Category is II. (PSR ¶ 42.)  Accordingly, Mr. Scott's Guidelines range should be **57-71 months**.

We respectfully urge your Honor to adopt the calculation set forth in the government's *Pimentel* letter, without crediting Mr. Scott with the three points for Acceptance of Responsibility.  That calculation is as follows:

U.S.S.G. Sections 2K2.1(a)-(b) and 2A2.2:

| | |
|---|---|
| Base Offense Level | **24** |
| Total Offense Level | **24** |
| Guideline Range (w/CHC II) | **57-71 months** |

Sentencing Considerations

  The Supreme Court has held that a sentencing judge is to "consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Pepper v. United States,* 562 U.S. 476, 487 (2011) (quoting *Koon v. United* States, 518 U.S. 81, 113 (1996)).  While the guidelines are the "starting point and the initial benchmark," the judge "may not presume that the Guidelines range is reasonable." *Gall v. United States,* 552 U.S. 38, 39 (2007). Rather, district courts are required to make an "individualized assessment" of the sentence warranted "based on the facts presented." (*Id.*, at 39.)

  Section 3553(a) of Title 18 provides that "[t]he court shall in every case impose a sentence sufficient, but not greater than necessary to comply with the purposes set out in paragraph (2) of this subsection."  18 U.S.C. § 3553(a).  Among the factors to be considered at sentencing are: (1) the nature and circumstances of the offense, (2) the history and characteristics of the defendant, and (3) "the need for the sentence imposed—(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; [and] (C) to protect the public from future crimes of the defendant."  18 U.S.C. § 3553(a).  We hope that your Honor will agree that several factors warrant the Court's leniency here.

9

<u>Who Is William Scott: History and Characteristics of William Scott</u>

Though not apparent at first blush, one of the characteristics consistently cited about William is what a "loving" man he is. William's mother shared that William is a "very loving son, father, brother, [and] nephew." (Ltr. of Sharon Renee Boone, annexed as Ex. A.) His twin sister Tameka describes William as a "loving father, son, brother and uncle." (Ltr. of Tameka Scott, annexed as Ex. C.) Cousin Shayne Alexis similarly focuses on how William is a "good father to his children." (Ltr. of Shayne Alexis, annexed as Ex. D.)

Mr. Scott is determined not to repeat the mistakes his father made; he doesn't want his beautiful daughter to grow up without her Daddy, as he did. The absence of a father figure growing up has led William to remain a constant presence for his three children -- A.S.(age 9); N.H. (age 6); and J.S. (age 5). William begs your Honor to show him mercy and return him to his family – humbled – so he can be a better father and better human being. He asks this so that his children don't have to grow up without their father in their life.

**William and his children**



Growing up in the Bronx taught William to be a strong protector of his friends and close family.  His twin sister Tameka shared that she is comforted knowing that her brother "will always protect me in any situation.  Mr. Scott has a heart of gold not the monster that [he] appears to be."  Tameka reminds the Court that Mr. Scott has "three beautiful children which he dearly and truly loves."  (Ltr. of Tameka Scott, annexed as Ex. C.)  William is committed to being present for his children – unlike his own absentee father.  Indeed, Mr. Scott's desire to protect his children has, in part, gotten him where he is today.  William was threatened on June 23, 2020 – when three armed men chased after William and his daughter – in broad daylight on the corner of E183rd St. and Prospect Avenue, just a block from the Bronx Zoo.  He ran to the corner, "parked" his daughter in the corner market, and then circled back to deal with his pursuers.[7]

William appreciates the value of service – to the Church and community-members in need.  While incarcerated, Mr. Scott has tried to reconnect with religion as a source of guidance – as he did as a child.  Wakina Jones, a disabled neighbor, explains how William takes her to medical appointments and shopping, assists washing clothes, and often runs errands for her.  Ms. Jones highlights another side to William, describing him as "a very nice person," "very

---

[7] By way of a reminder, Mr. Dequan Hunt, his brother Ramel and a friend of theirs came to the "block" to defend the honor of Mr. Hunt's daughter, who had been admonished earlier in the day by Mr. Scott because her dog was unleashed in a garden adjacent to the housing project where Scott and the young girl reside.  (Trial Tr. 234-236.)  The government's own witness, Lynette Philips, admits Mr. Scott apologized to her when he learned it was her daughter who he had the disagreement with earlier in the day, but Ms. Philips was still upset about the situation and reached out to her estranged husband's brother Ramel.  Her daughter also told Dequan Hunt what occurred.  When the Hunt brothers arrived on the block, they were armed and ready for a fight. It was they who initiated the conflict with Mr. Scott on the date of this incident. (Trial Tr. 195.)

reliable when I needed him he always came to help." (Ltr. of Wakina Jones, annexed as Ex. E.)

As a teenager, William went to live with his aunt, but she didn't have much time for William and William fell into the street life fairly quickly – leading to multiple mistakes. To her credit, William's aunt provided William with food, clothing, shelter, and a Catholic education – at least for a few years.

The large public schools William attended provided little guidance or motivation to succeed; his survival instinct lead him to seek out the "popular" and powerful kids who didn't care much for school – but provided him with a sense of belonging – and safety. They hung out in the street at all hours of the night, challenged each other to fights, argued with teachers, and cut school regularly. As a teenager, William needed someone to hold him accountable – but there was nobody who could fill that void for him. Though surrounded by his street "friends," emotionally, William was very much alone. Without adequate supervision or structure at home, he spent most of his time learning how to survive on the streets of the Bronx. Life in the streets wasn't easy and William, like so many other young men, did not understand that school provided the tools he'd later need to care for himself and his family.

Feeling sad, alone and afraid, by the age of 15, William sought comfort in marijuana, smoking multiple times per day. (PSR ¶ 68.) Marijuana made him feel calmer and less afraid of what was going on around him. As time passed, his

usage became more and more frequent.  As a student, William brought marijuana to school with him to smoke in the middle of the day.

William witnessed street violence and intimidation on a daily basis – whether it was on his walk to and from school – or on the school grounds.  He never felt safe at school or in his neighborhood – survival was key amid the mayhem.  As William got older and spent more time in the park and on the street, he became more aware of the violence endemic to his neighborhood, including fights, shootings and stabbings.  Gunshots could be heard outside his bedroom window at all hours of the day and night.

By the 11th grade, William was riddled by terror, insecurity and self-doubt.  Overwhelmed and confused, William left school – a mistake he now understands helped launch him into a downward spiral – and one that he regrets every day.  By leaving high school without the opportunities that come with possessing a diploma and without the reliable support of family, friends, or peers, William has come to understand that his life options have been severely limited.  Despite the limitations, William has tried to get on the "right track" by finding employment that ranged from being a movie production aide to an OSHA flagger at construction sites.  (PSR ¶¶ 78, 81.)  However, with no solid sense of himself or positive guidance, William has succumbed to his inner demons, struggling and making mistakes along the way.  Now, he must await the judgment of this Court.

William's Future Plans

William has learned many lessons while incarcerated under the brutal conditions that are a daily reality at the MCC and MDC.  For over the last 26 months and on a daily basis, William misses the opportunities he could have with his children and regrets every minute that passes him by – sad for the pain he has caused his loved ones.  William has shared with counsel his willingness to work hard to become the person he needs to be – if only for his children's sake – which is worthy of the Court's favorable consideration.  He has expressed his resolve to never again cause his children the pain that they have experienced over the past two years.

William is ready to become his best self and reintegrate as a productive member of society. He is ready, willing and able to lead a law-abiding life.  Though William is not the cut-and-paste antagonist the government portrays, he recognizes that the crime for which he was convicted is serious.  But William's story does not have to be perpetually bound to criminal conduct; rather, William believes that he is capable of profound growth – as a man, as a father, and as a functioning member of his community.  Counsel shared the story of William's early life, not for sympathy; rather, to contextualize the events that shaped him and the hardships he has endeavored to overcome.

William aspires to regain his freedom and feels like he is ready to take control of his life.  His time at the MCC and MDC has been sobering and he feels ready to embrace the next chapter of his life.  He hopes that upon his release from

federal custody, he will be able to make a fresh start. William is determined to be a productive member of society and to set a better example for his children. William also hopes to be able to volunteer and speak to young men in his community about how to avoid the mistakes he made when he was their age. Perhaps he can help other young men to "jump onto the right track."

<u>Incarceration During the Covid Pandemic</u>

Mr. Scott was arrested on July 8, 2020, for the instant offense. In all, William has served more than two years in federal prison, through the pandemic. By sentencing on September 6, 2022, William will have served almost 26 months.

<u>MCC New York</u>

Mr. Scott was originally incarcerated at the Metropolitan Correctional Center ("MCC") for more than ten months, from July 8, 2020 until May 17, 2021, before it was forced to shutter its doors owing to a host of abuses and neglect. On July 16, 2020, just eight days after arriving in the MCC, William became sick with COVID. Though he was experiencing severe symptoms including a raging fever, chills, nausea, shortness of breath, night sweats, and body aches, the MCC staff refused to offer treatment of any kind. Instead, William was locked in his cell, without so much as Tylenol to reduce his fever. Today, William realizes that he was one of the lucky ones – because his symptoms eventually subsided. This alone, has signaled to William that there is someone watching over him – and if he could beat COVID – and survive the inhumane treatment that he, and indeed, all inmates receive at the hands of the BOP, he must have a greater calling – and he is

desperate to begin charting a new course.

Inmates at the MCC, including William, were subjected to conditions of confinement far more punitive than the usual constraints of pretrial detention. Owing to the pandemic, inmates at MCC experienced lockdowns 24/7, lasting weeks and months, isolation, inadequate health and safety precautions, no contact with family either by phone or in person, and no legal visits. When William recovered from his first bout with COVID, he, like the other inmates, were locked down virtually non-stop; indeed, he was only let out of his cell for 30 minutes, 3 days a week. During this entire time, inmates were forced to share a single mask – often with twenty or more other inmates.

Social distancing was not observed, there was limited ability to clean one's cell, and the communal areas were not sanitized – or even cleaned. Indeed, for reasons that remain a mystery to this day, all soap was confiscated and inmates could only obtain soap through the commissary – at their own expense. To make matters worse and encourage the spread of this potentially deadly virus, the prison officers were largely unvaccinated, rarely wore masks and did not practice social distancing.

For the first year of the pandemic, COVID ran rampant within the MCC. In addition to suffering from the COVID virus, William was bitten by insects and mice in his cell; black mold grew on walls and surfaces; water dripped onto his mattress, and toilets that overflowed with waste filled his cell. So horrific and unsanitary were the conditions at the MCC that it has now been closed for a

complete physical rehabilitation – to address the very conditions that William lived through.  Judge McMahon described the conditions at the MCC as "disgusting, inhuman," "nothing short of inhumane," "worse than any time that anyone thought possible in the last 400 years in a federal jail in America," and worse than "any Colombian prison, but more so because we're supposed to be better than that."  In imposing the minimum sentence available, Judge McMahon told the defendant that she "shouldn't have to suffer for the incompetence of the United States Department of Justice and its subsidiary agency, the Bureau of Prisons."  *United States v. Tiffany Days*, 19 Cr. 619 (CM) (S.D.N.Y. April 29, 2021, pp.11-12,19).

Added to this horror, in the Fall of 2020, when Mr. Scott was locked in his cell, the MCC had two fires requiring the evacuation of the facility and the arrival of firefighters.  During both fires, William smelled smoke.  His cell began to fill with smoke before it was unlocked and he and the other inmates were escorted to the roof.  Mr. Scott thought for sure he was going to die.

MDC Brooklyn

William's move to the MDC was hardly an improvement.  Mr. Scott was transferred to the MDC during the MCC evacuation on May 18, 2021 – a little more than one year into the pandemic and during a spike in cases at that facility. He imagined that things had to be looking up; after all, they couldn't possibly be worse than the hell he'd been forced to weather at the MCC.  Not surprisingly, the MDC has been no better than the MCC – and quite possibly it is worse.

When Mr. Scott transferred to the MDC, he was placed in quarantine for three weeks.  The MDC has been beyond overcrowded due to the MCC transferees

and the inability to move inmates to other facilities because of the pandemic. Gang violence, including stabbings and assaults, is rampant and has resulted in total lockdowns for weeks on end. In October 2021, the MDC had no lights, no water, and the toilets overflowed into the cells, where, owing to COVID, the inmates were forced to remain day after day. Since the onset of the pandemic, MDC has cycled in and out of full lockdowns that seem to have no end. Violence abounds and medical care is virtually non-existent.[8] Worse, if you can imagine, the MDC has come to rely on boxes of food that are delivered to inmates daily – in lieu of cooked meals. A typical box includes four pieces of white bread and pre-school sized tubes filled with peanut butter, jelly and juice. Additionally, these boxes contain several slices of frozen bologna and a single bottle of water.

There are approximately 1,700 incarcerated people at the MDC. Many, including William, share small two-person cells originally designed for one person, with a shared toilet and sink. Throughout the pandemic, MDC has continued to "double-cell" its incarcerated population. At first, detainees were let out of their cells for 15-20 minutes every other day to shower – though this schedule did not include weekends – when showers were not permitted. Inmates at the MDC have been locked in a never-ending confinement with no access to programming and severely limited access to medical care or personal hygiene. Throughout the pandemic, the "panic" buttons in each cell were disabled, making it

---

[8] https://www.nydailynews.com/new-york/nyc-crime/ny-water-electricity-conditions-mdc-brooklyn-20211010-27q6mnw6jre4llsko6jbww4m74-story.html.

impossible to call for help in emergencies.  Recently, restrictions have relaxed to some extent, but remain onerous.  Indeed, the MDC has placed timers on the showers and each adult male is permitted only a 10-minute shower before the water is literally shut off.  Additionally, soap must now be purchased individually – whether an inmate can afford to purchase soap or not.[9]  That said, it really doesn't matter, because the only way to obtain soap is through the commissary; and, owing to the lockdowns, getting to the commissary is a virtual impossibility.  In-person visits with family were suspended for over two years, and even today, are severely limited and often canceled at the last minute.  Due to the extreme shortage of BOP staff, owing to employee refusal to get vaccinated, there have been violent flare ups that have resulted in the continuation of the institutional lockdowns seemingly forever.  During lockdowns, the only drinking water available to inmates is from the faucet in their cells, which runs brown/rusty in many of the units, including William's.  Of course, there is the single bottle of water in the inmates' picnic boxes.

While incarcerated during the COVID pandemic, William has been denied virtually all contact with his family.  This has made his incarceration all the more punitive because he has been isolated from his children, locked in a tiny cell with no opportunity to better himself.

---

[9] For reasons that have never been satisfactorily explained, all cleaning supplies were removed from MDC units throughout most of the pandemic, making it impossible for prisoners to attempt to keep their own units and individual cells clean.

<u>Reduction of Sentences Based on Conditions of Confinement at the MCC and MDC</u>

Incarceration at the MCC and MDC has been brutal, unduly harsh, and beyond that which has previously anticipated or experienced by pretrial detainers. Since the onset of the COVID pandemic, however, life at these institutions has been nightmarish; sadly, the inmates have yet to emerge from this nightmare. Judges in the Southern and Eastern Districts have granted downward variances based on the pandemic and the unduly harsh pretrial conditions of detention at the MCC and MDC. While there is no set formula, many judges are holding that time spent at these facilities during the pandemic should count as 1.5 to 2 times the actual time served.

By the time your Honor sentences Mr. Scott, he will have already been incarcerated for almost 26 months in two of the worst possible pre-trial detention centers in the United States – under the worst possible conditions. In *United States v. Carty*, the Second Circuit recognized that pre-sentence confinement conditions are a permissible basis for downward departures. 264 F.3d 191, 196 (2d Cir. 2001) (*per curiam*).[10] Life at the MCC and MDC has yielded conditions harsher than most inmates face when confined in facilities meant for long term incarceration, rather than the "short term" perversion that confronts inmates at the MCC and MDC.

---

[10] In *Carty*, the defendant was detained for eight months in a Dominican prison, where he was held in an unlit, four-by-eight-foot cell with three or four other inmates, had no access to running water, paper, pens, newspaper, or radio, and was allowed only one phone call per week. *Carty*, 263 F.3d at 193. The court of appeals held that such "pre-sentence confinement conditions may in appropriate cases be a permissible basis for downward departures." *Id.* at 196.

20

SDNY COVID Related Sentencing Adjustments

          In *United States v. Daniel Gonzalez*, 18 Cr. 669, (JPO), Judge Oetken

found as follows:

> Now, the defendant has already served 24 months of detention and that
> really has been under conditions that have been extraordinarily harsh.
> Most of the time has been in lockdown conditions 23 hours a day,
> basically like solitary confinement with no access to visitors for most of
> that time, virtually limited programming. And I do believe that because
> it's been harsher than a usual period that it's more punitive, that it's
> essentially the equivalent of either time and a half or two times what
> would ordinarily be served. So I think having served 24 months is
> equivalent to having served three years. That's what I believe in terms
> of how punitive it's been and how harsh it's been. As defense counsel
> points out, he has already served the equivalent of 28 months if you
> factor in good-time credit.

(Transcript from the sentencing in *United States v. Daniel Gonzalez*, 18 Cr. 669

(JPO) (S.D.N.Y. April 2, 2021, pp. 17-18.); *United States v. Morgan*, 19 Cr. 209

(RMB) (S.D.N.Y. May 5, 2020) (cutting the sentence to less than half of the low end

of the Guidelines based in part on conditions at MDC during the pandemic and

condemning the conditions at MCC and MDC prior to the current crisis); *United

States v. Dayss*, 19 Cr. 863 (VSB) (S.D.N.Y. May 4, 2020) (reducing the length of

the sentence in part based on conditions at MCC during the COVID crisis); *United

States v. Juan Carlos Aracena de Jesus*, 20 Cr. 19 (PAE) (S.D.N.Y. July 1, 2020)

(substantial downward variance from 30 to 37 months to six months in part

because of the "horrific conditions" at MCC during the pandemic); *United States v.

Pierson*, 14 Cr. 855 (LTS) (S.D.N.Y. May 4, 2020) (same for defendant detained at

MDC); *United States v. Mcrae*, No. 17 Cr. 643 (PAE), 2021 WL 142277, at *5

(S.D.N.Y. Jan. 15, 2021) ("[A] day spent in prison under extreme lockdown and in

fear of contracting a deadly virus exacts a price on a prisoner beyond that imposed by an ordinary day in prison. While not intended as punishment, incarceration in such conditions is, unavoidably, more punishing."); *United States v. Sharon Hatcher*, 18 Cr. 454-10 (KPF) (April 19, 2021) (reversing earlier denial of compassionate release and ordering that a defendant previously sentenced to 52 months immediately be released from confinement.  Judge Failla noted that "extreme lockdown conditions" had denied the defendant "mental health care, drug abuse treatment, and other important services" during her confinement, warranting immediate release.)

EDNY COVID Related Sentencing Adjustments

*United States v. Terrill Latney,* 18 Cr. 606 (JS) (E.D.N.Y. October 5, 2020) (downward variance from 360 months to life to 240 months for a violation of 18 U.S.C. § 1959, due in part to MDC conditions during the pandemic); *United States v. Juan Bravo-Mendez*, 18 Cr. 666 (DLI) (E.D.N.Y. August 28, 2020) (downward variance from 24 to 30 months to 18 months in an illegal re-entry case, taking into account the "difficult imprisonment conditions created by the COVID Pandemic" during defendant's imprisonment at the MDC); *United States v. Americo Migliore*, 20 Cr. 131 (DRH) (E.D.N.Y. April 19, 2021) (downward variance from 57 to 71 to 40 months for a violation of 21 U.S.C. § 841 (b)(1)(C), due in part to MDC conditions during the pandemic); *United States v. Garland Battle,* 20 Cr. 349 (EK) (E.D.N.Y. April 22, 2021) (downward variance from 30 to 37 months to 27 months for a violation of 18 U.S.C. § 922(g), noting in the Statement of Reasons that "The

conditions of Mr. Battle's detention are harsher than usual, given the ongoing pandemic."); *United States v. Saul Colon*, 15 Cr. 317 (MKB) (E.D.N.Y. November 20, 2020) (downward variance from 100 to 125 months to 18 months for a violation of 21 U.S.C. § 841 (b)(1)(C), due in part to MDC conditions during the pandemic.); *United States v. Carpenter*, 18 Cr. 362 (GRB) ("[T]he guidelines have not and at this point in history cannot have considered the effects of COVID and the other problems at MDC on the quality of incarceration.  So I do think that the time this defendant's already spent has been more punitive than it otherwise would have been.")

These downward variances have become a fairly standard judicial response to the circumstances faced by inmates at the MCC and MDC, as well as an attempt to lessen the tragedy that has defined incarceration over the past two years.  The only silver lining for William is that during the inescapable months of isolation, he has had quiet time to reflect on his life.  He never wants to be in this position again.  Indeed, for the first time in his life, William believes that a better world awaits his ultimate release – because he confides, he can't imagine it getting any worse.

Consistent with the Courts granting downward variances that recognize the harsh conditions associated with the nightmare at the MCC and MDC during the pandemic, we respectfully request that your Honor consider a variance substantially below the ten-year maximum that is "sufficient but not greater than necessary" to achieve the sentencing purposes of 18 U.S.C. §3553(a).

According to corrections expert Jack Donson, administrative/pre-trial environments, are transient and not intended to house inmates for prolonged periods of time." (*Id.*)  As a result, compared to facilities designed for long-term stays, the conditions at MDC and MCC are more restrictive:

> Inmates are confined indoors for a majority of the time and restricted to living in a small housing unit with limited movement. They have no campus, unlike almost all other federal correctional institutions and penitentiaries, and limited access to the outdoors." (Id. 12) Certain basic comforts are severely limited or absent entirely, like access to direct sunlight. At MDC, inmates have access only to "an enclosed unit terrace, no direct sunlight, with one gated wall where inmates are allowed to enter for a set period of time. Lack of access to sunlight can lead to Vitamin D deficiencies, especially over an extended period of time. Nwosu, B. U. et al. The Vitamin D Status of Prison Inmates. PLOS One, 2014, available                                                     at https://doi.org/10.1371/journal.pone.0090623 (comparing Vitamin D status across security levels, which determined inmates' access to sunlight). Vitamin D is essential to musculoskeletal health and deficiency increases risk for several diseases. *Id.*

Social science studies, case law and, increasingly, the American populace, recognize that indefinite or long-term solitary confinement – which is not at all dissimilar to the COVID lockdowns experienced by inmates at the MCC and MDC – is every bit as agonizing as physical torture.  The Guidelines were never drafted to envision this kind of catastrophic event and clearly, they do not adequately address any of these conditions.

The New York Times Editorial Board issued a scathing indictment of the handling of the pandemic by the penal system.  The details are familiar and

near universal – overcrowding, poor ventilation, small quarters, substandard

hygiene, unreliable access to personal protection equipment, uneven testing, poor

access to medical care and a population that "suffer[s] disproportionately from

comorbidities, such as high blood pressure and asthma, putting them at an elevated

risk for complications and death."[11]  The outcome is predictable – and, indeed, was

predicted.[12]  "The case rates among inmates are more than four times as high as

those of the general public, and the death rate is more than twice as high."  N.Y.

Times Editorial Board, *supra.*

      The circumstances of Mr. Scott's pre-trial detention in institutions

incapable of providing even the most basic needs to inmates and riddled with

outbreaks of the COVID pandemic – and interminable gang violence – warrants a

downward variance.  In addition to the perils of the COVID pandemic and gang

violence, inmates at the MDC have also been subjected to lengthy power outages,

which contributed to frigid temperatures and freezing drafts of cold air from outside

entering the cells during some of the coldest days of winter.  Inmates at the MDC

went for considerable periods with no heat, no extra blankets or extra clothing, no

hot water, no clean clothes, insufficient/non-existent medical care, canceled legal

---

[11] Editorial Board, *America Is Letting the Coronavirus Rage Through Prisons*, N.Y. Times (Nov. 21, 2020), https://www.nytimes.com/2020/11/21/opinion/sunday/coronavirus-prisons-jails.html.

[12] "'What happened — what's happening — it can really happen anywhere, particularly in an overcrowded prison, which unfortunately is the norm,' said Dr. David Sears, a physician and professor of medicine at the University of California, San Francisco, who toured San Quentin on June 13 and warned state officials about the emerging crisis. 'San Quentin's not the first prison to have a large outbreak, and unfortunately it won't be the last.'" Timothy Williams and Rebecca Griesbach, *San Quentin Prison Was Free of the Virus. One Decision Fueled an Outbreak.*, N.Y. Times (June 30, 2020) ("June 30 San Quentin Article"), https://www.nytimes.com/2020/06/30/us/san-quentin-prison-coronavirus.html.

and family visits, and days, weeks and months of lockdowns where inmates have been required to stay in their cells, and in some cases, their units, for days or weeks on end enduring these horrific conditions.  Despite numerous complaints, William was not provided any additional clothes or blankets, nor could he buy any at the commissary.

The Purposes of Sentencing are Satisfied by a Below-Guidelines Sentence

Based on the *Pimentel* letter written by the government, William hopes that your Honor will adopt a Guideline range of 57-71 months, rather than a term contemplated in the PSR.  The advisory range set forth in the PSR should not be followed because it: (1) is far greater than necessary to promote the goals of sentencing; (2) is out of balance with the purposes of sentencing, and fails to give due consideration to all of the factors set forth in 18 U.S.C. § 3553(a), as outlined above; (3) is the product of a Guideline system that is not based on empirical data and could not have considered the circumstances in which Mr. Scott is currently incarcerated; and (4) utterly fails to fully take into account the extreme conditions of confinement that William has endured, and will continue enduring, during his time in the MDC.

William Scott's circumstances supports the imposition of a sentence that is substantially-below the maximum term of imprisonment – indeed, a variance at or below the 57-71 month Guidelines range should be considered.  Extended incarceration cannot accomplish the purposes of sentencing and, in our respectful view, would violate the mandate of § 3553(a) that the Court impose a sentence

sufficient, but not greater than necessary, to achieve the purposes of sentencing.

<u>The Need for General and Specific Deterrence</u>

Here, the need to send a message of specific deterrence to William Scott has more than been accomplished by his stay at the MCC and MDC, respectively; and would not be undermined by the application of a downward variance. Indeed, the lessons William has learned being incarcerated for more than the last two years have helped him to imagine all of the ways that he must seek to improve his life – committing himself to a lawful way of life. Further, the media coverage of the grotesque conditions at the MDC, the notion of facing the threat of impending death on a near daily basis for the past two years – with nobody around him to care – or even notice – were he to live or die – has helped William realize that he has far too much to live for and way too much to lose to be involved in criminal activities going forward. He realizes that now – in a way he did not appreciate before. William is grateful to not be one of the inmates who have died in MDC custody since 2020.

As recently as August 16, 2022, the candidates for the open 10th Congressional District – Dan Goldman, Mondaire Jones, Yuh-Line Niou, Carlina Rivera, and Jo-Anne Simon – which includes the MDC in Sunset Park, Brooklyn, held a news conference outside the MDC and signed a letter to Attorney General Merrick Garland and Bureau of Prisons Director Colette Peters requesting that the "deplorable and inhumane conditions of confinement" and the "humanitarian crisis" be immediately addressed. (Ltr. of Candidates for Congress NY-10, annexed as Ex.

F.) The candidates focused on the desperation of four detainees, dying by their own hand, at MDC Brooklyn in the last two years; increased corruption since the transfer of the MCC inmates and 100 officers, and virtually non-existent medical care. (*Id.*)

As for general deterrence, there simply is no evidence that increases in sentence length reduce crime through deterrence.[13] "Three National Academy of Science panels, ... reached that conclusion, as has every major survey of the evidence." [14] William Scott has been deterred. We respectfully submit that nothing would be gained now by further extending his sentence of imprisonment.

---

[13] Of course, deterrence works in the sense that there is less crime with a criminal justice system then there would be without one. But the question here is one "marginal deterrence"; i.e., whether any particular quantum of punishment results in increased deterrence and thus less crime.

[14] Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime and Justice: A Review of Research 28-29 (2006) *see also* Andrew von Hirsch, et. al., *Criminal Deterrence and Sentence Severity: An Analysis of Recent Research* (1999).

Conclusion

In sum, consideration of all the factors contained in 18 U.S.C. § 3553(a), we submit, warrants imposition of a well-below maximum sentence for William Scott.  All the circumstances discussed above, militate strongly in favor of a sentence considerably below the Guidelines.

Dated: August 23, 2022
      Brooklyn, New York

Respectfully submitted,

*Susan G. Kellman*
_____
Susan G. Kellman, Esq.
Attorney at Law
25 Eighth Avenue
Brooklyn, NY 11217
718-783-8200
sgk@kellmanesq.com
*Attorney for William Scott*

_____
Eylan Schulman, Esq.
Schulman Trial, PLLC.
20 Vesey St., Suite 1400
New York, NY 10007
212-874-2500
eylan@schulmantrial.com
*Attorney for William Scott*

cc:    All Counsel

      Sandra Campbell, USPO

      William Scott