

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*United States District Courthouse*
*300 Quarropas Street*
*White Plains, New York 10601*

August 31, 2022

<u>BY ECF</u>
The Honorable Analisa Torres
United States District Court
Southern District of New York
Daniel Patrick Moynihan
500 Pearl Street
New York, New York 10007

Re:     ***United States v. William Scott, a/k/a "Ill Will,"*** 21 Cr. 429 (AT)

Dear Judge Torres:

The Government respectfully submits this letter in advance of the sentencing of defendant William Scott, which is scheduled for September 6, 2022. On June 23, 2020, the defendant committed a violent shooting in broad daylight on a busy residential street in the Bronx. The defendant shot a victim in the leg multiple times, right in front of the victim's children and their mother, shattering the victim's femur and causing life-long physical impairment. The shooting threatened the lives of numerous innocent bystanders, including the victim's family and the defendant's own six-year-old daughter, who stood across the street and watched as her father shot and attempted to kill the victim. A jury, when presented with overwhelming evidence of the defendant's guilt, swiftly returned a guilty verdict on April 14, 2022.

The defendant's participation in this brazen act of violence was just the latest crime in the defendant's lengthy criminal history, which now spans four decades and includes 12 prior criminal convictions. Indeed, the defendant committed this shooting while on pretrial release for another shooting where he shot a man in the chest. For the reasons described below, the Government submits that a Guidelines sentence of 120 months' imprisonment – as recommended by the Probation Department – is necessary to reflect the seriousness of the defendant's conduct, to protect the public from future acts of violence by the defendant, to promote respect for the law, and to ensure adequate general and specific deterrence.

A.      **Background**

On June 28, 2021, a grand jury returned an indictment charging the defendant with one count of being a felon in possession of ammunition (the "Indictment"). On April 14, 2022, following a four-day trial, a jury returned a guilty verdict. During trial, the Government presented overwhelming evidence of the defendant's guilt, including surveillance videos, witness testimony,

the recovered shell casings, crime scene photographs, ballistics analysis, the defendant's own text messages, law enforcement testimony regarding the defendant's arrest, and hospital records.

Taken together, the evidence at trial showed that on June 23, 2020, the defendant had an argument with one of the victim's daughters about a dog being let off-leash in the building's courtyard.  PSR ¶ 8.  The girl asked her mother to come downstairs and the mother confronted the defendant about yelling at her daughter.  *Id.*  The parties then went their separate ways.  *Id.*  Later that day, the mother told the victim's brother about the earlier dispute and the victim's brother said that he and the victim would speak to the defendant about the incident.  PSR ¶ 9.

Later that day, the defendant and his six-year-old daughter walked out of their apartment building.  The victim, the victim's brother, the mother, and the victim's five children were also outside of the apartment building enjoying the day and getting ready to drive to dinner.  PSR ¶ 9.  The defendant and his daughter walked to the corner deli, and the victim walked over to the deli as well, eventually joined by the victim's brother and friend.  PSR ¶ 9.  The defendant got into a verbal dispute with the victim and the victim's brother and friend.  PSR ¶ 10.  During the argument, the defendant pulled out a gun and began shooting at the victim.  *Id.*  The victim and his brother and friend ran for their lives down the street, along with several innocent bystanders who were outside.  The defendant left his daughter at the deli and turned around and slowly stalked the victim down the street.  *Id.*  With the mother and her five children just feet away, the defendant took aim at the victim and fired repeatedly.  *Id.*  Meanwhile, the defendant's own daughter ran in terror down the street, desperately searching for her father—the defendant—amongst the chaos, only to stand and watch him shoot the victim again and again.  *Id.*

The defendant ultimately shot the victim in the leg twice, causing the victim to fall to the ground.  *Id.*  Even as the victim lay defenseless in the street, the defendant showed no sign of stopping until the mother intervened, approached the defendant with her hands in the air, and said that the defendant would have to kill them all.  *Id.*  The defendant eventually started to run off to a waiting car, but even as he did so, he stopped and turned around and raised his arm towards the victim, making one last attempt to fire a shot at the victim.  *Id.*  The defendant and his daughter then got into the car and sped away, not even waiting for the daughter's door to close.  *Id.*

The mother then rushed her children and the victim to the hospital, where doctors found that the victim's femur was shattered and performed surgery to remove a bullet from the victim's leg.  PSR ¶ 11.  The doctors inserted a metal rod with several screws into the victim's leg.  *Id.*

Law enforcement recovered three shell casings from both locations where the defendant was captured on video shooting the victim.  Ballistics analysis confirmed that the shell casings were fired from the same gun, and a Special Agent from the Bureau of Alcohol Tobacco, Firearms, and Explosives determined that the shell casings were all manufactured outside of New York.  PSR ¶ 12.

Almost immediately after the shooting, the defendant sent text messages about needing to find an "outta town spot ASAP," and approximately two weeks later, law enforcement arrested the defendant in Kingston, New York, which is approximately 100 miles away from the defendant's apartment in the Bronx.

**B.      The Applicable Guidelines Range**

The Government respectfully submits that the Presentence Investigation Report ("PSR") correctly calculates that the defendant's offense level is 37 and his criminal history category is II, which would result in a Guidelines range of 235 to 293 months' imprisonment. Because of the statutory maximum sentence of imprisonment of 120 months' imprisonment, however, the Guidelines Sentence is 120 months' imprisonment.

The defendant raises two objections to the PSR's calculation of the Guidelines: (1) the application of the attempted first-degree murder guidelines under U.S.S.G. §§ 2K2.1(c)(1)(A) and 2A2.1(a)(1)(A); and (2) the application of a four-level enhancement for permanent bodily injury to a victim under U.S.S.G. § 2A2.1(b)(1)(A). Both of these objections should be rejected because the enhancements are supported by overwhelming evidence.

**1.      The Attempted First-Degree Murder Guidelines Apply Here**

The defendant first argues that he did not commit an attempted first-degree murder because he was "not charged with attempted murder," "there is no indicia [the defendant] intended to cause the victim's death, and [the defendant's] actions were not premeditated." (Def. Submission at 6). Each of these arguments should be rejected.

To begin with, the fact that the defendant was not charged with attempted murder is wholly irrelevant. The Sentencing Guidelines plainly instruct that where, as here, the defendant used or possessed ammunition "in connection with the commission or attempted commission of another offense . . . apply (A) § 2X1.1 (Attempt Solicitation or Conspiracy) in respect of that other offense, if the resulting offense level is greater than that determined above." U.S.S.G. § 2K2.1(c)(1)(A). Section 2X1.1(a) provides that the base offense level is the "base offense level from the guidelines for the substantive offense."[1] As a result, U.S.S.G. § 2A2.1 applies here if the defendant used the ammunition in connection with an assault with intent to commit murder or attempted murder. As further discussed below, the evidence overwhelmingly that this shooting was an attempted murder.

Second, the defendant plainly intended to kill the victim. As the evidence at trial showed (GX-402A and GX-402C), the defendant first pulled out his gun in front of a deli during an argument with the victim and fired at least one shot at the victim at close range. The victim fled from the defendant down the street towards the victim's family. Instead of ending the incident, however, the defendant calmly stalked the victim down the street and fired at least two more shots at the victim at close range. The fact that the defendant stood just a few feet away from the victim and fired his gun directly at him at least three different times, is alone clear evidence of the defendant's intent to kill. Indeed, where someone repeatedly fires a gun at close range directly at another person, the only logical conclusion is that the shooter is intending to kill the target. In fact, it is by pure luck that the victim, or other innocent bystanders like the victim's children, were not killed by the defendant's smattering of shots on a busy residential street.

---

[1] Section 2X1.1(b) sets forth specific offense characteristics that can decrease the offense level for attempt, conspiracy, or solicitation, but there is no argument that any such provision applies here.

Courts have thus routinely inferred an intent to kill where a defendant fires at a victim at close range. *See, e.g.*, *United States v. Atehortva*, 69 F.3d 679, 687 (2d Cir. 1995) (concluding that a district court could find intent to murder where there was "undisputed evidence that [the defendant] repeatedly fired a gun at federal agents from close range"); *United States v. Stroman*, 498 F. App'x 67, 69 (2d Cir. 2012) (affirming district court determination that attempted murder was intentional based on observation that surveillance video showed that defendant pursued two men into a grocery store and fired gun at them at close range); *United States v. Muyet*, 994 F. Supp. at 518-19 (collecting New York state cases which outline intent to kill, including cases involving defendants who point and fire guns at their intended victims at close range); *United States v. Ashburn*, No. 11 Cr. 303 (NGG), 2015 WL 5098607, at *17 (E.D.N.Y. Aug. 31, 2015) (citing New York state cases which establish that "shooting a firearm at close range generally evidences the intent to kill, not seriously injure"); *United States v. Rodriguez*, No. 12 Cr. 73 (JGM), 2015 WL 3454725, at *2 (D. Vt. May 29, 2015) ("[F]iring multiple shots at close range and preventing any mitigation of the damage is sufficient to establish intent to kill.") (citations omitted), *aff'd*, 626 F. App'x 314 (2d Cir. 2015); *see also People v. Gonzalez*, 216 A.D.2d 412, 628 N.Y.S.2d 726, 727 (1995) (intent established by defendant's overt acts of brandishing gun, turning it towards the intended victim, and firing it at least twice); *People v. Van Buren*, 213 A.D.2d 504, 623 N.Y.S.2d 906, 907 (1995) (evidence sufficient to establish attempted murder where defendant pointed gun at police officer and fired).

In addition to shooting at the victim at close range, the defendant also chased after the victim in order to continue shooting him, which further evidences a clear intent to kill. As described above, the defendant initially pulled out his gun and fired at the victim outside the corner store. But the defendant did not stop there. While the victim ran for his life, the defendant hunted him down the street, where he continued taking aim and firing directly at the victim. The defendant took pauses between his shots, tracking the victim's movements and attempting to get a clear shot at the victim. Seeing that he had not successfully killed the victim, the defendant showed no sign of stopping his violent rampage until the mother of the victim's children heroically intervened to save her children's lives. She managed to convince the defendant, who knew he had limited time to flee, that he should leave. And even as the defendant fled to his getaway car, he still turned around and raised his arm at the victim, trying to get one last shot at the victim.

Third, the above-described conduct also establishes that the defendant's actions were "willful, deliberate, malicious, and premeditated" for purposes of U.S.S.G. § 2A2.1(a)(1), which incorporates the definition of first-degree murder in 18 U.S.C. § 1111. The defendant appears to have walked to the corner deli carrying a gun after a dispute earlier that day with the victim's family, which alone is some indicia of planning. Moreover, even if the defendant's first shot outside the corner deli was not premeditated, the remaining shots clearly were. After the defendant first shot at the victim and the victim ran away, the defendant made a considered choice to continue hunting down the victim. Indeed, the surveillance video showed the defendant calmly saunter down the street, following the defendant, and then shoot at him again and again. The defendant also took time, raising and lowering his arm multiple times as he attempted to get a good aim at the victim. Premeditation does not need to be formed any set amount of time prior to the shooting, rather it only requires enough time "after forming the intent to kill, for the killer to have been fully conscious of the intent and to have considered the killing." *United States v. Whiteside*, 207 F. Supp. 3d 311, 321 (S.D.N.Y. 2016) (internal citation and quotation omitted). Defendant's actions

here plainly evidenced a fully conscious and considered intent to kill, demonstrating that the defendant committed an attempted first-degree murder.[2]

### 2.      The Defendant Caused Permanent Bodily Injury to the Victim

The defendant next argues that the record contains insufficient evidence that the victim sustained permanent bodily injury as a result of being shot in the leg two times, which resulted in a metal rod and three screws being inserted into the victim's leg.  (Def. Submission at 7).  As set forth below, the victim's hospital records and information provided by both the victim and the mother of the victim's children, support, at least by a preponderance of the evidence, that the victim's mobility has been permanently impaired as a result of being shot in the leg twice.

U.S.S.G. § 1B1.1, Application Note 1(k) defines "permanent or life-threatening bodily injury" as, among other things, the "loss or substantial impairment of the function of a bodily member, organ, or mental faculty that is likely to be permanent."  Here the victim's medical records, as introduced at trial, (GX 801), make clear that the victim was shot in the leg twice and that one of the bullets became lodged in the victim's leg.  Doctors performed surgery on the victim's leg to remove the bullet and, upon finding that the victim's femur had been shattered, inserted a metal rod and multiple screws into the victim's leg.  Both the victim and the mother of the victim's children described to the Government the nature of the permanent injuries the victim sustained as a result of this shooting.[3]  The victim told law enforcement that it took him about 10 to 12 months before he was able to walk normally, and described how his injuries have permanently impacted his mobility.  In particular, the victim explained that he is not supposed to put weight on the impaired leg, that his foot has permanently turned in, and that he is not able to run and jump and play sports with his children as he previously did.  The mother of the victim's children further confirmed that she has observed how the shooting has permanently impacted the way in which the victim sits and walks, and described how the victim is unable to run and jump as a result of the injuries to his leg.

---

[2] And even if the Court finds that there was insufficient evidence of premeditation, there can be no question that the shooting was intentional and therefore constituted an attempted second-degree murder, which would still result in a Guidelines sentence of 120 months' imprisonment.

[3] A copy of the Government's proffer notes reflecting meetings with the victim and the mother of the victim's children is attached hereto as Exhibit A.  It is well-established that the Court can properly consider hearsay evidence at sentencing.  *See United States v. Gomez*, 580 F.3d 94, 105 (2d Cir. 2009) ("The sentencing court's discretion is largely unlimited either as to the kind of information it may consider or the source from which it may come. . . .  A sentencing court is free to consider hearsay evidence. . . ."); *see also United States v. Kirk Tang Yuk*, 885 F.3d 57, 83 n.14 (2d. Cir. 2018) ("[T]he District Court was nevertheless permitted to consider [hearsay] in calculating [defendant's] Guidelines range.").

### 3.      The Government's Previous *Pimentel* Letters are Not Relevant

The defendant also argues that the Court should adopt the Guidelines calculations from a *Pimentel* letter the Government provided to defense counsel in November 2021, more than four months before trial.  But this request should be denied for at least three reasons.

First, the Government's November 2021 *Pimentel* is not binding on the Court's determination of the Guidelines.  As the Second Circuit has instructed, this Court must independently calculate the Guidelines, regardless of any agreement between the parties or, in this case, any *Pimentel* letter.  *See United States v. Rendsland*, 648 Fed. App'x 104, 107 (2d Cir. 2016).  Based on the evidence presented at trial, as detailed above, the defendant's offense level is 37, and because of the statutory maximum sentence of imprisonment of 120 months' imprisonment, the Guidelines Sentence is 120 months' imprisonment.

Second, the plain language of the November 2021 *Pimentel* letter makes clear that the letter was not binding and subject to change.  Specifically, the letter expressly states that, "[n]othing in this letter limits the right of this Office (1) to change its position at any time as to the appropriate Guidelines calculation in this case, even if that change is based, in whole or in part, on information that was in the Government's possession as of the date of this letter; and/or (2) to present to the Court or the United States Probation Office, either orally or in writing, any and all facts and arguments relevant to sentencing that are available to the Office at the time of sentencing."  Thus, by its very terms, the Government reserved the right to change its views on the applicable Guidelines calculations.  Indeed, the Government did change its view and provided defense counsel with a revised *Pimentel* letter on March 29, 2022, in advance of trial, which calculated the Guidelines consistently with the calculation set forth in the PSR.

Defense counsel's accusation that the Government is somehow punishing the defendant for exercising his right to trial is simply unfounded and belied by the record.  (Def. Submission at 7).  Far from causing surprise or punishment, the defendant was on notice of the Government's view of the Guidelines *in advance of trial* based on the March 29, 2022 *Pimentel* letter.  (*See* Ex. B (Mar. 29, 2022 *Pimentel* letter)).  Between the November 2021 *Pimentel* letter and the March 2022 *Pimentel*, the Government gathered additional evidence and further refined its trial proof, all of which contributed to a higher Guidelines level in the March 29, 2022 *Pimentel* letter.

## C.      Discussion

### 1.      Applicable Law

As the Court is well aware, the Sentencing Guidelines still provide strong guidance to sentencing courts following *United States v. Booker*, 543 U.S. 220 (2005), and *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005).  Because the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," *Gall v. United States*, 128 S. Ct. 586, 594 (2007), district courts must treat the Guidelines as the "starting point and the initial benchmark" in sentencing proceedings.  *Id.* at 596.  After that calculation, however, the Court must consider the seven factors outlined in Title 18, United States Code, Section 3553(a), which include the nature and circumstances of the

offense, the individual characteristics of the defendant, and the need to adequately deter criminal conduct and promote respect for the law. *Id.* at 50 & n.6.

### 2.  A Guidelines Sentence Is Necessary in This Case

The Government respectfully submits that a sentence of 120 months' imprisonment – the statutory maximum sentence – is necessary to achieve the legitimate purposes of sentencing. In particular, a Guidelines sentence is appropriate given the seriousness of the defendant's conduct, the need to protect the public from the defendant, the need to promote respect for the law, and the need to assure both general and specific deterrence.

*First*, the incredibly serious nature of the defendant's conduct justifies a 120-month sentence. The defendant's shooting in broad daylight in the middle of a residential neighborhood could have easily killed the victim or an innocent bystander, including one or more of the victim's five children or the mother. The defendant's senseless actions not only placed multiple lives in danger, it caused serious physical injury to the victim and traumatized the victim's young children and their mother. At trial, the mother of the victim's children testified through tears, recounting the horrific events of that day that are engrained in the memories of her and her children even now, years later. (Tr. 198-206). Thus, this conduct – in and of itself – justifies a Guidelines sentence.

*Second*, a Guidelines sentence is also necessary to protect the public from future acts of violence by the defendant. This is the defendant's twelfth conviction, and most concerning, the defendant's second conviction arising from the defendant having shot someone. In addition, as noted above, the defendant committed this shooting while on pretrial release for his other shooting. Simply put, the defendant is a violent person who time and again chooses to use guns to harm other individuals without any regard for the safety of others, including his own daughter. He is a danger to the community, and his detention for 120 months is critical to protecting the community at large.

*Third*, a Guidelines sentence is also appropriate to ensure general and specific deterrence. With respect to general deterrence, a Guidelines sentence would send an important message that individuals with felony convictions who use ammunition to repeatedly shoot at another person will face a serious sentence of imprisonment. As Your Honor is no doubt aware, increasing gun violence is having a significant impact on our communities, many of whom, as reflected in the instant offense are being forced to live amongst ongoing threats of violence erupting on their street at a moment's notice.

With respect to specific deterrence, as set forth above, this is the defendant's twelfth conviction, and most troubling, the defendant's criminal conduct appears to have sharply increased in severity in the last few years. While many of the defendant's convictions were for more minor offenses and were from long ago, the sheer number of convictions is concerning, as is the fact that the defendant has become increasingly violent in recent years. Indeed, approximately four years before the instant offense, the defendant shot another man in the chest. Accordingly, while defense counsel claims that the likelihood of recidivism decreases as individuals age, the defendant's conduct evidences increasingly serious criminal conduct in his older age. Also relevant to specific deterrence is the fact that the defendant appears not to have taken responsibility for his actions. Not only did the defendant choose to proceed to trial despite overwhelming evidence of his guilt,

but even after a swift jury verdict, the defendant continues to make excuses for his actions – falsely claiming he was threatened by armed men and acting to defend his daughter.

### 3.  The Defendant's Arguments For Leniency Should Be Rejected

The defendant asks the Court to impose a below-Guidelines sentence, but none of the defendant's arguments are persuasive.

*First*, the defendant points to the difficulties he faced in childhood growing up in the Bronx with a single, working mother.  While the Government acknowledges these difficulties, a substantial portion of individuals who appear before the Court for sentencing have also had difficult upbringings, with many far worse than reported in the defendant's PSR.  And while the defendant's background is a relevant consideration for the Court, so is the fact that the overwhelming majority of people with difficult upbringings do not choose to shoot someone repeatedly in the middle of a residential street, with numerous children nearby.  Indeed, as reported in the PSR, the defendant's own siblings have full-time jobs and are productive and contributing members of society, without any history of alcohol abuse, drug use or illegal conduct.  PSR ¶ 53.  Moreover, the defendant was almost 42 years old at the time he committed this shooting.  Accordingly, as a middle-aged man, he has had decades to learn from his mistakes and to understand the consequences of his actions.

*Second*, the defendant claims to be an exemplary and dedicated father to his three children and asks the Court for a lenient sentence so he can continue playing a positive role in his children's lives.  (Def. Submission at 10-11).  But the instant offense and facts detailed in the PSR belie this assertion.  As clearly shown in the surveillance footage introduced at trial, (GX-401G, GX-402A), the defendant *abandoned* his six-year-old daughter at a corner deli so that he could chase and repeatedly shoot another man.  The defendant's daughter, visibly terrified by the chaos that erupted from her father's shooting, is seen running towards the shooting, and then standing alone, watching, as her father repeatedly shoots another man.  Not only was her life put in danger by the defendant's actions (she easily could have run into the line of fire), but one can only imagine the untold trauma this shooting has caused her.  And while the defendant may wish to play a positive role in his children's lives, his actions – by repeatedly shooting at the victim on that day in June 2020 – do the opposite.

*Third*, the defendant claims that he committed this shooting to protect his daughter.  (Def. Submission at 11).  This argument is wholly false, and only demonstrates that the defendant remains unwilling to accept responsibility for his actions *even after* his conviction.  The defendant claims that he was threatened on June 23, 2020 "when three armed men chased after [the defendant] and his daughter."  *Id*.  However, there is absolutely no evidence that anyone aside from the defendant was armed when the defendant got into an argument outside the corner deli with the victim and the victim's brother and friend.  Indeed, had any one of the three other individuals had a gun, they certainly would have pulled it out in self-defense, as the defendant repeatedly shot at the victim at close range.  As reflected in the video, the victim stood defenseless as the defendant fired his multiple rounds.  Indeed, it was only *after* the defendant fled that the victim's brother was able to unlock the car to recover a gun and chase after the defendant, who had long since left the scene.  Contrary to defense counsel's submission, if nothing else, the

presence of the defendant's daughter should have been the reason the defendant chose *not* to commit this shooting.

*Finally*, the defendant seeks a below-Guidelines sentence based on the conditions of his confinement in light of the COVID-19 pandemic. The Government recognizes that prison conditions have been more difficult during COVID-19 as facilities have taken a wide range of steps aimed at preventing and controlling the spread of COVID-19.  While this is of course a factor for the Court's consideration, the Government respectfully submits that it does not justify a sentence below 120 months' imprisonment based on the other Section 3553(a) factors, including, most notably the nature and circumstances of the offense.  Indeed, but for the statutory cap on the offense, the nature and circumstances of the offense would support a sentence well above 120 months' imprisonment.

**D.    Conclusion**

For the reasons set forth above, the Government respectfully requests that the Court impose a sentence of 120 months' imprisonment.

Respectfully Submitted,

DAMIAN WILLIAMS
United States Attorney


by:   /s/ Courtney Heavey
      Courtney L. Heavey
      Andrew Chan
      Alexandra Rothman
      Assistant United States Attorneys
      (212) 637-2413 / 1072 / 2580